Gmail

Richard Riordan <rriordan723@gmail.com>

# Letter to the Board, Administration and others. On Budget and Public Comment 05/06/2026

1 message

**Richard Riordan** <rriordan723@gmail.com> Mon, May 18, 2026 at 3:31 PM
To: rustj@lanecc.edu, maldonadoj@lanecc.edu, mulhollandz@lanecc.edu, boecomment@lanecc.edu, alltuckerk@lanecc.edu, Austin Folnagy <folnagya@lanecc.edu>, mitals@lanecc.edu, Weismannj@lanecc.edu, bulgers@lanecc.edu, flathk@lanecc.edu, lccea@lanecc.edu, lccef@lanecc.edu, Shelley Tinkham <TinkhamS@lanecc.edu>, lanesga@my.lanecc.edu, president@my.lanecc.edu, vicepresident@my.lanecc.edu, senator1@my.lanecc.edu, senator2@my.lanecc.edu, senator3@my.lanecc.edu, senator4@my.lanecc.edu, senator5@my.lanecc.edu, senator6@my.lanecc.edu, senator7@my.lanecc.edu, senator8@my.lanecc.edu, freij@lanecc.edu, lin@lanecc.edu
Bcc: hilltk@lanecc.edu, Clay Williams <WilliamsC@lanecc.edu>, Daphne Gabrieli <GabrieliD@lanecc.edu>, SenaP@lanecc.edu, mitchella@lanecc.edu, pastosz@lanecc.edu, simmonsws@lanecc.edu, sacklinj@lanecc.edu, pearsonm@lanecc.edu, Richard F Riordan <riordanrf@lanecc.edu>, bockovend@lanecc.edu, borrowdalej@lanecc.edu, burleyh@lanecc.edu, escobarj@lanecc.edu, gilbertd@lanecc.edu, MurphyCJ@lanecc.edu, rowlettb@lanecc.edu, saltj@lanecc.edu, soriano-cervantesl@lanecc.edu, TurnerMS@lanecc.edu, GrijalvaC@lanecc.edu, raesi@lanecc.edu, rattanr@lanecc.edu, nicholsbd@lanecc.edu, isaacsonn@lanecc.edu, ArtsteinM@lanecc.edu, kime@lanecc.edu, ofearghailc@lanecc.edu, ky@kyfights.org, frasierj@lanecc.edu

**[LENGTH WARNING: Feel free to throw this into chatgpt or whatever to summarize it for you. We have the technology to spark-notes anything. If reading long chunks of text is hard at an ability level or due to time constraints I understand I've been there. But in this day and age, length isn't an adequate reason to not engage with content anymore given the technology available. Other than that, have a nice read and day, thanks!]**

Dear Lane Community College Board of Education, President Bulger, Student Government, President Olson, and whoever else is receiving this letter:

I'm a student at Lane Community College, and I am increasingly concerned about whether the values this institution claims to hold dearly are being practiced in any sense that matters. In a public college, values are not something you stick onto a piece of laminated wood like a "Live Laugh Love" sign from Ross Dress for Less. They are supposed to govern conduct, especially when doing so becomes inconvenient. When values are treated as decorative language that are fashionable to say rather than binding commitments, and when they are bent around a bottom line, the consequences are not abstract nor can be insulated into spreadsheets

on a powerpoint.

That being said, what has mobilized me to such an extent is not only seeing my family impacted but my friends losing their financial aid as a result of decisions made at the board. Those same students were pretty much told that not only can they simply go to Klamath Falls without Lane's support services but that they have been verbally assured of individual counselors to help them through this peril. A real “Let them eat cake” moment of our time. A letter on that point will be made separate as the events of 4/22/2026 really do require its own study to unpack in detail. However the 4/22/2026 Board of Education meeting is not within the scope of what I want to talk about here. Having attended the Board of Education meeting on 5/6/2026 and reviewing the recording of it, it brings up more concerns than answers. More concerns than what was outlined in my last email to the board that night. That's why the scope of who is receiving this email has been broadened to a considerable degree.

**On Budget**

There is something difficult to reconcile in the college’s discourse surrounding the budget. This is not about the budget in the ordinary sense (numbers and such), people more familiar with that sort of thing have undertaken that task. Rather, this is an exploration on how rhetoric surrounding the budget’s importance appears to be discretionary, in character. During public comment, Jen Sacklin revealed that public funds were spent on something peculiar, and she spared no expense on details: performers from Buffalo, New York, including a juggler with his sidekick, accompanied by a singer in a sequin vest performing Elton John's "I'm Still Standing." Jen’s words captured the feeling exactly: “I’m sorry Rick and Christina and Kevin and Sarah and Jenny and Alan and all the upcoming C3 cuts. I’m sorry you lost your positions, but at least you got to see some juggling before you leave.”

There is a bit of cruelty in that, but cruelty has never been a foreign entity to austerity. That's what made Vice President of Finance Kara Flath's slide, titled "A Moment of Celebration" so poetic. At a time when people were being asked to accept loss of livelihoods as a necessity, the institution still found room for ceremony. Although it lacked Elton John and the likeability that came with his music, the performance at the podium was sufficiently present.

What stands out to me the most however is the contradiction. Administration appears to be committed to two opposing positions at once: that Lane Community College is in a serious budget crisis, but not crisis enough to rule out performers from out-of-state. This is a fascinating method of financial discipline, and its formulation is something that's worth examining: announce scarcity, then use that scarcity to justify program cuts, then do a 180 by performing abundance, and finally return to the public with a straight face and explain that the programs had to go because of scarcity. This kind of spin is interesting because it depends rather heavily on the public developing a sudden weakness for chronology.

Jen's use of "bread and circuses" was no abstraction either. In ancient Rome, bread and circuses distracted the public from what a poor job the Emperor was doing. You got to see Russell Crowe in the Colosseum doing cool stuff like fighting Hollywood villains or something and you got free bread. Here, the comparison is nearly perfect. You do have people on campus and at building 3 who do a lot of performance instead of anything real but there are differences that are more notable than the distinct lack of Russell Crowe. We still have to pay for food on campus. And, Lane Community College is still a public institution, the people responsible are still accountable to the public. They do not have the luxury to stand above the public (this will be important later.)

All that aside, my main point of contention is whether the budget crisis is being handled properly by (allegedly) responsible people. If the crisis were real, material, and as dire as it has been claimed to be, one would expect money to be spent with great care. Instead, the budget appears to exist in a sort of administrative superposition: it assumes the characteristics of a fiscal emergency in the presence of austerity, and also assumes the characteristics of fiscal flexibility in the presence of an emotional need for opulence. On this point, I see a notable discrepancy between the administration's claims and the actual state of affairs.

(Hi, side note: there's also that weird need to keep that sweet six figure salary for managers while some faculty qualify for food stamps but I don't think people are emotionally ready for that conversation yet. I just find it funny that whenever cuts are announced, it's always programs and whatnot that get gutted but the people who push for that never ask themselves "How can we contribute for the greater good?" Something quite similar happened at Portland Community College and I assure you that is not a model of administration worth trying here. I guess what I'm trying to say is here is that the whole "Cuts for Thee but Not For Me" mentality that has taken administration by storm really does read like this image:




**On Public Comment**

This is my main point of contention. It is afterall the most alarming yet the most revealing. Before we get into it we must understand what the Ad Hoc Committee on Public Comment is, and whether or not anything might be contrary to its function.

https://pub-lanecc.escribemeetings.com/FileStream.ashx?DocumentId=664

(From Ad Hoc Committee on Public Comment - Recommendation 3.26.2026)

**Stated Values:** The Ad Hoc Committee on Public Comment affirms that Lane Community College places a high value on meaningful public engagement and the role that public input plays in effective governance. The committee recognizes that public comment is an important way for community members, students, employees, and stakeholders to share perspectives with the Board of Education.

In developing these recommendations, the committee was guided by the following values:

● Respect for the First Amendment and the importance of protecting the public's right to speak.

● Commitment to high-quality public involvement, ensuring community members have meaningful opportunities to engage with the Board.

● Prioritization of student voices as a central constituency of the college.

● Support for effective Board governance, ensuring the Board can efficiently conduct the business of the college.

● Transparency and accountability in the public comment process.

● Safe and respectful discourse, fostering an environment where individuals can participate without intimidation or personal attacks. The committee believes that policies and procedures governing public comment should balance these values by encouraging robust participation while maintaining a respectful and orderly meeting environment.

Now that we have the stated values and what values guided these recommendations. Now what are these recommendations?

**Recommendations for Board Consideration**

The Ad Hoc Committee on Public Comment recommends the following items for consideration by the Board of Education:

1. Maintain the current individual speaking time limits for public comment:

○ Three minutes per speaker under standard circumstances.

○ Two minutes per speaker when 20 or more individuals are signed up to speak.

2. Establish a time cap for public comment during public hearings, with the full Board determining the appropriate overall time limit.

3. Consider randomizing the order of public speakers to ensure fairness and equity in the speaking process.

Only one recommendation stands out as contrary to the committee's stated values: Recommendation No. 2. I anticipate someone may hide behind "ensuring effective Board governance" as though that phrase settles the matter (it doesn't.) Nearly every other value concerns public speech, student voices, participation, transparency, accountability, and the First Amendment. Then, sitting among them, is one value about the Board conducting business efficiently, that is the contradiction. It asks public-facing values to make room for Board convenience as if it were on equal footing.

Efficiency has its place sure, but public comment does not exist to keep the Board's evening tidy. It exists so those entrusted with public power must sit in the presence of the public they affect. Efficiency may sound cool and normal in isolation, but it has an extensive record of lending respectable language to less respectable intentions and appealing to even less respectable individuals. (And believe me, such individuals are not distant from us.)

This observation is not abstract; one member of this board has made a regular practice of keeping the public at digital distance while now leading the effort to reduce how much of the public must be heard at all, Julie Weismann. In the spirit of fairness, let us examine her words verbatim (with "ums" and "ers" removed) from the 05/06/2026 BOE meeting on this point. I have bolded and numbered several peculiar assertions so the reader can compare the statement itself with the analysis that follows:

"You know, **[1] none of us want to, like, curtail public comment at all** and I like where you guys have gotten to on some of these recommendations, and I appreciate it. I watch your meetings on YouTube and listen to the conversations about this. This is not an easy decision to make. **[2] However like tonight we had a small group of people who spoke. We've been able to move through this agenda. We still have a little bit of time to be able to cover some stuff. So we got some substantial work done.** I applaud us, but this is an example of why we're having this conversation about public comment, because when public comment

goes to two – three hours, we then, our timeline is just scrunched, and we just can't get to these kinds of discussions. We can't get to longer, substantive conversations at all for approving things. **[3] So I don't know how to put a time cap on the public comment**, but I would like really like to put maybe suggest that there's **[4] a kind of an absolute hard stop for board meetings**, right? And so that may be that we have to calculate that there's 60 people in the room that want to do public comment. If they get two minutes, that's two hours. So now that only gives us a couple of hours left. We have to have a full stop at some point. We can't just go on to two o'clock in the morning, or one o'clock in the morning, 11, 12. **[5] We're volunteers.** So, I want to do it. The rest of the stuff, I'm okay with the one-minute mark. Fast 40 might be a way to address that. I like that we want to clean up that language about students. **[6] They are always going to be the first speakers. [7] The public can communicate with us at any time.** We have public email addresses, and all communications to us from the public are not anonymous. They're public. So public comments are public. There's no such thing as an anonymous public comment. So, **[8] public comments through emails is great.** They're going to be set there. We know that the board packet is available. Board members are expected to be prepared for the meeting. So, **[9] the appropriate place, in my opinion, for public comment being emailed up to 24 hours**, because they've been populated even before them as they come in. When we had the, gosh, I think we had a dozen public comments in one of our last meetings all hit via email, and had an opportunity to be able to read all those before our meeting. But they were in the board packet and I knew they were there. I'm not sure that we want to have them being just one at a time. **[10] I think they'd get lost in the morass and our email inboxes would be huge. I think the appropriate place for this is in the board packet online.** And we know they're there. Yeah, I think that says it. Thank you." [Lane Community College. "Board of Education Meeting." YouTube video, May 6, 2026. Remarks by Julie Weismann 03:14:25. https://www.youtube.com/watch?v=_XGnpIcWfh8]

[1] Forthrightly, Julie states that in no uncertain terms does she not wish to curtail public comment. However, she then spends the rest of her statement describing the very mechanisms by which public comment can be stopped, displaced, administratively contained, or, one might say, curtailed. Now it's easy to forgive this since being coherent is hard sometimes, but this was no accident on her part. This is an interesting form of denial, undermined almost immediately by what follows it. The fundamental contradiction on Julie's part invites one to examine her rhetoric and conduct in more detail as it spares no expense as to how revealing the rest of it is.

[2] Julie states that “tonight we had a small group of people who spoke,” and presents this as part of why the Board got “substantial work done.” This is quite revealing as it shows what is important to her. In Julie’s formulation of governance: the work improves proportionally to how much public participation disappears. Public participation, in this telling, is not part of the Board’s work but instead, it is merely an inconvenience that the Board must get through before the “real work” can begin. This is an uncommon theory of democracy: rule by the people, just without the participation of the people. It's uncommon mostly because democratic governments with public participation sidelined are not, in fact, democratic.

(Yes this gets much worse)

[7-8-9] Stating “the public can email us” is not the answer Julie seems to think it is. (She also doesn’t read or respond to them anyways according to a lot of people but like that’s a side thing.) Emails can be received without being read and filed without being answered. Live public comment is difficult to sit through precisely because it cannot be quietly shoved away into a file you don’t have to read. The false equivalence between emails and live speakers rests on an unusually narrow understanding of public accountability. This may reveal the hidden impulse to curtail public comment in some capacity.

[3-4] Julie states she does not know how to put a time cap on public comment, and then, with admirable proficiency, describes a time cap under the name “an absolute hard stop.” It’s such a fine thing to watch: someone refusing a proposal, by inventing the same proposal under a different coat of paint. Either by some miracle there was an accidental attempt at deception or she really did not expect anyone to notice, I’ll leave that up to the reader to decide.

[6] There is also an assurance that students will always speak first. This does not address the broader issue at all. In function, the framing of this asks the public to admire the order of entry while ignoring that the door is being narrowed. Also suppose there are for example 30 or 60 students. That's 1-2 hours on its own, clearly something Julie would be not happy with. (Are you beginning to see why this doesn't address the fundamental problem yet?)

[10] This one gives away the game here even more. In Julie's proposition: the public can communicate at any time, unless the public communicates too much, because then democracy has to take a backseat to an inbox's tidiness. "The First Amendment is alive and well, just don't clutter my inbox please and instead shove it into the board packet online where your concerns are thanked, filed away, admired for the silence, and ignored with even greater ease." This is quite the theory of public engagement: the public may speak whenever it likes, just as long as nobody has to deal with the inconvenience of hearing them. In her statement Julie keeps implying that public comment takes too long. Do you think that maybe her real complaint is that she has to deal with it at all?

[5] This is probably the most egregious assertion, and its irony is exceeded only by its weakness. But weak arguments have a habit of exposing strong motives. It is rich in the sense that it reveals her reflexive formulation of what governance means to her. Thus, the real impulse is laid bare for all to see: "We're volunteers."

How should one tackle this? For starters, Julie Weismann sought public office, campaigned for public

office, won public office, and now invokes the language of volunteerism for pity when public accountability becomes inconvenient. It's even more perverse when you consider that on both 4/22/2026 and 5/6/2026 students were dealing with midterms and still showed up in person. The faculty took time out of their already demanding lives and still showed up in person. All this to say, community members came in person and stayed late because the Board's decisions affect their programs, jobs, education, and futures.

And now the public is asked to pity the burden placed on a board member who routinely attends from the comfort of a Zoom window, where she can continue to roll her eyes, interrupt people (with justifications that are dubious at best), conduct herself rudely, facepalm, eat food, and complain that the people physically present in the room are taking too long to have their say. The joke writes itself here. It takes a special kind of self-important entitlement to seek out the authority of public office, avoid much of the physical burden of public attendance, and then complain that the public has become too present. Julie Weismann has not demonstrated character enough, merely by calling herself a volunteer, to place her complaints on equal footing with the students, faculty, and community members who came in person to defend their futures. Not one of them would be complimented by being put on an equality with her. While students were trying to protect their futures, and faculty were trying to protect their programs and jobs, Julie is now bravely trying to protect her bedtime, all from the comfort of her home with access to a mute button. That's what makes her complaints all the more funny.

The people most affected by the decisions, in part pushed by Julie, appear willing to bear the price of democracy. Julie appears annoyed that she must witness it, and is now leading the charge to subvert it. It raises the question: has it ever occurred to her that maybe so many people show up for public comment because they have a lot to say about what the board is doing? Perhaps public office is not her thing since it

has the unfortunate tendency to involve the public. It's such a pity, surely, to seek public power then discover that not only must one be responsible but the public is attached to that power. Now we have to cry crocodile tears for her and not, I don't know, maybe recent outcomes pushed by Julie that gutted two programs and threw students' academic futures in peril. But yes Julie, please do go on about your scheduling inconvenience, that sure is something worth more of your vitriol. Needless to say, I'm not convinced, but don't worry maybe democracy's just overrated anyways:

**Conclusion**

All this to say, from her statement alone: this is no credible individual, and this is no disciplined proposal. The danger, of course, is that bad proposals have a habit of being entertained by allegedly responsible people once they are dressed in the usual friendly-procedural language. That's the real danger here. Not only do students already worry that administration may disrupt programs, financial aid, academic paths, and futures before the formal process has even caught up. Now we must also worry that, when we show up to object, the Board may decide that we can't have any say that will matter to them.

I am urging the Board and the public at large not to let a cap on public comment even reach a vote. It is fundamentally at war with the purpose of a public institution. Though it is easy to launder as a measure to ensure governing convenience, the devil really is in the details, and we will know who has listened to that devil by whoever attempts to launder such an odious proposal that way. It is self-serving fanaticism that drains judgment of proportion, deprives the imagination of responsibility, and destroys all symmetry of good character. It is a reactionary rolling back of democracy with a procedural-friendly gloss: a governing mania

that treats public accountability as an obstacle and public participation as a scheduling problem. It treats democracy itself as something to be rationed instead of guarded, and quite perversely it does so in the very country where people fought, bled, and died to secure those rights here at home and continue to do so today.

If the Board believes public comment is too long, the answer is not to hear less from the public, the answer is to examine why so many people feel compelled to speak. A public body that creates public harm should not be surprised when the public arrives to describe it. When Julie complains about public comment, it's not public comment she is talking about; it's democracy she is annoyed by, or at least democracy where everyone can participate. Maybe if it were "the good ol' days" of Peterloo and the Bourbon Restoration, when popular participation could still be treated as a disturbance to "order" then she would finally be happy.

It appears though she isn't the only one. Kevin Alltucker and Steve Mital have flirted with such a proposal as well. (And per usual Jesse just waits to see which way the wind's blowing so he can be on the winning side then give, "reasons," which are just restatements of what someone else has said as his justification for voting with everyone else, truly only original thoughts are ever made by him.) They know better, yet even here it reveals something very concerning. Steve, in particular, has repeatedly shown a talent for reducing human beings into administrative quantities, as he often proudly does so. His own rhetoric really does require its own study, and it will receive one in time.

All this to say, we need not go far to ascertain who the wirepullers are, nor what course they intend to drag all of us down with. They have publicly stated, loudly and proudly, the absolutism to which they subscribe, for the people stuck in the past are always the easiest to spot. This really is one of those times when a public institution must decide whether its values are merely recited or actually kept. If public comment can be narrowed whenever it's labeled as burdensome, then the public's right to speak exists only at the discretion of

those being criticized. A right held at another's discretion is no right in practice. If we accept this corrupt bargain, then we would have lost the words for all time.

With candor,

-Richard Kamuela Riordan