EMPLOYMENT RELATIONS BOARD

OF THE

STATE OF OREGON

Case No. UP-060-23

(UNFAIR LABOR PRACTICE)

| | |
|---|---|
| LANE COMMUNITY COLLEGE EDUCATION ASSOCIATION (LCCEA),<br>Complainant,<br>v.<br>LANE COMMUNITY COLLEGE,<br>Respondent. | RULINGS, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER |

On April 11, 2025, this Board heard oral argument on the objections of Complainant Lane Community College Education Association (Association or LCCEA), and cross-objections of Respondent Lane Community College (College), to a December 13, 2024, recommended order issued by Administrative Law Judge (ALJ) Martin Kehoe after a hearing on May 15, 2024, via videoconference, and May 16, 17, and 20, 2024, in Eugene, Oregon. The record closed on July 12, 2024, upon receipt of the parties' post-hearing briefs.

Sarah K. Drescher and Luke Kuzava, Attorneys at Law, Tedesco Law Group, Portland, Oregon, represented Complainant.

Kyle T. Abraham and Kristi Foy, Attorneys at Law, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Portland, Oregon, represented Respondent.

---

On November 7, 2023, the Association filed an unfair labor practice complaint with the Employment Relations Board (Board) against the College. The Association filed amended complaints on December 15, 2023, February 23, 2024, and April 18, 2024. The College filed timely answers.

The issues are:

1. Did the College violate ORS 243.672(1)(a): (A) by targeting Mitchell, Simmons, Oberstaller, Alvarado, Hampton, and Soriano-Cervantes for retrenchment; (B) by forwarding to the Board of Education an anonymous complaint containing criticism and false allegations against the Association's officers and soliciting a formal complaint against the same officers; (C) by telling the Faculty Council Co-Chairs that they could not discuss minimum qualifications and certifications for faculty members at Faculty Council meetings and threatening legal actions should they continue to discuss such topics in that setting; (D) by engaging in surveillance of the Association's confidential communications to its members; and/or (E) by engaging in each of the alleged violations in the aggregate and in light of the facts set forth in the complaint?

2. Did the College violate ORS 243.672(1)(c): (A) by targeting Mitchell, Simmons, Oberstaller, Alvarado, Hampton, and Soriano-Cervantes for retrenchment; (B) by forwarding to the Board of Education an anonymous complaint containing criticism and false allegations against the Association's officers and soliciting a formal complaint against the same officers; (C) by telling the Faculty Council Co-Chairs that they could not discuss minimum qualifications and certifications for faculty members at Faculty Council meetings and threatening legal actions should they continue to discuss such topics in that setting; and/or (D) by engaging in surveillance of the Association's confidential communications to its members?

3. Did the College violate ORS 243.672(1)(b): (A) by telling the Faculty Council Co-Chairs that they could not discuss minimum qualifications and certifications for faculty members at Faculty Council meetings and threatening legal actions should they continue to discuss such topics in that setting, and/or (B) by meeting directly with bargaining unit employees to discuss proposed changes to the Division Faculty Coordinator position and sending out a survey to bargaining unit employees gauging their support for those changes?

4. Did the College violate ORS 243.672(1)(e) by initiating conversations about the College's proposal to change the Division Faculty Coordinator position directly with employees through a face-to-face meeting and an email survey?

5. Is a civil penalty warranted?

6. Is a notice posting warranted?

As explained below, we conclude that the College violated ORS 243.672(1)(a)[1] by telling the Faculty Council Co-Chairs that they could not discuss minimum qualifications and certifications for faculty members at Faculty Council meetings and threatening legal actions should

[1]Where a subsection (l)(a) violation has been established, we need not consider a parallel (l)(c) claim that is based on the same facts. *State Teachers Education Association/OEA/NEA and Andrews et al. v. Willamette Education Service District and State of Oregon, Department of Education*, Case No. UP-14-99 at 33, 19 PECBR 228, 260 (2001), *aff'd without opinion*, 188 Or App 112, 70 P3d 903 (2003), *rev den*, 336 Or 509, 87 P3d 1136 (2004). Furthermore, finding a violation of ORS 243.672(1)(c) based on the same facts as the proven (1)(a) claim would not alter our remedy in this case. Consequently, we find it unnecessary to address the (1)(c) claims where a (1)(a) claim has been established.

they continue to discuss such topics in that setting, and by engaging in surveillance of the Association's confidential communications to its members. We also conclude that the College violated ORS 243.672(1)(b) and (e) through its communications with bargaining unit employees about the Division Faculty Coordinator position. However, we reject all of the Association's other legal claims. We also conclude that the Association is entitled to a notice posting but we decline to award a civil penalty.

## RULINGS[2]

During the hearing, all of the Association's exhibits were admitted except for Exhibits C-9, C-11, C-12, C-50, C-68, and C-69. On May 20, 2024, the Association added two pages to Exhibit C-52, without objection. All of the College's exhibits were admitted except for Exhibit R-13, which was withdrawn. All of the parties' joint exhibits were admitted. Upon review, we conclude that the ALJ's evidentiary rulings were correct.

## FINDINGS OF FACT[3]

### The College and the Board of Education

1. The College is a "public employer" within the meaning of ORS 243.650(20).

2. The College educates over 15,000 students annually at six locations across Lane County and online. Among other things, the College provides professional technical and college transfer programs; business development and employee training; academic, language, and life skills development; and lifelong personal development and enrichment courses.

3. The College's Board of Education has ultimate authority over the College. The group has seven members, all of whom are elected representatives from Lane County. The Board of Education has primary authority for adopting policies governing College operations. It is also responsible for adopting/approving the College's annual financial budget. The Board must approve major substantive changes, such as budget cuts to programs, services, and personnel.[4]

4. The Board of Education regularly conducts public meetings. During those meetings, the Board of Education regularly hears public comments.

---

[2]On appeal to this Board, neither party raised any objections to the ALJ's rulings as set forth in the recommended order, meaning that any objections are unpreserved and waived. We adopt and affirm the ALJ's rulings in the recommended order without further discussion or republication, including the ALJ's unobjected to ruling that the Association's (1)(b) claim regarding the College's email to the Faculty Council Co-Chairs, was waived.

[3]The Association objected to some of the recommended order's findings of fact. We have reviewed the record and have modified some of the findings of fact based on the Association's objections. However, the changes do not alter the ultimate disposition of this case.

[4]*See* College's Answer to Third Amended Complaint and Defenses, at ¶1.

5. Much of the Board of Education's authority has been delegated to the College's President. For instance, the Board of Education does not make hiring or firing decisions or conduct performance evaluations for the College's faculty members. It also does not discipline them. The Board of Education only evaluates the performance of and makes personnel decisions regarding the College's President (the Board of Education's only employee).[5]

6. The College's President's interactions with the Board of Education are governed, in part, by Board of Education policy.

7. Among other things, the College's President is expected to help the College be "financially sustainable." In order to do that, the President can make recommendations to the Board of Education about the College's budget.

8. The President's cabinet generally includes the President herself and the College's Vice Presidents, Associate Vice Presidents, General Counsel, and Executive Director of External/Public Affairs.

9. Since July 1, 2022, Stephanie Bulger has been the College's President. The College's previous President was Margaret Hamilton.

The Association

10. The Association, a union, is a "labor organization" within the meaning of ORS 243.650(13). It is formally affiliated with the Oregon Education Association and the National Education Association.

11. The Association and the College are parties to a collective bargaining agreement (CBA). By its terms, the CBA was effective from July 1, 2019, through June 30, 2024, and is automatically renewed from year to year if neither party provides timely written notice of a desire to modify or terminate the CBA.

12. Broadly speaking, the Association is the exclusive representative of a bargaining unit that includes the College's part-time (PT), full-time (FT), and "contracted" faculty members employed by the College, as well as other College employees who hold certain "non-teaching" positions (*e.g.*, librarians). In total, the Association represents around 200 FT faculty members and around 375 PT faculty members. What makes someone a PT, FT, or "contracted" employee is defined by the parties' CBA.

13. In this case, the term "contracted employee" essentially refers to employees in the Association's bargaining unit who are "employed more than half time on an annual basis." Contracted employees are usually considered FT employees, but contracted employees may technically be less than FT employees. PT employees are employed half time or less on an annual basis (and have been described as "noncontracted faculty").

[5]The Board of Education has also been referred to as the College's Board of Trustees.

14. The Association's Executive Council includes eight elected positions: a President (Adrienne Mitchell), five Vice Presidents (Christina Howard, Wendy Simmons, Peggy Oberstaller, Rosa Lopez, and Kate Sullivan), a Treasurer (Wendy Rawlinson), and a Secretary (Aryn Bartley).

15. Since the fall of 2000, Adrienne Mitchell has been a FT faculty member in the College's Academic Learning Skills (ALS) department. In addition, since September 2018, Mitchell has been the Association's President. Mitchell also serves as the chair of the Association's bargaining team, and has been on that team since 2007. From 2017-2018, Mitchell was the Association's Grievance Chair. During her tenure, she has also had a variety of other significant Association-related roles. To many, Mitchell is seen as the Association's most visible member.

16. The College and the Association have a Joint Labor/Management Committee. It meets monthly during the regular academic year for the purpose of discussing issues and concerns that could impact the College and/or the employees in the Association's bargaining unit.

17. The Association is distinct from the one other union of College employees called the Lane Community College Education Federation (LCCEF), which represents the College's "classified" employees/professionals. The President of LCCEF is Francette (Frankie) Cocanour. In general, employees in the classified union cannot teach classes.

<u>Class Assignments and Bumping Rights</u>

18. Broadly speaking, the College's classes are assigned to faculty members four times a year, with assignments made for each fall, winter, spring, and summer term. In practice, however, contracted/FT faculty members rarely teach during the summer term, and the majority of contracted/FT faculty members receive assignments for the whole year. Each term is about 11 weeks long.

19. In general, contracted and FT faculty members are considered "permanent" employees, and are continuously employed from term to term and year to year. In contrast, PT employees are only given assignments and contracts for a single term.

20. In general, both PT and FT Faculty members may only be assigned to teach courses that they are specifically certified to teach. If appropriately certified, faculty members may teach courses affiliated with one or more departments. As explained below, assignments are given to contracted/FT and PT faculty members in order of class-specific seniority. Further, contracted/FT faculty members and PT faculty members have separate seniority systems.

21. When classes first become available, those classes are first assigned to appropriately certified contracted/FT faculty members in order of seniority (among contracted/FT faculty members). In general, FT employees get five classes per term (or the equivalent). After all contracted/FT faculty members are assigned classes, appropriately certified PT faculty members are assigned any remaining classes by seniority (among PT faculty members). If there are no available/remaining classes that can be assigned to a PT faculty member, then that PT faculty

member is not assigned any classes that term. The contractual process that results in one faculty member taking over a class from another has been referred to as "bumping."

22. The College's administration (not the Association) ultimately decides what courses to offer at the College. The fact that a faculty member is certified to teach a particular course does not necessarily mean that that course will be offered.

23. Relative seniority can be compared by looking at seniority lists and reduction in force (RIF) reports that are created and maintained by management and/or Human Resources (typically by Sharon Daniel). However, sometimes, a given seniority list or RIF report may be inaccurate or out of date. Accordingly, Association President Mitchell encourages bargaining unit employees to review their RIF reports and make sure that they are accurate and corrected.

24. FT and PT faculty members are paid at different rates and have different salary schedules. (Essentially, FT faculty members are paid more than PT faculty members.) If a PT faculty member is ever assigned more classes than would ordinarily be assigned to a PT faculty member, they should be paid a contracted/FT faculty member's rate.

25. Article 34 of the CBA addresses special conditions affecting PT personnel. Article 34.5.3 of the CBA specifically addresses PT faculty assignment by seniority.

26. Assignment rights are also addressed in a memorandum of understanding. That memorandum provides, in relevant part,

"**A. Academic Year Assignments are made in the following order:**

> "<u>1. Contracted faculty</u> (including temporary and teaching-only) are assigned their courses.
>
> "<u>2. Part-time faculty with seniority rights</u> are assigned available courses, consistent with Article 34.5.3 seniority rights.
>
> "<u>3. Part-time faculty without seniority rights</u> are assigned available courses, consistent with Article 34.5.3 seniority rights."

<u>Retrenchments and Reorganizations</u>

27. Article 10 of the CBA generally addresses "retrenchments." Article 10.1 provides, "For purposes of this Article, retrenchment means a partial or full layoff of any contracted employee for any good-faith reason other than disciplinary, performance-related or personal reasons."

28. In general, a retrenchment may be deemed appropriate or necessary when it has been determined that the College cannot afford to offer a particular class or program, or when too few students are interested in a class to justify offering it. Over the years, the College has retrenched numerous positions/employees.

29. Retrenchments are categorically different than reorganizations. As indicated, a retrenchment essentially involves the elimination of a position, and may result in a layoff. Under a reorganization, a position remains in place, and its job duties may even remain unchanged. But after a reorganization, the same position may report to a different manager in a different division/department. It is also possible that, under a reorganization, one division/department may merge with another.

30. Article 10.2 of the CBA provides,

> "**Association Notice.** Whenever the College determines that a retrenchment is necessary and the retrenchment will affect employees beginning with the new academic year in the fall, then the College by no later than March 15 of the preceding academic year shall schedule a meeting with the Association to discuss the general subject and possible alternatives. Whenever the College determines that a retrenchment is necessary at any other time, then at least sixty (60) calendar days before its implementation, the College shall schedule a meeting with the Association to discuss the general subject and possible alternatives."

31. Article 10.17 of the CBA provides,

> "**Retrenchment Notice to Employee.** The College will provide notice of layoff to the affected employee by no later than May 1 of the same academic year for any employee affected by a retrenchment which the College was required to discuss with the Association by March 15 in Section 10.2. The College will provide at least sixty (60) calendar days' notice of layoff which is at least thirty (30) calendar days after the sixty (60)-day notice to the Association in Section 10.2, to the affected employee for retrenchments that occur at any other time of the year."

32. Given the foregoing, the parties generally agree that (unless notice of a proposed retrenchment is given by March 15th of the preceding academic year, which did not occur here) their CBA requires them to have at least 30 days of "good faith discussions about alternatives" before the College gives a final Article 10.17 notice of a retrenchment. They also generally agree that, after that 30-day period, the College has to give 60 days' notice to an employee before they are retrenched (essentially resulting in a 90-day timeframe).

33. As the language of Article 10.2 implies, the mere fact that an Article 10.2 notice has been given to the Association does not necessarily mean that there will actually be a retrenchment. More often than not, the Association and the College can come up with a mutually agreeable alternative/solution that results in no layoffs. However, sometimes no alternative can be found, and a position or program ends up being retrenched.

34. In lieu of being laid off, an employee who is selected for retrenchment may be transferred to a different division/department, for example. It is also possible that an appropriately certified FT faculty member who has been selected for retrenchment may be able to "bump" a PT faculty member out of a class that the PT faculty member would otherwise have been assigned to. As noted, if a PT faculty member is bumped from all of his or her available classes, that PT faculty

member is effectively laid off. (PT faculty members cannot bump FT faculty members out of an assignment.)

35. Article 10.3 of the CBA provides, "**Layoffs.** Layoffs necessitated by the retrenchment shall be in the inverse order of seniority within the affected unit so long as the employees to be retained are qualified to perform the remaining duties."

36. Article 10.7 of the CBA addresses the elimination of contracted positions. Article 10.7.1 provides, "**Part-time Employees.** Part-time employees will not be hired to fill positions of qualified contracted employees who are on layoff." Relatedly, Article 10.7.3 provides, "**Maintaining Contracted Positions.** Contracted positions shall not be eliminated for the sole purpose of dividing, or continuing to divide, a full-time assignment among part-time faculty."

37. Article 10.9 of the CBA generally requires the College to create a "Retrenchment Report" that can be used to determine which faculty members should be retrenched.

38. Article 10.10.1 of the CBA provides,

> "In the event a reduction in force becomes necessary, the College shall display the courses and/or activities provided within the affected units in descending order of priority and conformance with the time line specified in Section 10.2."

39. Article 10.10.2 of the CBA provides,

> "In determining the layoff order, employees with greater seniority will be retained over less senior employees provided that they have the minimum qualifications to perform the remaining duties. Whenever possible, reduction in force shall be applied so as to protect contracted positions."

<u>Previous Discrimination Allegations</u>

40. All of the College's Faculty Counselors are included in the Association's bargaining unit. In this case, the term Faculty Counselor is a "job classification" or "job family." Historically, a Faculty Counselor can have a variety of job titles (*e.g.*, Retention Counselor, Mental Health Counselor) and/or job assignments (*e.g.*, an assignment in the Gender Equity Center, or one involved with scholarships), and can be assigned to a variety of departments as needed. However, different Faculty Counselor assignments (as opposed to the more general Faculty Counselor job classification/family). Furthermore, not every Faculty Counselor is licensed to perform every kind of Faculty Counselor assignment. For example, a Faculty Counselor named Jessica Alvarado (who is addressed in additional detail below) is not certified to provide mental health counseling to students. That said, in general, all Faculty Counselors teach courses and provide counseling to students.

41. For most of the events of this case, Jessica Alvarado, Leslie Soriano-Cervantes, and Anthony Hampton have been FT Faculty Counselors who have performed the work of (and have frequently been called) Retention Counselors. Additionally, those three employees are "persons of color."[6] As of the May 2024 hearing, Hampton was no longer a Faculty Counselor.

42. Outside of Alvarado's work for the College as a Faculty Counselor, Alvarado has also been a Faculty Council Co-Chair and a College Council Chair. (The College's Faculty Council is addressed in detail below.) She has also been an Association Department Representative for over 18 years. In addition, Alvarado has served on a Racial Equity and Social Justice Committee.

43. Christina Howard is a FT faculty member, and part of the College's Health Professions department (which includes the College's Health, Physical Education, and Athletics departments). Since July 2008, some of Howard's work has included working as a Program Coordinator for the Physical Therapy Assistant program. Howard currently reports to Jonathon Corey Miner, Dean of Health Professions. Outside of Howard's work for the College, Howard has been the Association's Grievance Committee Chair since January 2020. In that capacity, Howard has resolved between 20 and 30 informal grievances and has filed between five and seven formal grievances. Since 2015, Howard has also been the Association's Vice President for Career and Technical Faculty. Beyond that, Howard regularly attends Joint Labor/Management Committee meetings.

44. Since September 2019, Michael Shane Turner has been the College's Associate Vice President of Human Resources and Labor Relations. Turner first started working for the College in March 2019. In his current role, Turner is the College's lead manager for labor relations with the classified employees union. In contrast, regarding the College's relationship with the Association, Turner serves in more of a support role, and is not part of the College's bargaining team that negotiates with the Association. Turner's current position has also been described as Chief Human Resources Officer.

45. In 2019 or 2020, the three Faculty Counselors of color noted above attended a meeting with the College's previous President, Margaret Hamilton. During that meeting, the three complained that they were experiencing disparate treatment and racial discrimination at the College. That complaint eventually led to an investigation by Associate Vice President of Human Resources and Labor Relations Turner and "outside counsel." During the affiliated investigation, the three were assisted by Mitchell (acting as the Association's President) and Howard (acting as the Association's Grievance Chair). Ultimately, the College's investigators determined that the Faculty Counselors' allegations were unfounded.

46. On June 18, 2021, after the parties were unable to resolve the dispute informally, the Association, via Howard (acting as the Association's Grievance Chair), filed a grievance on behalf of all College's Faculty Counselors (not just the three referenced above). In essence, the grievance alleged that a new course, FYE199 – College and Career Essentials, was going to be

---

[6]The Association's pleadings, as well as its correspondence with the College as reflected in the exhibits that form the record in this case, repeatedly refer to Alvarado, Soriano-Cervantes, and Hampton as "faculty of color," "faculty counselors of color," or other similar formulations. Solely for ease of reference, we use the Association's choice of verbiage throughout this order.

assigned to faculty members who were outside of the Counseling department, and that the new course was too similar to an existing course. The grievance also alleged that that assignment was the result of racial discrimination toward the three Faculty Counselors of color. At later stages in the processing of the FYE199 grievance, Association President Mitchell provided additional assistance. In the end, the College opted not to offer the new course. When the FYE199 grievance was filed, Division Dean of College and Career Foundations Anna Gates-Tapia and Associate Vice President of Academic Affairs Jennifer Frei were listed as the affiliated managers – not then-Assistant Vice President of Academic Affairs "JR" (a pseudonym), who is discussed below.

47. On or around June 9, 2022, an informal grievance meeting took place in which the parties discussed possible changes to "retention faculty working conditions related to the duties performed as described in [the] Lane Academic Progress Standards system." Howard was also involved with that informal grievance meeting.

Bulger Becomes College President

48. The College has three major sources of funding: (1) property taxes (which provide around a third of the College's funding), (2) state funding (the College's largest source of funding), and (3) tuition revenue. Additional funding comes from the federal government and other sources. The funding received via property taxes is relatively predictable, compared to the other two major sources of funding. State funding generally covers a two-year period (a biennium), and is influenced by enrollment, which is an uncontrolled variable. Tuition is largely determined by enrollment. Meanwhile, the largest *expense* for the College is its personnel costs (*e.g.*, salary and benefits), which usually amounts to about 84 or 85 percent of the College's total budget.

49. When Stephanie Bulger started as College President, it was her first time holding such a position, and her first time working in Oregon. Even before she started on July 1, 2022, Bulger already knew that the College had some financial issues. Once Bulger started at the College, she tried to get a better understanding of the College's finances. To do so, Bulger reviewed the records of some Board of Education meetings. In Bulger's view, at the time, the Board of Education was divided into two groups/perspectives: (1) one that believed that the College was in a healthy financial condition, and (2) one that believed that the College was financially unhealthy. Bulger also noted that the College's COVID-19 pandemic relief funding was ending. In addition, Bulger saw that the College had been experiencing around a 60 percent decline in enrollment over a period of ten years. She also became aware that the College had some cost increases coming, including increased salaries following a recent CBA "reopener." Bulger further noted that the College had recently lost its Controller and its Associate Vice President of Finance and Operations (who was ordinarily "in charge" of the College's budget).

50. In or around July 2022, the College implemented a hiring freeze. However, by the fall of 2023, and even after the Board of Education's September 27, 2023, "special meeting" addressed below, the College hired new faculty members when required.

51. Shortly after Bulger started as College President on July 1, 2022, Association President Mitchell reached out to Bulger to have a meeting with her. Subsequently, on July 7, 2022, Bulger and Mitchell had their first meeting. During the meeting, Bulger attempted to be

friendly and light-hearted, and to develop a professional relationship with Mitchell. Early on in that initial meeting, Bulger said, "Tell me about your vision for Lane. I don't think people wake up in the morning with a list of people and think, I'm going to get these people."[7] At a different point in the pair's initial meeting, Mitchell proposed that the two meet twice a month. In response, Bulger suggested that they have a "business meeting" in Bulger's office once a month, and have a separate "social meeting" once a month. Mitchell agreed to that arrangement.

52. In or around the third week of July 2022, the Board of Education had a retreat that President Bulger also attended. During the retreat, the Board of Education asked Bulger what her priorities were. In response, Bulger explained that one of her priorities was to improve the College's "fiscal condition." For that priority, in part, Bulger wanted there to be a common/shared understanding of the College's fiscal condition. (As noted above, at the time, it appeared to Bulger that the members of the Board of Education had two divergent views about the financial condition of the College.) Bulger also shared that her second priority was improving enrollment, and that her third was "institutional culture." Later, in August and/or September 2022, the Board of Education accepted those three goals/priorities.

53. During the same July 2022 retreat, President Bulger also made a promise to the Board of Education that she would not let the Board of Education be surprised by anything. That assurance was not specifically covered by a particular Board of Education policy. However, by policy, the College's President is expected to ensure that the Board of Education "is informed and supported in its work." The President is also expected to keep the Board of Education "aware of relevant trends and anticipated adverse media coverage." Additionally, the Board of Education's current Chair, Austin Folnagy, likes to be informed of what he may hear in public comments.

54. In the fall of 2022, College enrollment was down around 3.5 percent instead of the 10 percent that President Bulger had expected.

55. In early fall of 2022, President Bulger hired two experienced consultants with CPA licenses to perform an external fiscal assessment/audit of the College. Subsequently, the two consultants reviewed multiple years' worth of the College's "audited financial statements" and utilized a "composite financial index."

Association President Mitchell's Stint on a Search Committee

56. In August 2022, Mitchell started serving on a search committee established to hire a new Vice President of Academic Affairs. The Chair of that search committee was Jennifer Frei. Frei is one of the College's two Associate Vice Presidents of Academic Affairs, and she oversees the College's "transfer departments and divisions" and certain "career technical programs." (Frei has had that position for over nine years.) The College's other Associate Vice President of Academic Affairs, Grant Matthews, was a candidate for the Vice President of Academica affairs position and also was filling that position on an interim basis.

57. On August 4, 2022, Association President Mitchell had a lunch meeting with College President Bulger. During that meeting, Bulger again suggested that she and Mitchell

---

[7] During the hearing, President Bulger did not recall making this statement.

should meet twice a month, with one of those meetings being a social event. After that, Bulger explained her reasoning, stating, "If you throw me under the bus, I will come to you and say, 'Adrienne [Mitchell], I thought we were friends. I thought we were colleagues.'"[8] In the same meeting, Bulger also suggested that Mitchell should provide Bulger information instead of providing that information to the Board of Education.

58. On September 15, 2022, Association President Mitchell had another meeting with College President Bulger. In that meeting, Bulger once again suggested that Mitchell should provide information to her rather than to the Board of Education. Bulger also said that, if Mitchell took that advice, Bulger could provide context to the Board of Education. In response, Mitchell explained that she could not do so, and that she was required to give a report to the Board of Education every month.

59. In October 2022, Association President Mitchell resigned from the Vice President of Academic Affairs search committee. Mitchell did so because she believed that there were "irregularities" with the process that she found to be "unethical, unfair, inequitable, and inconsistent with numerous policies." Around that time, Mitchell tried to schedule a meeting with College management (including Associate Vice President of Academic Affairs Frei) in which Mitchell could explain her issues with the search committee. However, those attempts were unsuccessful. At some point, a faculty member from the Adult Basic and Secondary Education program named Zara Pastos also resigned from the same search committee, without publicly stating her reasons for doing so.

60. On October 4, 2022, Association President Mitchell had another meeting with Bulger. At the end of that meeting, Bulger stated that she wanted to "tussle" with Mitchell.[9] Mitchell was taken aback by the comment, but she did not understand it. In the same meeting, Bulger also invited Mitchell to see a play. Bulger did not intend to be aggressive with her October 4, 2022, statements to Mitchell. At some point after the meeting, Bulger and Mitchell did go to a play together. However, Mitchell did not agree to any other social events with Mitchell afterward, based on the advice of some Association officers. After the October 4, 2022, meeting, the two only meet once a month.

61. During most of the events of this case, the College's General Counsel was Michael Blade. However, Blade stopped working for the College shortly before the May 2024, hearing for this case (after the Association's initial complaint was filed).

62. On October 28, 2022, after Association President Mitchell's resignation from the search committee, Mitchell sent an email to General Counsel Blade. In that email, Mitchell

[8]During the hearing, President Bulger did not recall making this particular statement, but also did not deny making it.

[9]During the hearing, College President Bulger did not recall making this "tussle" comment. Moreover, Vice President of Human Resources and Labor Relations Turner could not specifically recall Bulger using the word "tussle" in a meeting with Association President Mitchell. That said, Turner did remember that the meetings with Bulger and Mitchell were "strained" and "really sort of awkward, tense." Moreover, Turner has not been present for every meeting between Bulger and Mitchell.

explained her ethical concerns with the search committee. At the time, Mitchell was concerned that there would not be a formal investigation of the committee. Mitchell later shared similar concerns with President Bulger and Vice President of Human Resources and Labor Relations Turner via email on November 9, 2022.

63. In approximately November 2022, Association President Mitchell met with College President Bulger and Vice President of Human Resources and Labor Relations Turner. In that meeting, Mitchell shared that she was uncomfortable with some of the comments that Bulger had made to Mitchell, including Bulger's statement that she wanted to "tussle" with Mitchell. Mitchell also brought up Bulger's comment about not waking up in the morning and trying to "get these people."[10]

64. On December 1, 2022, Association President Mitchell sent another email to College President Bulger and Associate Vice President of Human Resources and Labor Relations Turner. In the email, Mitchell inquired whether there had been an investigation of the search committee. Elsewhere in the email, Mitchell wrote, "Please consider my concerns a formal complaint." Mitchell continued to request an investigation in subsequent emails.

<u>The College Begins to Create a Budget</u>

65. In December 2022 or January 2023, the two consultants who had been hired by President Bulger provided a full audit report to the College and the Board of Education. In their report, the two consultants concluded that, financially, the College fell into the "barely surviving" category (the second-lowest rating possible). The report also highlighted certain weakness (including decreased enrollment over time) as well as some strengths (including certain assets).

66. In January 2023, President Bulger continued to build the budget for the 2024 fiscal year. (For the College, a fiscal year starts on July 1 and ends on June 30). As was normally the case, in January 2023, the College's Budget Development Subcommittee (which is part of the College Council) also started collecting relevant information. At the time, Mitchell was a Co-Chair of that Subcommittee.

67. As indicated above, during many of the events of this case, Grant Matthews was an Associate Vice President of Academic Affairs. In that role, Matthews generally oversees all of the College's Career Technical Education (CTE) divisions (including Health and Physical Education, for example) and the Deans of those divisions.

68. In early January 2023, during a regularly scheduled meeting, General Counsel Blade informed Association President Mitchell that there was going to be an announcement regarding the hiring of a new Vice President of Academic Affairs (the position that the search committee sought to fill). Blade also said that Matthews (who, as indicated, had been a candidate for the position, and had been acting as Interim Vice President of Academic Affairs for the fall term) would *not* be taking over that role. (Again, ordinarily, Matthews is an Associate Vice President of Academic Affairs, like Frei.) In the same meeting, Blade asked Mitchell if she still

[10]During the hearing, President Bulger could not recall a meeting in which Association President Mitchell expressed any objection to Bulger's comments.

wanted to meet with Bulger about the search committee. Mitchell responded that she did. In addition to the foregoing, Blade told Mitchell that there might be some retrenchments in the upcoming spring term, and that the College would be providing notice about those possible retrenchments. Blade also said that those retrenchments might be in the Political Science and Sociology departments. (Mitchell's partner worked in the Sociology department.) In response, Mitchell asked for more information.

69. In January 2023, after General Counsel Blade and Association President Mitchell's meeting, Shelley Tinkham started working as the College's new Vice President of Academic Affairs. In that role, Tinkham is, among other things, responsible for Academic Affairs' entire budget (which is the largest portion of the College's total budget). Outside of that, Tinkham regularly participates in the parties' Joint Labor/Management Committee meetings. Tinkham is also an ex-officio member of the Faculty Council (as detailed below).

70. On January 12, 2023, Association President Mitchell had a meeting with Associate Vice President of Academic Affairs Matthews and General Counsel Blade (after Mitchell's other January 2023 meeting with Blade). In that meeting, Matthews indicated to Mitchell that the Sociology retrenchment would include at least one FT position. Mitchell felt that Matthews' behavior during the meeting was "vehement" and "angry."

71. On January 13, 2023, Association President Mitchell met with Associate Vice President of Academic Affairs Matthews again. During that meeting, Mitchell mentioned that she had previously raised concerns about the Vice President of Academic Affairs search process. She also said that she wanted Matthews to know that her concerns were with the search process itself, and were not a reflection on any particular candidates. (As noted above, Matthews had been a candidate for the unfilled Vice President of Academic Affairs position.) At the time, Mitchell was concerned that Matthews believed that Mitchell interfered with the search.

<u>Alvarado's Stint as an Early Outreach Coordinator</u>

72. In late 2022, Alvarado, who had been a Faculty Counselor for many years, started working as an Early Outreach Coordinator after she successfully applied for the position in August 2022. When Alvarado reviewed the provided job description for the new position and was set to start the job, Alvarado felt that it did not align with the description given in the affiliated job posting. She also felt that the work presented in the provided job description resembled that of a classified employee, rather than a faculty position. (Again, classified employees are in a different bargaining unit.) Alvarado's concerns were shared with the College with the assistance of the Association, mainly via Christina Howard (acting as the Association's Grievance Chair), and to a lesser extent Mitchell (acting as the Association's President). That was done, in part, by the pair attending meetings and/or through emails. Eventually, it was determined that Alvarado would be returned to her previous Faculty Counselor position in late March or early April of 2023. In total, Alvarado only spent around six months as an Early Outreach Coordinator.

73. During the period in which Alvarado's concerns with the new position were being considered, Howard generally worked with JR, who was overseeing the new position's program (and oversaw all of the Faculty Counselors), as well as Associate Vice President of Human

Resources and Labor Relations Turner. During the same period, Alvarado's immediate supervisor was Director of Advising Tammi Garlock. In turn, Garlock reported to JR. At the time, JR's job title was Assistant Vice President of Academic Affairs. (JR's initial job title has also been described as Counseling Manager and Student Success Dean.)

74. In the spring of 2023, there were a couple of meetings in which Retention Counselors were discussed. (Again, Retention Counselors are a type of Faculty Counselor.) During those meetings, the parties discussed proposals that the Association had made to move the Retention Counselors to Career Pathways, and a similar proposal made by the College to move the Retention Counselors to other departments. At the time, however, neither of those proposals was accepted.

75. In the spring of 2023, a large group of students, faculty, and classified professionals also attended a rally during a Board of Education meeting. At the time, the College was considering closing the College's Health Clinic. The rally was encouraged by the Association's Action Team. One of the faculty members who attended the rally was Wendy Simmons.

76. Since December 2022, Simmons has been a PT faculty member in the College's Physical Education department. (Simmons was a FT faculty member before she retired and began her current position.) Currently, Simmons reports to Miner, Dean of Health Professions (which, as noted above, includes the College's Health, Physical Education, and Athletics departments). Outside of her work for the College, Simmons is a "highly visible" representative of the Association. For around six years, Simmons has been the Association's Vice President at Large. Since around 2017, she has been the Association's Membership Committee Chair. She has also been (or currently is) a Co-Chair of the Association's Action Team.

77. On March 15, 2023, the parties conducted a Joint Labor/Management Committee meeting. Attendees included Turner (Associate Vice President of Human Resources and Labor Relations), Matthews (Associate Vice President of Academic Affairs), Aryn Bartley (the Association's Secretary), Simmons (the Association's Vice President at Large), and Mitchell (the Association's President). Matthews, Turner, and Bartley appeared via Zoom, while the other attendees appeared in person. In Mitchell's view, Matthews made very aggressive comments and "had an outburst" during the meeting. In addition, Mitchell was "very upset" by Matthews' behavior in the meeting, and felt that Matthews' behavior was directed at her. After the meeting, Mitchell went to Turner's office and cried.

78. In early April 2023, Howard (the Grievance Chair) received a call from a Faculty Counselor named Beth Landy concerning a comment made by then-Assistant Vice President of Academic Affairs JR in the fall of 2022 in a one-on-one conversation with Landy. During the April 2023 call with Howard, Landy reported (for the first time) that, in the fall of 2022, Landy had been discussing the new Early Outreach Coordinator position (that, as noted, Alvarado had for a time) with JR. Landy told Howard that, during that fall 2022 conversation, JR referred to the three Faculty Counselors of color (Alvarado, Hampton, and Soriano-Cervantes) as "the spawn of Satan." In response to Landy's allegation, Howard encouraged Landy to report the comment to the College's Human Resources department. Afterward, Landy reached out to the College about JR's fall 2022 comment as suggested.

79. On or around April 5, 2023, Landy, Howard, and Associate Vice President of Human Resources and Labor Relations Turner had a meeting about JR's comment. During the meeting, Landy shared that, on September 13, 2022, JR said that she thought of the three Faculty Counselors of color as the "spawn of Satan," and said, "I hope I don't slip up and refer to them that way in a meeting." Landy also reported that JR told her, "Had I known that [Alvarado] would apply for the Early Outreach Coordinator position, I never would have designed the position the way that it was."

80. In April 2023, after the April 5, 2023, meeting about JR's comments, JR was reassigned from her Associate Vice President of Student Affairs position to a Grants Manager position. In JR's new/current role, JR is no longer part of Student Affairs, and she does not supervise any Faculty Counselors. As noted below, Colman ("Colum") Joyce eventually took over as Vice President of Student Affairs on June 1, 2023. Alvarado was not informed of JR's "spawn of Satan" comment until the fall of 2023, when retrenchments were being considered (a topic that is discussed below).

<u>Association President Mitchell Files a Whistleblower Complaint</u>

81. The College's whistleblower protection policy provides, "The Board [of Education] strictly prohibits discrimination or retaliations against any employee for engaging in whistleblowing activities * * *."

82. The College also has a formal harassment and discrimination complaint process. Regarding anonymous complaints, the policy that details that process provides,

> "The College will respond to the extent possible to anonymous reports of discrimination or harassment or reports made by third parties not directly involved in the discrimination or harassment. However, the response to such reports may be limited if information contained in the reports cannot be verified by independent facts."

83. On April 16, 2023, Association President Mitchell filed a formal complaint that primarily alleged retaliation and a violation of the Board of Education's whistleblower policy. In that whistleblower complaint, Mitchell alleged that the College was retaliating against her by providing notice of possible retrenchments in the middle of the school year that would, if accepted, take effect in the spring term. The complaint also referenced the Joint Labor/Management Committee meeting that took place on March 15, 2023. Mitchell filed the complaint via the College's online complaint filing system. Nevertheless, Mitchell's complaint was not investigated for many months.

84. Between a week to four weeks after Association President Mitchell filed her April 16, 2023, whistleblower complaint, Mitchell sent a follow-up email to a manager named Carl Yeh. In response, Yeh informed Mitchell that he had forwarded the whistleblower complaint to Human Resources. After that, Mitchell did not hear back from management or Human Resources about her whistleblower complaint until October 2023.

85. In either April or May of 2023, in a meeting, College President Bulger said to Association President Mitchell, "I don't know how long you're going to be around here."[11] Mitchell did not respond to the comment.

86. At the end of April or the beginning of May 2023, Association President Mitchell had some discussions with Associate Vice President of Human Resources and Labor Relations Turner. In those discussions, Mitchell proposed a reorganization that would include, in part, moving Faculty Counselors to the College's newly-formed Workforce Development/Career Pathways division. In response, Turner stated that he did not believe that Beth Landy (who, as noted, had previously reported JR's comments) and the three Faculty Counselors of color would work well together.

<u>The Board of Education Adopts the College's Budget</u>

87. In early May 2023, the College's Budget Committee (which includes around 14 people) started meeting, as required by law. The College's overall annual budget at the time was in excess of $80 million. In an early meeting, someone noted that it looked like there was going to be a $4 million deficit at the end of 2024, and an ending fund balance of $3 million going into fiscal year 2025. It also appeared to the Committee that, if things did not change, the College would not have any money left in fiscal years 2025 and 2026. In subsequent Budget Committee meetings, the group discussed and unanimously agreed on the need for "reserve for revenue shortfall," which is essentially a contingency/reserve fund within the College's budget that would cover a potential "revenue shortfall" if certain of the College's budget "assumptions" did not come to fruition. That plan was eventually shared with the Board of Education.

88. On June 1, 2023, newly-hired Joyce took over as Vice President of Student Affairs. That position had previously been held on an interim basis (from August or September of 2022 until Joyce started in June 2023) by Dawn Whiting, who is currently the Associate Dean of Enrollment, Admissions, and Recruitment.

89. In early June 2023 (before the final budget approval noted below), the Board of Education directed President Bulger and the College's administration to come up with a $3.8 million "reserve for revenue shortfall." One reason for that was, at the time, the College did not know how much funding was going to be provided by the state or the federal government. Additionally, the College did not know what enrollment would be for the next school year. Between fiscal years 2022 and 2023, there were also notable increases in expenses, including contracted-for salaries and insurance.

90. Another reason for the required revenue fund was because of a Board of Education policy that requires the College's "ending fund balance" to be 10 percent of the College's expenditures. According to the same Board of Education policy, if the College does not come up

[11]During the hearing, President Bulger did not recall making this statement, and asserted that it was not something that she would have ever said to anyone. Similarly, Associate President of Human Resources and Labor Relations Turner could not recall Bulger making the statement in a meeting with Bulger and Mitchell.

with that 10 percent ending fund balance/reserve, the College (and/or its President) is supposed to come up with a three-year plan to "build back" the balance/reserve.

91. The Board of Education's June 2023 directive was the first time that the Board of Education tasked the College's administration with coming up with a "reserve for revenue shortfall."

92. Later on in June 2023, the Board of Education unanimously and formally adopted/approved the College's proposed budget that included the required reserve fund and a variety of budget-related "assumptions." At that time, the College still did not know what enrollment would be for the next academic year, or know precisely how much money the College would be getting from the state. In President Bulger's view, at the time, the College was in a "crisis situation."[12]

93. The College's budgeting process is guided, in part, by statutorily required timelines. State statutes require that the Board of Education approve the College's final budget no later than June each year.

94. After the College's budget was approved, President Bulger directed Interim Vice President of Finance and Operations Sue Fahey and the rest of Bulger's cabinet/executive team to come up with a plan to meet the requirements of the approved budget. (At the time, Bulger still did not have a Controller or a permanent Vice President of Finance and Operations, and Fahey had only recently been hired.) Two of the College's goals were for every one of the College's departments to come up with a potential six percent cut, and for them to do so in accordance with certain "guiding principles" (that had previously been approved by the Board of Education in June 2023). Those principles included, among other things, minimizing impact to the students, viewing the reduction process through an "equity lens," adhering to "collective bargaining contract obligations" (*e.g.*, notice, seniority, and bumping), and enacting "an expedited decision-making process to finalize operational budgets."

95. By the end of June 2023, the College knew that it would receive an increase in funding from the state. It also knew that that allocation was likely going to be over 12 percent more than had been allocated to the College the previous biennium. (However, precisely how much the College's share of the state's increase would be would not become clear until around mid-October 2023, as it was still unknown how much would ultimately be distributed to each of the state's 17 community colleges.) Around the same time, it had also become clear that enrollment (and thus tuition) was up around 10 percent, which was a considerably higher enrollment than had been contemplated in the budget.

96. On July 2, 2023, Brett Rowlett, the College's Executive Director of External/Public Affairs, sent an email to all College employees (including President Bulger) and the Board of Education. The email noted that the state's various community colleges had received a boost in state funding (without providing a specific dollar amount).

---

[12]As summarized by John Nisbet, who was the College's Interim Vice President for Finance and Operations for a time (and did not testify), the budget "was adopted at a time of great uncertainty, particularly around the revenues [that the College] would receive [that] year."

97. In August 2023, Moody's downgraded the College's credit rating, "due primarily to the College's history of declining enrollment and spending down in reserves." The downgrade did not immediately increase the College's costs. However, it was clear to the College that, in the future, it could impact the cost of borrowing. For President Bulger, the new Moody's rating functioned as a "cautionary tale about spending down reserves and declining enrollment." Historically, every other year, the College has needed to borrow money to cover/make payroll.

98. The Board of Education ordinarily does not meet in August, and did not meet in August 2023.

<u>The College Identifies Possible Retrenchments (Summer 2023)</u>

<u>Student Affairs' Possible Retrenchments</u>

99. After newly-hired Vice President of Student Affairs Joyce was tasked with coming up with a 6 percent budget cut in his area, he (like other managers) tried to come up with a number of options. Joyce generally tried to minimize the impact to students, staffing, and "essential services" whenever possible. To that end, Joyce first explored whether he could make cuts in supplies and materials instead of laying people off. Joyce discovered that Student Affairs had already had numerous personnel cuts over the years, and that many positions were already not being filled. Joyce also met with Mandy Pritchard (an Associate Dean of Accessibility, Accommodations, and Testing), Dawn Whiting (Associate Dean of Enrollment, Admissions, and Recruitment), Carl Yeh (Dean of Student Life, Student Success, and Student Standards) and others. Joyce did not consult with JR during this period, and did not meet JR until late fall of 2023. In addition, when considering which positions to select, Joyce did not review the relevant RIF reports or lists of certifications. At the time, Joyce was also aware that there had previously been discussions about transferring the Retention Counselors, and generally believed that selected positions might be able to bump others. In the end, Joyce specifically selected and recommended all three *Retention Counselor positions* (all of whom were either in the Counseling or Mental Health and Wellness Centers in Student Affairs) for possible retrenchment (without specifically selecting Alvarado, Hampton, and Soriano-Cervantes for retrenchment), not simply three generic Faculty Counselor positions.

100. When Vice President of Student Affairs Joyce was considering what cuts to recommend, he had only ever briefly met the three Faculty Counselors of color one time in passing at a "welcome get-together for all [of S]tudent [A]ffairs" that was attended by 50 to 70 employees. Even as of the May 2024 hearing for this case, Alvarado had only had "two very brief conversations" with Joyce in total. Additionally, Joyce primarily works with the classified employees union.

101. During the main retrenchment process described herein, Michelle Rae Barber was the only Faculty Counselor assigned to the College's Gender Equity Center (not the Counseling or Mental Health and Wellness Centers). Barber is also certified to provide mental health counseling to students.

102. JR was not involved with selecting Faculty Counselors for retrenchment.

Academic Learning Skills (ALS) and French's Possible Retrenchments

103. When considering possible cuts to the ALS department, the College noted that the ALS department had had declining enrollment. The College also considered how workload was defined under the CBA for ALS employees, how many credits amounted to a full "workload," and how many "course preparations" (which have also been referred to as "preps") can be assigned to an individual FT faculty member. At the time, ALS employed just one FT faculty member (Association President Mitchell) and three PT faculty members.

104. When considering retrenchments in the French department in particular, the College considered the fact that enrollment in French classes had been declining for years. That resulted in an insufficient workload for the contracted/FT faculty in the French department. As noted below, eventually, it was decided that one FT faculty member in the French department would possibly be retrenched.

105. When Vice President of Academic Affairs Tinkham was deciding which cuts to make in her areas of responsibility, she specifically worked with the two Associate Vice Presidents of Academic Affairs, Frei and Matthews. Eventually, it was determined that each of the three would attempt to cut around 10 percent of each's budget. Moreover, each considered multiple reduction options. If possible, Tinkham wanted to maintain all of her programs, not lay anyone off, and not harm any students. However, Tinkham also recognized that enrollment in ALS had "significantly" dropped since 2018, and considered which reductions would result in reduced revenue. Eventually, Tinkham decided to reduce materials and supplies spending, and to not print a magazine (and instead only offer a digital edition). Separately, Tinkham opted to personally take over the then-vacant Associate Vice President of Institutional Effectiveness' role for one year. Tinkham also decided to not fill certain other vacant positions, and to reduce a Librarian position. (In/around the previous January and February, Tinkham had already cut around $500,000 from her budget by not filling certain open positions.) In addition, Tinkham ultimately recommended retrenchments of one *position* in (1) ALS (specifically, Association President Mitchell's position) and (2) another *position* in French. (Tinkham did not tell Interim Vice President of Finance and Operations Fahey which specific *employees* might be retrenched. Moreover, Tinkham did not direct Frei or Matthews to communicate with Fahey about the proposed retrenchments.) Later, Tinkham's retrenchment recommendation was supported by the College's larger cabinet (*e.g.*, Frei, Matthews, Fahey, Associate Vice President of Human Resources and Labor Relations Turner, Vice President of Student Affairs Joyce, and the College's "finance staff").

106. When Associate Vice President of Academic Affairs Frei considered whether retrenchments were appropriate, she gathered information from the Deans and divisions she oversaw. Frei also considered a report that addressed the ALS department. The report was written by a Dean. It did not mention Association President Mitchell by name. Beyond that, Frei did not provide Interim Vice President of Finance and Operations Fahey or anyone else with specific *names* for potential retrenchment.

Health's Possible Retrenchments

107. As indicated above, Jonathon Corey Miner is the Dean of Health Professions, which includes the College's Health, Physical Education, and Athletics departments. He has had his current Dean role for over five years. Miner's immediate supervisor is Associate Vice President of Academic Affairs Matthews, who oversees certain Career Technical Education (CTE) programs. Matthews is, in turn, supervised by Vice President of Academic Affairs Tinkham.

108. When Dean Miner was considering where to recommend making cuts, he noted that his dental assisting and medical assisting programs were struggling. However, he also noted that those programs were viable and needed in the community. In addition, Miner noted that he had accreditation requirements that effectively dictated how many faculty he needed to have for certain programs. He also noted that losing certain positions would result in losing entire programs and/or students. Eventually, Miner recognized that the only programs he oversaw that could lose employees (without risking losing the program) were Physical Education and Health Nutrition. Miner also believed that, if one FT faculty member in Health was retrenched, the College would still be able to have Health classes. Ultimately, Miner recommended that one of the FT faculty member *positions* in Health be retrenched, without recommending a particular person be retrenched. Miner never specifically recommended that Association Grievance Chair Howard, Sharrie Herbold, or anyone else be retrenched. Further, at the time, Miner was unaware of the FT Health faculty members' relative seniority. It was also the first time that Miner had had to consider a possible retrenchment. Later, Miner learned that Herbold had been listed for possible retrenchment (as noted below), but he did not learn who made that selection.

109. Since 2004, Peggy Oberstaller has been a PT faculty member in the Health department. Outside of that, since 2022, she has been the Association's Vice President for PT Faculty. Since 2022, she has also been on the Association's bargaining team. In 2021, Oberstaller was Co-Chair of the Association's Action Team. Since 2020, Oberstaller has also been a Department Representative. Oberstaller reports to Dean Miner. During the events of this case, Miner was unaware of Oberstaller's Association-related work.

110. President Bulger was not personally involved with any specific retrenchment decisions, including which positions to possibly cut.

The College Provides a List of Proposed Retrenchments in Response to Association Request

111. Article 11.11 of the parties' CBA provides, in relevant part, "Upon written request by the Association, the College shall, in a timely manner, provide information for the purposes of grievance investigation, bargaining, or within the domain of the Public Records Law (ORS 192.420)."

112. On September 15, 2023, the Association sent the College an Article 11.11 information request related to the presentation materials on budget reduction packages that would be presented to the Board of Education during an upcoming September 20, 2023, "work session." (Before that, the Association learned of what would be presented during the work session from what the College had publicly posted online via "Board Docs.") The Association's request was for

"the positions and the incumbents" who would be impacted by the personnel reduction package that the Association believed was going to be proposed. Around that time, Association President Mitchell was "very concerned" by the fact that the Association had not yet received any Article 10.2 retrenchment notices and a belief that the Board of Education was going to be voting on cuts on September 27, 2023, leaving insufficient time for the parties to properly discuss "alternatives" to retrenchment.

113. Under ordinary circumstances, the College's response to the Association's September 2023 Article 11.11 information request would have been the result of the collaborative efforts of Associate Vice President of Human Resources and Labor Relations Turner and Interim Vice President for Finance and Operations Fahey, with Fahey taking "point." However, when the Association made its request, Fahey's mother's health was declining, requiring Fahey to step away from work for a period of time. (Sometime later, Fahey's mother passed away.) As a result, Turner was essentially left to "step in" and provide the Association the requested information, in a timely manner, largely on his own. Turner also had to deal with the fact that, when the Association made its September 2023 information request, the College did not yet have a "final list" of selected *employees* (as opposed to *positions*) to provide, and the fact that the parties had not yet explored "alternatives" in good faith (or meaningfully discussed retrenchments at all). (Indeed, even as of the September 27, 2023, "special meeting" of the Board of Education discussed below, the College had not firmly determined which employees would be selected for retrenchment.)

114. On September 20, 2023, the Board of Education's "work session" took place as scheduled. In that session, the College's administration shared a PowerPoint presentation with the Board of Education that generally described the College's proposed budget cuts, gave the reasons for those cuts, and shared a summary of relevant events. As noted during the work session, the proposed cuts included approximately $2.6 million in personnel cuts (out of the $3.8 million in cuts the Board of Education had requested). During the work session, no specific positions or names were highlighted for possible retrenchment.

115. On September 22, 2023, Associate Vice President of Human Resources and Labor Relations Turner sent an email to Association President Mitchell in response to the Association's September 15, 2023, information request. The email included, as an attachment, a list of the positions/employees being considered for retrenchment organized into a spreadsheet. A carbon copy of the same email was sent to Francette Cocanour, the President of LCCEF, the classified employees union.

116. The body of Associate Vice President of Human Resources and Labor Relations Turner's September 22, 2023, email stated,

> "Last Friday, we received an Article 11.11 request from you for specific information related to the presentation materials on budget reduction packages presented to the Board on September 20.
>
> "In an effort to be consistent and transparent in information sharing, I've copied Frankie [Cocanour] on this message as well. Sue [Fahey] has been away from campus dealing with a family emergency and has been unable to work on your

request. That being said, I've done the best I can to collect the requested information.

"In the attached spreadsheet, you will find listings for positions with incumbents that were included in the budget reduction packages. Highlighted blanks for the estimated savings from the two part-time reductions are pieces of information that only Sue Fahey has and I'll need to connect with her to get accurate information.

"Additionally, it was unclear from the original request whether you are seeking information on the line-item vacancy savings - some of which will be in holding the position and some which will be due to delay in refilling. I only know part of this information, and rather than giving you an incomplete picture, I would prefer to work with Sue to get you all of the vacancy savings information at once which amounts to approximately $1.5M of the $2.6M in personnel savings.

"While it goes without saying, all named individuals in the spreadsheet possess contractual rights regarding notice, seniority, bumping, etc. that will be upheld as this process unfolds."

117. The College's attached list of proposed retrenchments included six Association-represented positions and the names affiliated with those positions. Specifically, that included the College's three Faculty/Retention Counselors of color, all of whom were in the Counseling and/or Mental Health and Wellness Center: (1) Alvarado; (2) Hampton; and (3) Soriano-Cervantes. The same list also included the names and positions of (4) Karin Almquist, a faculty member in the French and Spanish departments; (5) Mitchell, a faculty member in the ALS department (and the Association's President); and (6) Sharrie Herbold, a faculty member in the Health department. In addition to the foregoing, the College's list also included four positions that were represented by the classified union and the names affiliated with those positions, as well as two PT positions affiliated with the Library and Instructional Testing Services that did not have names affiliated with them.

118. Howard, Oberstaller, and Simmons were not listed for possible retrenchment in the College's list.

119. As indicated in Associate Vice President of Human Resources and Labor Relations Turner's September 22, 2023, email, within the attachment with the list of proposed retrenchments, certain areas were highlighted and left as incomplete. When Turner created the document, he did not have that missing information. He expected that Interim Vice President of Finance and Operations Fahey would fill in those areas later.

120. As noted above, the College's list of proposed retrenchments that was given to the Association was partially created by Associate Vice President of Human Resources and Labor Relations Turner. However, the document that Turner shared was based on some information/notes that had previously been put together by Interim Vice President of Finance and Operations Fahey, as well as the proposed "budget reduction packages" that had been presented to Fahey by the

College's various cabinet members.[13] The only position that Turner personally selected for possible retrenchment was one of the named classified employees (Katie Rascon). Turner did not select or have "any influence on" any of the other positions or names listed, and did not know who selected them.

121. The College's September 2023 list of proposed retrenchments was the first time that, for a proposed retrenchment, the College had provided the name of a faculty member in a position to be eliminated who was not the least senior faculty member in his or her position. Once again, Article 10.3 of the CBA provides, "**Layoffs.** Layoffs necessitated by the retrenchment shall be in the inverse order of seniority within the affected unit so long as the employees to be retained are qualified to perform the remaining duties."

122. As indicated above, when Associate Vice President of Human Resources and Labor Relations Turner shared the list of proposed retrenchments with the Association, the College had not yet discussed any of the possible retrenchments or "alternatives" with the union. And as noted in Turner's September 22, 2023, email, when Turner shared the list, he made it clear that the list provided was not final and that the parties still needed to go through the Article 10.2 notice processes. He also intended to make it clear that the College was actually selecting *positions*, not specific individuals. Turner believes that, in practice, when a position is being retrenched, the person who actually gets retrenched/laid off (if anyone) will ultimately be the least senior employee in the position at issue due to the CBA's seniority and bumping language.

<u>The Association's Reactions to the Proposed Retrenchment List</u>

123. In advance of the September 27, 2023, Board of Education "special meeting" described below, Association President Mitchell and Cocanour (the President of the classified employees union) notified employees who had been listed in the provided spreadsheet of their possible retrenchment. However, by that point, the College had not yet provided any formal "Article 10.2 notices."

124. When Association President Mitchell saw her own name and position on the list of proposed retrenchments, she was "very surprised," in part because she believed the list meant that her entire department was being eliminated (including its PT faculty members), as Mitchell was the most senior and the only FT faculty member in ALS.[14]

[13]Association President Mitchell testified that Interim Vice President of Finance and Operations Fahey does not have access to seniority information but Associate Vice President of Human Resources and Labor Relations Turner does. (Fahey did not testify.)

[14]In Associate Vice President of Academic Affairs Frei's view, even if there had been a retrenchment in ALS, despite Mitchell's name being selected for retrenchment, in reality, Mitchell ultimately would never have been laid off. Frei holds that view because the College's retrenchment process always includes a review of the other areas faculty members are certified to teach, and Mitchell (like most faculty members) is certified in a number of areas, allowing the College to assign Mitchell classes in other areas.

125. When Association President Mitchell saw Herbold's name listed, she was concerned because the only other FT faculty member in Health, Susie Cousar, had lower seniority than Herbold. Mitchell also believed that because Herbold was listed, it meant that the College might have to lay off or reassign the three PT faculty members in Health (including Oberstaller), and essentially cut the entire Health department because of FT faculty members' contractual bumping rights. Further, Mitchell was surprised by that perceived result because she believed that the Health department brought in significant "net revenue" for the College.[15]

126. Again, Oberstaller's name and position were not included in the College's list of possible retrenchments. Nevertheless, when Oberstaller saw Herbold's name included in the list, she believed that, if Herbold was indeed retrenched, she would also be laid off. As Oberstaller saw it, if Herbold's FT position was being retrenched, it meant that the College would necessarily also be laying off all of the PT faculty members in Health (including herself) and eliminating most Health classes. To be clear, at the time, the Health department had two FT faculty members (Cousar and Herbold) and three PT faculty members (Oberstaller, Tina Davis, and Sam Gibeau).[16]

127. As with Oberstaller, Simmons' name was not included in the College's list. However, when Simmons (again, a PT faculty member and the Association's Vice President at Large) saw Herbold's name and FT position on the list, Simmons was "quite surprised" because she knew that the Health and PE departments brought in money for the College. At the same time, Simmons also believed that because Herbold was selected for possible retrenchment, Simmons could be "bumped" from all of her PE classes by Herbold, as Simmons knew that Herbold was FT and certified in Health and overlapping Physical Education classes. Additionally, Simmons believed that because Herbold was listed, the entire Health department was going to be cut. (Simmons works in the Physical Education department, and does not work in the Health Department.) After reviewing Turner's list of possible retrenchments, Association President Mitchell had similar thoughts about Simmons' potential retrenchment.[17]

128. When Association President Mitchell reviewed the College's list, she first noted that the three Faculty Counselors of color were listed for possible retrenchment. She also noted that the three were not the least senior Faculty Counselors, and that another Faculty Counselor, Michelle Barber (who is not a Retention Counselor like Alvarado, Hampton, and Soriano-Cervantes), had less seniority than the three. In Mitchell's view, under the CBA, Barber should have been listed for retrenchment.

---

[15]In its post-hearing brief (at 15, 29), the College acknowledges that Herbold had "slightly more seniority" than Cousar, and contends that Herbold was merely "incorrectly identified" because Interim Vice President of Finance and Operations Fahey was out on leave at the time.

[16]Dean Miner acknowledges that, if a FT faculty member in Health was retrenched, it could have affected how many classes might have been offered to Obserstaller and the other PT faculty members in Health.

[17]In Dean Miner's view, Simmons was never going to be affected by the retrenchment of a FT faculty member in Health, given Simmons' numerous certifications and relative seniority. However, Miner also recognizes that, if there had ultimately been reductions in the Fitness and Lifestyle Specialist program, then Simmons (and his wife, Jennifer Miner, who works in two departments) might have been affected.

129. When Alvarado saw that she, Hampton, and Soriano-Cervantes were listed, Alvarado was also concerned and confused because she had the highest seniority of all of the Faculty Counselors, and Barber had less seniority than the three who were listed. However, Alvarado simultaneously believed that, once the Association got involved and the CBA was discussed, it would become clear to the College that Alvarado's relative seniority should provide Alvarado some job security. Alvarado currently believes that she was selected for possible retrenchment because she was more outspoken and challenging than her coworkers. She also believes that there was a long-term plan to remove the three Faculty Counselors of color from Student Affairs, and that there was never a budget crisis.

130. Alvarado has worked for the College as a Faculty Counselor for at least 18 years. During that time, the Counseling department has been "downsized" nearly every year (though not necessarily through retrenchments in every instance). At one point, there were around 13 or 14 Faculty Counselors. During the central events of this case, there were only five Faculty Counselors.

131. Sarah Erickson is a FT faculty member in the Mathematics and Engineering department. She is also a member of the Association's bargaining team and the Association's grievance team. In addition, Erickson has acted as the Interim Secretary for the Association, and is a representative of the Mathematic and Engineering department on the Faculty Council.

132. The College never proposed that Erickson be retrenched. Nevertheless, when Erickson learned of the proposed retrenchments in the College's list, Erickson wondered whether she would be retrenched by the College next.

133. On September 26, 2023, Luke Kuzava (one of the Association's attorneys) sent a letter to General Counsel Blade via email. In that letter, the Association alleged that the College's retrenchment proposal was unlawful, and demanded that the College cancel the Board of Education's upcoming September 27, 2023, vote.

134. On September 26, 2023, Sarah Drescher (another one of Association's lawyers) also sent General Counsel Blade correspondence expressing concern that the College's proposed retrenchments unlawfully targeted Association officers and other faculty members who had filed complaints against the College.

September 27, 2023, Board of Education Special Meeting

135. The agenda for the Board of Education's September 27, 2023, special meeting indicated that, during that meeting, Interim Vice President of Finance and Operations Fahey would be reviewing the fiscal year 2024 budget balancing package with the Board of Education. The notice also indicated that the Board of Education would be voting to authorize the College's administration to begin implementing the proposed "budget reduction packages" as presented at the Board of Education's September 20, 2023, work session, including the contractual processes for union notice and meeting as required as part of any proposed personnel reductions.

136. On September 27, 2023, at 6:00 p.m., the Board of Education conducted its scheduled special meeting. During that meeting, the College presented its proposed budget balancing package for the 2023-2024 school year. In general, the College did not attempt to modify its previously approved budget in the meeting, despite the budget-related updates that it had received since the budget had been approved in June 2023.

137. During the September 27, 2023, special meeting, the College's main presentation did not announce the names of anyone who would possibly be retrenched, or refer to specific programs. Moreover, General Counsel Blade publicly announced that, after the parties had a chance to meet to discuss the matter, the provided list of employees and positions selected for possible retrenchment was "likely to change a hundred percent" and "look nothing like" the list did that day.

138. During the September 27, 2023, special meeting, Vice President of Academic Affairs Tinkham publicly indicated that she did not support the proposed cut in the Health department (that might have affected Herbold's FT position). Tinkham also publicly stated that she had worked with Associate Vice Presidents of Academic Affairs Frei and Matthews when considering which cuts to recommend making in Academic Affairs.

139. The September 27, 2023, special meeting lasted nearly five hours in total. (Usually, a Board of Education meeting lasts for two and half or three hours in total.) Between one and a half to two hours of the meeting was devoted to public comment. A number of faculty members (including Association President Mitchell and Erickson, for example), classified professionals, and other community members provided comments/testimony during that period. Some of those who spoke to the Board of Education expressed that the College's proposed plan "lacked transparency," and/or alleged that the proposed retrenchments were "retaliation" against the Association. Beyond those who made comments, the meeting was also attended by a "very large number of campus community members" (including faculty members and classified professionals), and drew some media coverage. Some attendees held signs. The tone of the special meeting was "very heated."

140. When Association President Mitchell gave public testimony to the Board of Education during the September 27, 2023, special meeting, Mitchell asserted that the reserve fund was no longer necessary because there was no revenue shortfall. Mitchell also discussed the impacts of the proposed cuts, and noted that the College had not engaged in the discussions with the Association that were required by the CBA. In addition, Mitchell mentioned JR's "spawn of Satan" comment about the three Faculty Counselors of color.

141. Seeing Herbold's name in the College's list of possible retrenchments made Oberstaller somewhat hesitant about being a visible member of the Association, and she was concerned about the College retaliating against her. Nevertheless, during the Board of Education's September 27, 2023, special meeting, Oberstaller and the other faculty members in the Health department made a public statement to the Board of Education about Herbold's proposed retrenchment.

142. By the end of the September 27, 2023, special meeting, the Board of Education voted on and adopted two motions, after a related discussion and some amendments/modifications to the language. Those final motions were:

> "Motion 1:
> "I move the Board authorize LCC Administration to begin the implementation of the non-personnel portions of the Fiscal Year 2023-24 budget reduction packages as presented to the Board at the September 20, 2023 Work Session.
>
> "Motion 2:
> "For the personnel portions of the Fiscal Year 2023-24 budget reduction packages only, I move the Board authorize the LCC Administration to initiate the contractual processes, as set forth in the collective bargaining agreements with both LCCEA and LCCEF, for notification and meetings regarding the proposed retrenchments; furthermore, the Board directs the LCC Administration to work with both collective bargaining units to discuss the general subject of retrenchments as well as possible alternatives to the proposed retrenchments pursuant to the requirements of the respective collective bargaining agreements."

143. The first of the two motions accepted on September 27, 2023, included the elements of the College's proposal that involved savings from materials and supplies and vacant positions. None of the proposed cuts involving filled positions were approved during the meeting.

144. In President Bulger's view, the individuals who gave public comments during the September 27, 2023, special meeting "preempted the process," as the parties had not yet begun to discuss "alternatives" as required by the CBA. She also found some of the comments to be "really horrifying" because she did not actually want to retrench anyone, and was not trying to target individuals. However, at the same time, Bulger understood that, given the size of the budget cuts at stake, and given that fact that personnel costs make up such a large part of the College's budget, it was possible that employees might end up being laid off. For Bulger, the possibility of making personnel cuts was "incredibly painful."

145. The September 27, 2023, special meeting was the first time that the Board of Education voted regarding possible retrenchments before an Article 10.2 notice was given to the Association. Previously, the College had given the Association the required Article 10.2 notice without the Board of Education ordering or authorizing the College to do so in advance. (As indicated above, Article 10.2 of the CBA does not overtly reference the Board of Education, and to that extent does not require or bar the Board of Education's involvement in retrenchments.)

146. At some point before the September 27, 2023, special meeting, President Bulger's "team" led her to believe that the College needed to go to Board of Education first before the College could start negotiating with the College's unions regarding possible retrenchments.

147. Associate Vice President of Human Resources and Labor Relations Turner believed that, in this instance, the College had to get approval from the Board of Education before it proceeded because the Board of Education had, for the first time, adopted a budget with a "reserve

for revenue shortfall." Turner also believed that the College needed the Board of Education's approval before the College could "release" or spend the funds that had been set aside. Additionally, during the events of this case, Turner was aware of the CBA's 90-day timeline for retrenchments.

Article 10.2 Notice and Related Meetings

148. On September 28, 2023, Associate Vice President of Human Resources and Labor Relations Turner sent an email to Association President Mitchell and others. The subject of the email was "Article 10.2 Notice." The body of the email stated,

> "I'm writing to provide you notice consistent with Article 10.2 of the faculty contract that the College is contemplating contracted faculty retrenchment in the following disciplines:
>
> "Academic Learning Skills
> "French
> "Counseling
>
> "Because the retrenchments are in both Student Affairs and Academic Affairs, I would propose that we schedule separate meetings for each of the major divisions to discuss the general subject and explore possible alternatives in good faith. Please let me know your availability starting next week."

149. The College's September 28, 2023, Article 10.2 notice did not include the proposed cut in Health (involving Herbold's FT position) that was previously included in the College's list. The College withdrew that particular proposal after it was discovered (in either August or September 2023) that there had been an unaccounted-for, "last-minute" resignation in the Mathematics department that the College subsequently chose to leave unfilled to save money. However, at the time, the College did not explain that change to the Association.

150. At some point in October 2023, General Counsel Blade met with Association President Mitchell in her office and asked her to resubmit her April 16, 2023, formal whistleblower complaint. Afterward, Mitchell resubmitted the complaint as requested.

151. On October 3, 2023, the parties conducted an "Article 10.2 meeting" to discuss the College's proposed retrenchments in the French and ALS departments. The meeting was attended by Association President Mitchell (whose FT position in ALS was previously selected for possible retrenchment), Vice President of Academic Affairs Tinkham, Associate Vice President of Academic Affairs Frei, and others. During the meeting, the parties initially had a disagreement or misunderstanding about how many "preps" are included in a "full workload" under the parties' CBA and the parties' "Joint Workload Taskforce" memorandum of agreement. However, after the parties discussed the matter, the College stated that it agreed with Mitchell's views regarding preps. At some point in the meeting, the College announced that it was not going to cut any ALS courses, and that there would not be a retrenchment in ALS. Separately, it was decided that, instead

of retrenching a position in French, the affected individual would teach "a combination of French and Spanish."

152. On October 4, 2023, the parties conducted an Article 10.2 meeting to discuss the College's proposed retrenchment of the three FT Faculty/Retention Counselors of color. Attendees included Association President Mitchell, Associate Vice President of Human Resources and Labor Relations Turner, Vice President of Academic Affairs Tinkham, Vice President of Academic Affairs Matthews, Vice President of Student Affairs Joyce, and others. During the meeting, Mitchell mentioned that the three Faculty Counselors selected for possible retrenchment were not the least senior Faculty Counselors, and mentioned that Barber was the least senior Faculty Counselor. Mitchell also discussed the impact of the three proposed retrenchments, how the three positions at issue could be funded, and proposed (as an alternative) transferring the three Faculty/Retention Counselors to the Workforce Development/Career Pathways division (just as the Association had proposed in the spring) without changing anyone's job title. (In the meeting, the College did not explain why it had not selected Barber's position for retrenchment.) Eventually (before the "global agreement" referenced below), the parties agreed that the three Faculty/Retention Counselors of color would be transferred or reassigned to Career Pathways (and not retrenched), and would retain the same salary and seniority as before. Barber ultimately remained in the same department.

153. At some point in mid-October 2023, the College learned that it would be receiving $1.3 million more than the College had previously expected from the state. Despite that, the College opted to try to continue with its general hiring freeze and leave certain vacant positions unfilled to save money. Nevertheless, around the same period of time, the College did hire some new employees when necessary.

154. On October 13, 2023, the parties had a "global meeting" in which they discussed coming up with an agreement that addressed all of the College's proposed retrenchments. Thereafter, the parties signed a memorandum of agreement that included, among other things, a "no layoff agreement" for the whole school year for all contracted faculty. It also included a "separation incentive" for all faculty members. In Association President Mitchell's view, the memorandum "was a positive thing." Ultimately, no Association-represented (or classified) employees were retrenched. Further, many vacant positions were left unfilled "in order to maintain a conservative position relative to the budget."

155. When the College agreed to abandon the proposed retrenchments, the College still did not have enrollment numbers for the winter or spring terms. However, the positive changes that the College had learned of (which improved the College's financial outlook) made the College's decision-makers feel that it had enough "breathing room" to abandon the contemplated cuts.

<u>October 2023 Anonymous Complaint</u>

156. Article 25.9 of the parties' CBA details a "formal complaint procedure" for complaints made against bargaining unit members. Relatedly, the College's students can file

"Maxient complaints" (referring to the name of the software system that is used) if they have formal complaints about their instructors.

157. The College's regular complaint process allows for anonymous complaints. When the College receives an anonymous complaint, the College examines it to see whether there are enough facts to support continuing to investigate the complaint. In that context, the College looks for something that it could ask witnesses about. Typically, complaints about College employees are handled by Human Resources, the College President, and/or College management, and the Board of Education is not involved.

158. Howard has been directly supervised by Dean Miner for over five years. During that time, Howard has also presented multiple grievances to Miner. While Howard's supervisor, Miner has heard many informal complaints about Howard from staff, students, and management.

159. Building 30 functions as the College's "health and wellness building." Dean Miner ordinarily works in Building 5, but also visits and works in Building 30 nearly "every day" and "almost every weekend," and frequently works late. Miner's ID/keycard allows him to open every door in Building 30. Ordinarily, all of Building 30's exterior doors are closed over the weekend. Howard ordinarily works in Building 30 – which contains her office (Room 124) and her classroom (Room 122) – and does so "[v]irtually every day of the week."

160. On Friday, October 27, 2023, at 4:45 p.m., Howard left her office for the week.

161. On Sunday, October 29, 2023, Dean Miner used his ID/keycard to enter Building 5 at 9:23 p.m. and 9:28 p.m. Later, at 10:40 p.m., Miner entered the downstairs southeast entrance of Building 30. Around three minutes later, Miner left the same building, via its downstairs northwest entrance. (Miner's entrance and exit were captured via ID/keycard logs and security camera footage.[18]) The route between those two doors that Miner used required him to have walked by the hallway that includes the door to Howard's office, which is in the southwest corner of Building 30. The route also took Miner by his wife's office door.

162. On Monday, October 30, 2023, at approximately 8:45 a.m., Howard found an anonymous complaint inside an inter-campus mail manilla envelope on the floor of her office. To Howard, it appeared that the complaint had been slipped under her office door over the weekend.

[18]Exhibit C-42 is a surveillance video file. When Dean Miner was shown a portion of that video during the May 2024 hearing, he generally acknowledged that he was likely the person in the video, but he also could not recall what he was doing in Building 30 at the time on October 29, 2023. Miner otherwise testified that he did not write the anonymous complaint, did not deliver a copy of it to anyone, and did not know who wrote the letter. Howard clearly recognized Miner in the video. In its post-hearing brief, the College appears to concede that Miner can been seen in the video, and states that Miner was "near Ms. Howard's office on the evening of October 29, 2023." However, the College also asserts that Miner did not write the complaint. We conclude that Miner is shown in the video. (That conclusion is corroborated by Exhibit R-2, which shows Miner's ID/keycard being used at the same time.) However, with the evidence presented, we cannot also conclude that Miner put a copy of the anonymous complaint in Howard's office, or identify the complaint's author(s). Importantly, the Association merely asserts that "someone" slipped the complaint under Howard's door, and does not allege that the creation of and/or initial delivery of the complaint was an independent unlawful action.

163. In its entirety, the anonymous complaint that Howard found stated,

"Dear President Bulger,

"We write to you today representing a concerned group of faculty and staff members who have come together, united by a pressing issue that has been undermining the very essence of our institution's values and culture.

"You have often championed the need to nurture a positive campus culture, emphasizing it significance in driving our college towards excellence. However, there's a persistent challenge that stands in the way of achieving this vision: the detrimental behavior of certain individuals in leadership roles, notably Ms. Christina Howard and Ms. Adrienne Mitchell. Their actions and attitude, as detailed below, have created a hostile work environment for many.

"While we recognize and respect the commendable attributes of these individuals, their approach to leadership and collaboration has been consistently counterproductive. Christina, for instance, brings undeniable passion to her program and introduces noteworthy ideas. Yet, the manner in which she advances her agenda has left deep scars on the college community. As the grievance officer for LCCEA and a lead faculty member in a health profession program, she is ironically one of the most-complained-about individuals at the college. Each year, multiple students voice serious grievances against her, yet the fear of retaliation compels them to remain anonymous, effectively silencing any hope for resolution.

"It's not just the students: staff members from diverse departments, ranging from academic affairs, student affairs, and support areas such as the mailroom, facilities, and IT, recount unsettling encounters with Christina. These interactions paint a picture of an individual who frequently acts contemptuous, condescending, and uncooperative. We have credible firsthand accounts of her berating colleagues openly and treating her superiors with blatant disrespect. Several of her students have sought support from our counselors and mental health clinic due to the stress of working under her. The consistent narrative from these students about their experiences is alarming. In their recent division meeting, Christina attacked both her dean and another college manager who was presenting about student conduct. Many faculty and staff felt very uncomfortable with the exchange.

"Adrienne, too, has played a part in cultivating this toxic environment. While holding significant influence within the LCCEA, Adrienne has unfortunately been a pivotal figure in exacerbating the challenges we face. Her demeanor and interactions, often characterized by an overt sense of entitlement and disregard for collaborative values, have left many feeling marginalized and unheard. Numerous colleagues have confided about her propensity to dismiss differing opinions, creating an atmosphere where genuine dialogue and constructive criticism are stifled. It's disheartening to witness such behavior from someone in a position of

power, as it not only hampers our collective growth but also sets a concerning precedent for emerging leaders within our institution.

"Both she and Christina have often justified their behavior with various reasons, yet these explanations fall short when weighed against the distress they have inflicted upon the college community. To claim that one's program lacks support or to assert superiority over others in terms of work commitment further alienates those who genuinely strive for the college's betterment and to do their best to provide support for student success.

"The repercussions of this toxic culture are tangible. We've heard troubling rumors of deans contemplating departure due to mistreatment, and we know of managers who've left the institution, attributing their exit to the hostile environment perpetuated by these individuals and, to some extent, our union. It's crucial to note that these are not baseless rumors; they are cries for attention from those at the heart of our institution.

"Dr. Bulger, this cannot be our legacy. We implore you to look into this, to engage with those who work directly with these individuals, and not just their close circle. We cannot, and should not, stand by as our colleagues, both old and new, dread coming to work. Every individual at Lane deserves respect, value, and a safe environment to thrive.

"We are at a pivotal moment. Numerous faculty, staff, and managers are contemplating leaving due to the prevailing culture. This institution cannot afford such a loss. For over a decade, this issue has persisted. This has gone on for too long. Now, we humbly ask for your intervention to usher in the change we so desperately need.

"Respectfully,

"Concerned College Community Members
"*Written with the assistance of AI.*"

164. When Howard found and then read the anonymous complaint, she was shocked, offended, surprised, and confused. When Howard saw that the letter had been written with the assistant of artificial intelligence, initially, "she kind of thought it was silly." Further, in Howard's view, the things that were said about her in the complaint were untrue and "beyond ridiculous." Before the anonymous complaint, no serious concerns or complaints had been brought to her attention. It was also the first time that Howard had found a letter that had been slipped under her door. She normally receives letters in her mailbox.

165. After Howard reviewed the anonymous complaint, she shared it with other Association officers, including Association President Mitchell. In response, Mitchell was concerned about the contents of the complaint, and found it to be unusual and worrisome.

Eventually, Howard was advised to make a copy of the letter, and she sent it to the Association's attorney, Sarah Drescher.

166. Near the end of October 2023, President Bulger was handed a copy of the anonymous complaint/letter by her executive assistant, Celia Wright. After that, Bulger read then scanned the document.[19]

167. At some point, Associate Vice President of Human Resources and Labor Relations Turner also received, via Wright, an additional copy of the anonymous complaint that was addressed to him. When Turner read the anonymous complaint, he noted that it would be difficult to investigate it, as the complaint was anonymous and did not include specific factual allegations. However, Turner also felt that he and the College needed to do something to address the potentially "hostile work environment." Among other things, Turner is responsible for "compliance with a host of laws and regulations" affiliated with Human Resources.

168. On October 31, 2023, at 7:44 p.m., President Bulger sent an email to the Board of Education. The email included an unredacted copy of the anonymous complaint as an attachment. In its entirety, Bulger's October 31, 2023, email stated,

> "I am attaching a letter that I received today. I do not want you to be surprised in case you hear or have heard from members of the college community regarding the claims raised in the letter. I am going to discuss the appropriate course of action with Mike Blade and Shane Turner (who also received the letter). I will keep you informed."

169. President Bulger sent her October 31, 2023, email and the anonymous complaint to the Board of Education because of her earlier agreement with the Board of Education that she would not surprise them. Further, at the time, Bulger was worried that people affiliated with the College would approach the Board of Education's members about it, given that the complaint specifically concerned the Association's President (Mitchell) and one of its Vice Presidents (Howard). In Bulger's view, that made the matter "very, very sensitive."

170. Mike Eyster is a member of the Board of Education (and was previously its Chair). On October 31, 2023, at 9:34 p.m., Eyster sent President Bulger an email responding to her email. Eyster's email stated,

> "When I was an administrator one of the things I found most difficult to deal with were anonymous complaints by employees against other employees. It also doesn't lend much credibility when individuals working in higher education have to rely on AI to express an opinion. On the other hand, everything in the letter may be true. I think your idea of having Mike [Blade] and Shane [Turner] look at it is good. The allegations are so serious, that it may warrant involvement of an outside party.
>
> "This is hard stuff."

---

[19]President Bulger testified that she did not write the anonymous complaint/letter, and the Association does not allege that she did.

171. As noted above, Austin Folnagy is current Chair of the Board of Education. He has been on the Board since 2021. When Folnagy first reviewed the anonymous complaint, he was surprised because, ordinarily, the Board of Education is not given copies of any complaints.

172. On November 1, 2023, in the morning, President Bulger spoke with General Counsel Blade and Vice President of Human Resources and Labor Relations Turner about what to do next about the anonymous letter. In that conversation, Bulger asked Turner if the College was tracking "incidences" at the College. Bulger also proposed letting the College community know, every quarter or so, or semi-annually, what the College's process is for registering complaints. Turner agreed to do so. Around that time, Turner believed that, even though the anonymous complaint did not include facts that could easily be investigated, a subsequent complaint might include additional details that could be investigated (and could either support the original complaint or exonerate Association President Mitchell or Howard).

173. On November 1, 2023, at 9:32 a.m., after Vice President of Human Resources and Labor Relations Turner's meeting with President Bulger and General Counsel Blade, Associate Vice President of Human Resources and Labor Relations Turner sent out an email to all College employees (not just those who were part of the Association's bargaining unit), in accordance with Bulger's request and Turner's own past practice. In its entirety, Turner's email stated,

> "Good morning,
>
> "While the College strives to provide an environment free from harassment, discrimination, or bias, it is work that requires employees to come forward when they observe something that is concerning. I'm writing to you to provide with this periodic reminder of the avenues available to you to submit an official complaint to the College (even anonymously).
>
> "Should you experience or observe instances of these types of behavior, please use this link that also appears at the bottom of every College web page with the text: 'report a complaint or concern' to share the information. Links to the applicable complaint procedures can be found at this page as well.
>
> "Thank you for your helping making the College a more safe and welcoming environment for all of us. If you have any questions, please don't hesitate to contact me.
>
> "Shane"

174. The underlined link included in Vice President of Human Resources and Labor Relations Turner's November 1, 2023, email was associated with a webpage where one can report concerns and review brief explanations of the College's complaint procedures. Turner's email did not mention Association President Mitchell, Howard, or the October 2023 anonymous complaint.

175. Vice President of Human Resources and Labor Relations Turner has sent out similar communications before and after he did so on November 1, 2023, as part of Lane Weekly email newsletters that go out to the entire College community. In those emails, Turner reminds College employees of the College's process for making complaints about harassment and discrimination. Turner's Lane Weekly notices/reminders go out once a term. One reason that Turner sends out reminders about the College's complaint procedures is because of an employer's responsibilities under Title VII. In addition, the College wants to "present a culture of acceptance around submitting complaints." That being said, Turner's November 1, 2023, email was the first time that he specifically told employees how to file anonymously.

176. On February 15, 2022, for example, in part of a Lane Weekly email newsletter, Vice President of Human Resources and Labor Relations Turner referenced the College's various policies and procedures related to harassment and discrimination, encouraged College employees to report incidents of and concerns about harassment and discrimination, and directed employees to contact him if they had any related questions. As indicated, Turner's February 15, 2022, entry did not specifically mention how to file anonymously. However, the College's procedures for filing harassment and discrimination complaints address anonymous complaints. Lane Weekly emails go out to all College employees (including Association-represented faculty members and employees in the classified employees union).

177. On November 1, 2023, at 10:20 a.m., President Bulger sent another email to the Board of Education. It stated,

> "Hello Board Members,
> "I met with Shane Turner and Mike Blade this morning to review next steps regarding the letter I received yesterday. I asked Shane Turner to send communication via email to all employees. Please see the email below. I have asked Shane to send a similar email to all employees at least twice a year. If you have questions, please direct them to me."

At the end of the email, Bulger included a copy of the language that Vice President of Human Resources and Labor Relations Turner had included in his 9:32 a.m. email to all College employees.

178. On November 1, 2023, Howard met with Dean Miner in Howard's office. During that meeting, Howard showed Miner a copy of the anonymous complaint. It was the first time that Miner had seen the complaint. During the same meeting, Howard told Miner that someone had placed the complaint under her office door, and that someone had delivered copies of the same complaint to the Board of Education and some managers. Howard also expressed to Miner that "she felt pretty bad" about the complaint. In the meeting, Miner read the letter in front of Howard, then told her, "I'm sorry," and expressed that Howard should not have had to experience what she had. Later, Miner spoke with Vice President of Academic Affairs Tinkham about the complaint. In that conversation, Tinkham suggested to Miner that nothing could be done with the letter because it was anonymous.

179. On November 1, 2023, Association President Mitchell spoke with a Board of Education member named Lisa Fragola on the telephone. In that call, Mitchell mentioned in passing that Howard had received an anonymous complaint under her door. In her repose, Fragola indicated that she was already aware of a complaint.

180. On November 1, 2023, at 4:45 p.m., Sarah Drescher (the Association's attorney) sent a letter to General Counsel Blade, via email. In the letter, Drescher asserted that the College had targeted bargaining unit employees for engaging in legally protected activities. In the same letter, Drescher also formally requested that, by November 15, 2023, the College provide a variety of information regarding the anonymous complaint.

181. On November 1, 2023, at 5:18 p.m., General Counsel Blade responded to Drescher's letter via an email to Association President Mitchell. In the email, Blade wrote, in part, that the College would process the Association's information request and respond to it as quickly as possible. Blade also wrote, that "the administration cannot do anything with unofficial hearsay complaints made anonymously with no specific facts accompanying the complaint." When Mitchell and Howard read Blade's November 1, 2023, response, they believed that the College would simply disregard the October 2023 anonymous complaint. (At the time, the two were not yet aware of Bulger's October 31, 2023, email to the Board of Education.)

182. On November 2, 2023, John Nisbet, the Interim Vice President for Finance and Operations, sent out a financial update regarding the 2023-2024 fiscal year, via email, to all College employees. Among other things, Nisbet's update noted some of the College's "fiscal concerns" as well as some items that had positively impacted the College's financial situation (including the fact that state funding, tuition revenue, and enrollment were going to be more than previously expected). The update also noted that the College had a "balanced operational budget" for 2023-2024. The night before, on November 1, 2023, Nisbet presented similar information to the Board of Education during a public meeting.

183. On November 2, 2023, Vice President of Student Affairs Joyce also sent separate reassignment notices to Alvarado, Hampton, and Soriano-Cervantes (the three Faculty Counselors of color). Each of those letters notified the recipient that, instead of a retrenchment/layoff, they were being reassigned/transferred to Career Pathways under Academic Affairs, and that each's assignment would consist of a mixture of teaching assignments and career counseling. The November 2, 2023, notice of retrenchment was the first such notice that Alvarado had ever received. As indicated above, Barber (the least senior Faculty Counselor) was not reassigned, and remained in the same position (and thus did not receive a similar notice).

184. On or around November 7, 2023, Association President Mitchell independently found a different copy of the anonymous complaint in her mailbox. The complaint that Mitchell received was in the same type of inter-campus mail manilla envelope that Howard's had been found in. The envelope that Mitchell found also had the words "President Bulger" handwritten on it. Subsequently, Mitchell learned that her copy of the complaint had been discovered on the floor in front of the door of the ALS office on the morning of November 2, 2023.

185. On or around November 15, 2023, the College provided the Association the information that it had requested on November 1, 2023. The information provided included President Bulger's October 31 and November, 2023 emails to the Board of Education, as well as Member Eyster's October 31, 2023, email responding to Bulger.

186. When Association President Mitchell received a copy of Bulger's October 31, 2023, letter to the Board of Education, Mitchell was "shocked." Likewise, when Mitchell saw a copy of Bulger's November 1, 2023, letter to the Board of Education, she found it to be "very disturbing."

187. After Association President Mitchell found out that the anonymous complaint letter had been forwarded to the Board of Education by College President Bulger, it changed how Mitchell operated at the College. For example, Mitchell stopped having monthly meetings with Bulger from January through March of 2024 because Mitchell "was worried about ongoing or additional retaliation." Mitchell also did not attend any of the Joint Labor/Management Committee meetings during the winter term because Mitchel was worried about retaliation and she was uncomfortable meeting with administrators. After Mitchell stopped meeting with Bulger, Bulger reached out to Mitchell in an attempt to start meeting with her again.

188. When Howard learned of President Bulger's email to the Board of Education, Howard was humiliated, sad, shocked, and "a little afraid." The discovery has also changed how she interacts with her coworkers, and led to Howard having a "strained" relationship with Dean Miner. Separately, when Howard reviewed Board of Education Member Eyster's October 31, 2023, email, Howard felt unsafe and targeted.

189. On November 22, 2023, at 12:04 p.m., Howard sent an email to Dean Miner. In that email, Howard wrote, in part, "Thanks for meeting with me today. As you are likely to understand, I am reducing meetings with others in the division to writing to ensure clarity and transparency." As indicated in the email, earlier that day, Howard met with Miner. During that meeting, Howard asked Miner to make an announcement to the division about his expectations for raising issues and communication expectations, and about how to collaboratively solve problems in a productive and professional way. Miner did not respond to Howard's request, and did not send something out to the employees in his department.

<u>Release Time</u>

190. As addressed in the parties' CBA, bargaining unit employees who are also Association officers are generally permitted to use "release time" to perform Association-related work (*e.g.*, serving on the Association's bargaining team) when they would normally be working on a course or performing their other regular duties. Release time can also be used when someone is taking a sabbatical, participating on a search committee, and for participation in College governance. Whenever someone needs to use release time for Association-related work, they are expected to notify their supervisor (*e.g.*, a Dean) in advance. Sometimes, the College may need to find someone else to replace an employee who has requested release time. That replacement employee needs to be available, qualified, and sufficiently experienced to teach the class that needs coverage.

191. On November 31, 2023, in a regularly scheduled Joint Labor/Management Committee meeting, the College stated that it would like more notice when faculty members were going to use release time. Afterward, the parties did not discuss release time any further.

192. In the 2022-2023 school year, Howard used release time to perform Association-related activities, including her work as the grievance chair. In the 2023-2024 school year, Howard did not use release time. Currently, Howard is unable to utilize Association-related leave "because of her program coordination role and the accreditation requirements of her program."

Minimum Qualifications/Certifications Discussed in a Faculty Council Meeting

193. The Faculty Council is a deliberative body, largely made up of faculty members (all of whom are represented by the Association), that considers changes to academic and grading policies. It is part of the College's larger "governance system," and just one of several councils. Ultimately, the Faculty Council reports to the College Council. The Faculty Council generally meets every other week during a term.

194. The Faculty Council is governed by the Faculty Council Charter, which can be found online. The Faculty Council is also addressed in Article 39 of the parties' CBA, and has been for decades.

195. The Faculty Council has approximately 22 voting faculty members, who essentially act as liaisons between the Faculty Council and a member's department. (Each of those voting members is selected by one of the College's various departments. And each department has a certain allotment of members, based on how many employees are in a department.) There are also two Co-Chairs on the Faculty Council. Currently, those two Co-Chairs are Gerald Meenaghan and Kevin Steeves (both of whom are represented by the Association). Among other things, the Co-Chairs are responsible for monitoring membership, drafting and setting the group's agendas, reviewing feedback, setting up the meetings, and ensuring minutes are taken. Additionally, the Faculty Council has four non-voting ex-officio members. During the events of this case, two of those ex-officio members were Vice President of Academic Affairs Tinkham (who formally represents the College's administration on the Faculty Council) and Association President Mitchell (who formally represents the Association on the Faculty Council).

196. Meenaghan has been a faculty member since September 2012. His current job title is Cooperative Education Coordinator. For at least four years, Meenaghan has also been a member of the Association's Membership Committee. He has been a member of the Faculty Council since approximately 2015. As noted, Meenaghan is currently one of the Faculty Council's two Co-Chairs.

197. The Faculty Council does not have the authority to bargain on behalf of the Association. That being said, the Faculty Council does receive brief updates from the Association at its meetings. Normally, those updates come from the Association's President (who as noted also serves as an ex-officio non-voting Faculty Council member). However, it is not always the Association's President who does so. Article 39.2.2 of the CBA provides, "The president of the

Association shall be an ex-officio non-voting member of the Faculty Council and shall make regular reports to the Council on the activity of the Association."

198. Section 1.1 of the Faculty Council Charter provides, in part, "Faculty Council fosters collaboration among campus constituencies, advocates for a rigorous and equitable environment for teaching and learning, and crafts policies related to teaching, learning, and institutional success. It may also consider other matters brought before it."

199. Section 3.1.1 of the Faculty Council Charter, which is titled "Freedom of Discussion," provides, "In realizing its role, any issue that impacts the faculty at large, excluding legally confidential matters, may be considered by this group. However, Faculty Council does not engage in dealing/bargaining."

200. As indicated, in order for someone to be a voting member of the Faculty Council, that person needs to be a selected faculty member whose position is included in the Association's bargaining unit. However, people whose positions are not included in the bargaining unit can still attend Faculty Council meetings, as the meetings are open to the entire "campus community." In practice, other attendees may include students, classified staff, management, administrators, or other faculty.

201. The parties have regularly discussed the subject of "minimum qualifications" of bargaining unit employees since 2020. Minimum qualifications can include an education requirement, and/or an experience requirement. Whether someone is minimally qualified can affect whether the person can be certified to teach a particular course, which in turn can affect hiring, seniority, job security, and what classes someone is assigned.

202. On March 31, 2022, the Association shared a written proposal related to minimum qualifications. In theory, if that proposal was accepted by the College as drafted, it would have been memorialized as Article 43 of the parties' CBA. As of the May 2024 hearing for this case, the College had not given the Association a written proposal of its own regarding minimum qualifications.

203. Near the end of a mid-October 2023 Faculty Council meeting, a Faculty Council member asked about the status of changes to minimum qualifications. In response, the Faculty Council's two Co-Chairs, Meenaghan and Steeves, decided that, as a response to the inquiry, the next Faculty Council meeting would include a review of the history of minimum qualifications.

204. As part of her role as an ex-officio member of the Faculty Council, prior to each Faculty Council meeting, Vice President of Academic Affairs Tinkham regularly meets with the Faculty Council's two Co-Chairs, reviews the agenda, and provides the two with "general support."

205. On October 26, 2023, Vice President of Academic Affairs Tinkham met with Co-Chairs Meenaghan and Steeves and Association President Mitchell to "touch base" about the agenda for the next Faculty Council meeting. In that meeting, the two Co-Chairs shared that they intended to review the history of the minimum qualifications topics in the next Faculty Council

meeting. Mitchell shared that the Association previously proposed a CBA article that addressed minimum qualifications, that the Association believed that the topic would eventually be bargained, and that it was not actively being bargained at the time. During the same meeting, Mitchell emailed Meenaghan and Steeves a copy of the March 2022 Article 43 proposal.[20]

206. On October 26, 2023, another, unrelated meeting took place in College President Bulger's office. The "regular monthly meeting" was attended by Bulger, General Counsel Blade, and Association President Mitchell. During the meeting, Mitchell requested information about "bias reporting procedures." In response, Bulger directed Blade to not provide that information to Mitchell. After that, Mitchell said that she would be making a formal information request. Bulger then responded that Mitchell making an information request was "aggressive." During the same meeting, Blade told Association President Mitchell that he had been asked to look into the search committee but could not speak with her about it.

207. Co-Chairs Meenaghan and Steeves created an agenda in advance of the November 3, 2023, Faculty Council meeting. Part of that agenda, in a section titled, "Past/Ongoing Business," addressed the topic of minimum qualifications. The agenda also included a link that could be clicked to access a copy of the Association's March 2022 minimum qualifications proposal. At the time, the parties were ostensibly still negotiating the minimum qualifications issued. However, those negotiations had effectively "stalled."

208. On the topic of minimum qualifications, the agenda for the November 3, 2023, Faculty Council meeting stated, in its entirety,

"● Minimum qualifications (7 min.)
  "○ 12/4/2020 FC meeting discussion and comments
  " ■ Faculty Certification Procedure | Comments
  " ■ Minimum Course Qualifications Procedure | Comments
  "○ 6/4/2021 FC Meeting minutes (Section VI – Provost Updates)
  "○ 3/31/23 Article 43 – Minimum Qualifications *proposal*
  "○ Overview and history of MQ / faculty certification procedures and bargaining forthcoming – LCCEA & College have agreement to negotiate over this issue; LCCEA is currently awaiting information about scheduling from Administration."

209. On Friday, November 3, 2023, hours before the day's Faculty Council meeting was scheduled to start, Vice President of Academic Affairs Tinkham saw the agenda for the meeting. Shortly after that, Tinkham briefly spoke with Meenaghan on the telephone, then met with Meenaghan in person about the agenda at around 2:30 p.m. During their in-person discussion,

[20]The Association objected to this finding of fact on the basis that it "incorrectly states that Association President Mitchell attended the meeting with Tinkham and the Faculty Council Co-Chairs" asserting that instead, "Mitchell attended a separate meeting with both Faculty Council Co-Chairs, where she shared with them a previously proposed CBA article—a bargaining proposal from March 31, 2022—that addressed minimum qualifications." We do not find the facts as asserted by the Association apparent from the record in this case. Regardless, even if we were to sustain the Association's objection, it would not impact our analysis or ultimate conclusions in this this case.

Tinkham said that she was "very uncomfortable" with minimum qualifications being included in the agenda because the parties were bargaining the matter, and asked Meenaghan to remove the topic from the agenda. Tinkham also shared that she was uncomfortable with the topic being discussed in front of managers during bargaining because the situation could be viewed by the Association as something "akin to direct dealing" (an unfair labor practice violation). Additionally, Tinkham said that, if the topic was discussed in the Faculty Council meeting, she would leave the meeting and direct the other managers to do so as well. In response, Meenaghan said, among other things, that the minimum qualifications portion of the meeting was meant to be purely informational, and agreed that Tinkham could leave the meeting for that portion of it. He also said that he would be happy to remove the copy of the proposal that had been included with the agenda, as he believed that attendees did not need to see the actual contents of the Association's proposal. After the pair's discussion, shortly before the Faculty Council meeting began at 3:00 p.m., Meenaghan removed the linked copy of the actual proposal from the agenda. However, Meenaghan otherwise left in the minimum qualifications topic and the related information.

210. On November 3, 2023, from around 3:00 to 4:30 p.m., the Faculty Council meeting occurred as scheduled. During the meeting, Meenaghan spoke generally about the history of the minimum qualifications subject for around two minutes. Among other things, Meenaghan referenced previous instances when minimum qualifications had been discussed during Faculty Council meetings, and noted that the Association and the College had an agreement to negotiate the matter. After that, Meenaghan invited the meeting's attendees to discuss the topic further. None did. A copy of the March 2022 Article 43 proposal was not distributed during the November 3, 2023, Faculty Council meeting.

211. During the same November 3, 2023, meeting, Erickson (as noted, a FT faculty member) also provided an Association update to the Faculty Council. Erickson did so instead of Association President Mitchell at that particular meeting because Mitchell was busy that day and could not attend it. Near the end of the update, Erickson said, "Relatedly, LCCEA will be negotiating with the College regarding the MQ and Certification procedures. The Association and College have an agreement to take up this issue that had been postponed from last Spring, and Association representatives are waiting to hear from the Administration about scheduling." After that, Erickson asked attendees if they had any questions. They did not.

212. Earlier in Erickson's November 3, 2023, Association update, Erickson also said,

> "The administration has accepted our proposal to move three counselor positions to Career Pathways where they will continue to teach generating revenue and will also work with STEP students allowing the institution to leverage federal funding that would not otherwise be available to LCC. We are excited about this plan which is a win-win-win solution. It will allow for the strategic expansion of the Workforce division, positively impact the budget, expand services for students, especially ones from historically oppressed groups, and obviate retrenchments and disruption to our three valued counselors as well as multiple faculty in another division who would have been impacted."

The three "counselor positions" that Erickson referenced on November 3, 2023, were those filled by Alvarado, Hampton, and Soriano-Cervantes (the three Faculty Counselors "of color").

213. During the November 3, 2023, meeting, at least two managers, including Vice Presidents of Academic Affairs Tinkham and Matthews, were present while minimum qualifications were discussed. Further, at the time, Matthews was on management's bargaining team. After the meeting, Tinkham informed General Counsel Blade of what had occurred.

The College Bars Further Discussion of Minimum Qualifications

214. On November 6, 2023 (a Monday), at 4:44 p.m., General Counsel Blade sent Faculty Council Co-Chairs Meenaghan and Steeves an email. A carbon copy of the email was sent to Vice President of Academic Affairs Tinkham. Blade's email stated,

> "Kevin [Steeves] and Gerry [Meenaghan],
>
> "It has come to my attention that at the Faculty Council last week there was a discussion of the collective bargaining subject regarding minimum qualifications and certifications for faculty members. This is wholly inappropriate and potentially an Unfair Labor Practice ('ULP') for direct dealing with the administration.
>
> "Shared governance councils are not the appropriate place to discuss any subject that is being bargained. While LCCEA and the college administration had agreed to suspend bargaining on this subject (to be started soon), it is still being bargained currently, and should not be discussed outside the bargaining sessions.
>
> "Finally, I was also informed that an 'Article 43' to the collective bargaining contract with LCCEA was on the agenda. Apparently, it was not discussed. This is also completely inappropriate as there are currently only 41 articles in the current contract, and the current contract is not open, so no new articles can be added at this time. Discussing a new article when the contract is not open is also potentially a ULP.
>
> "I trust this email will suffice to stop this discussion at Faculty Council immediately. If the faculty would like to discuss bargaining issues or contractual provisions, they may, but a shared governance council is not the appropriate vehicle for such a discussion as there are managers and classified professionals present. The simple solution is to schedule a faculty only meeting and discuss these issues as much as you would like.
>
> "The administration has no desire to avail itself of a hearing with the [Employment Relations Board] to address these ULP's, but it will be forced to do so should this continue.
> "Thank you for your attention to this very important matter."

215. When Meenaghan received General Counsel Blade's November 6, 2023, email, Meenaghan was confused, "a little anxious," "kind of at a loss," "a little indignant," annoyed, and intimidated. He also found Blade's email to be accusatory, threatening, and "kind of frightening." Later, when Erickson read Blade's email, Erickson was "pretty shocked and upset." Erickson received a copy of Blade's email from Association President Mitchell.

216. On November 7, 2023, the Association filed the instant unfair labor practice complaint with the Board against the College.

217. In November 2023, the College announced that none of the positions that had been listed for possible retrenchment would actually be retrenched.

218. During the next Faculty Council meeting after the November 3, 2023, Faculty Council meeting, attendees discussed the need to be mindful of the fact that representatives of both the College and the Association were present during Faculty Council meetings.

Division Faculty Coordinator Assignment Evaluated

219. Faculty members who serve as Division Faculty Coordinators are, like other faculty members, included in the Association's bargaining unit. In essence, faculty members who are given the Division Faculty Coordinator assignment/role are released from some of their teaching duties to perform a more administrative/support assignment (*e.g.*, class scheduling). The Division Faculty Coordinator assignment was first created in 2020.

220. The Division Faculty Coordinator assignment is generally addressed in Article 38 of the CBA, which specifically concerns "Faculty Administrative Support Assignments," or "FASAs." Article 38.2.1 provides that the assignment will "specifically exclude supervisory duties." Article 38.3.3 provides, "Specific assignment descriptions of FASAs will be developed by the responsible department/division chair/manager in consultation with stakeholders."

221. The College regularly looks at job/assignment descriptions, and periodically updates them. Before the events of this case, however, the Division Faculty Coordinator role had never been evaluated or reviewed to see whether the role was working. In the fall of 2023, the College wanted to gather information about how the Division Faculty Coordinator role was working. During that period, Vice President of Academic Affairs Tinkham tasked Associate Vice President of Academic Affairs Frei with gathering and processing information/feedback on that subject and the possibility of using a new "Faculty Chair model" instead of the College's current approach (after the topic came up in a "campus climate workgroup").

222. In general, a Faculty Chair assignment is considered to be more extensive than a Division Faculty Coordinator assignment, and a Faculty Chair might be expected to evaluate and otherwise supervise other faculty members. Currently, Division Faculty Coordinators essentially do not evaluate others, and they are not considered supervisors.

223. On November 21, 2023, Associate Vice President of Academic Affairs Frei met with "classified coordinators" in the "academic divisions" and collected information on

(1) what has worked well with their coordinator roles, (2) what has not worked well, and (3) recommendations for improvement.

224. On November 30, 2023, Associate Vice President of Academic Affairs Frei distributed surveys to certain College employees, via Deans, regarding the Division Faculty Coordinator role. Around the same time, invitations were sent out, via email, for meetings in which the Division Faculty Coordinator role would be discussed. Those meetings were generally scheduled with employees who were or had worked as Division Faculty Coordinators. Those invitations were never specifically sent to the Association. Moreover, no one who attended the meetings did so on behalf of the Association as an official Association representative.

225. In late November or early December 2023 (during winter break), Association President Mitchell was contacted by a manager named Daniel Brown. At the time, Brown was the College's Title IX investigator. Brown scheduled a meeting with Mitchell in December 2023, and told Mitchell that he would be investigating Mitchell's April 2023 formal whistleblower complaint.

226. On December 6, 2023, Anna Gates-Tapia, the Division Dean of College and Career Foundations, sent an email to Association President Mitchell and three PT faculty members in the ALS department. Gates-Tapia is Mitchell's supervisor/manager, and the Dean who oversees ALS. In its entirety, Gates-Tapia's December 6, 2023, email stated,

> "Hello, ALS Colleagues,
>
> "The college is seeking feedback on the division faculty coordinator roles, and ideas about a faculty chair model.
>
> "Please take a few minutes to respond to a 4 question survey that asks for feedback on what's been effective/not effective about the division faculty coordinator role, any recommendations for improvement to the division faculty coordinator roles, and ideas about a faculty chair model.
>
> "Email addresses are **not** being collected.
>
> "You can find the survey by following this link Division Member Survey on Faculty Coordinator Roles
>
> "The survey is open until December 19, however it's recommended that you complete it during your current contracted period."

227. The four questions asked in the voluntary survey referenced in the December 6, 2023, email were: (1) "What works, or worked, well with the Division Faculty Coordinator roles?" (2) "What didn't work, or is not working, well with the Division Faculty Coordinator roles?" (3) "What recommendations do you have for improvement of the Division Faculty Coordinator roles?" and (4) "What ideas do you have for a Faculty Chair model, how would it be different from

the current Division Faculty Coordinator model, and what improvements would it provide?" All of those questions were created by Associate Vice President of Academic Affairs Frei.

228. On December 6, 2023, at 3:00 p.m., Associate Vice President of Academic Affairs Frei participated in an in-person and virtual/Zoom (a hybrid) meeting with current and prior Division Faculty Coordinators. (No Association leaders were invited to the meeting.) Early on in the meeting, attendees discussed how the Division Faculty Coordinators were being used in the various divisions. After that, attendees discussed the four questions listed above. Some of the answers provided by attendees included ideas about changing attendees' job duties. One idea that was shared was to give the Division Faculty Coordinators more of a supervisory role, which might affect whether someone was included in a bargaining unit. Another idea that was shared was to have Division Faculty Coordinators conduct performance evaluations of employees in the Association's bargaining unit, under the Faculty Chair model. A different shared idea was to have the Division Faculty Coordinators involved with budgeting. Frei did not provide input or make any suggestions during the meeting. Instead, Frei essentially facilitated the discussion, asked for clarification as needed, and took notes.

229. Vice President of Academic Affairs Tinkham did not participate in any of the Division Faculty Coordinator meetings, and did not gather feedback herself.

230. After the December 19, 2023, deadline for completing the Division Faculty Coordinator surveys passed, Associate Vice President of Academic Affairs Frei compiled the information from the surveys and the related meetings in a report. In February 2024, Frei gave her report to Vice President of Academic Affairs Tinkham. Among other things, the report noted that "any future decisions or actions governed by the faculty CBA would be processed through the appropriate collective bargaining procedures." The report was not sent to anyone in the Association's bargaining unit.

231. Ultimately, no changes were made to the Division Faculty Coordinator assignment/role. Further, the College never made a proposal to the Association to switch to the Faculty Chair model or to change anything about the role. The College also did not communicate to faculty members about any changes to the Faculty Coordinator role actually being made.

<u>More Employee Responses</u>

232. On December 6, 2023, during a Board of Education meeting, Faculty Council Co-Chair Meenaghan made a public statement regarding how he felt about General Counsel Blade's November 1, 2023, email barring the topic of minimum qualifications from being discussed during Faculty Council meetings. Meenaghan also spoke of the events that led up to the email. In part, Meenaghan shared that he felt "intimidated, annoyed, and gaslit."

233. On December 6, 2023, during the same Board of Education meeting, Howard also publicly spoke about the impact that the anonymous complaint had on her after she discovered that the complaint had been shared with the Board of Education. One reason she made that statement was because she felt that the College had done nothing on her behalf in response to the letter. In

addition, Howard stated that she felt unsafe. During the same meeting, Howard's husband also spoke on Howard's behalf, for similar reasons.

234. After the December 6, 2023, Board of Education meeting, the College informed Howard that it would be willing to help her with her safety and other concerns related to the anonymous complaint. Subsequently, Howard had a related telephone call with Associate Vice President of Human Resources and Labor Relations Turner.

235. On December 10, 2023, Howard sent an email to Associate Vice President of Human Resources and Labor Relations Turner. In that email, Howard requested "an unconditional apology" from President Bulger for sharing the anonymous letter. In the same email, Howard characterized the anonymous letter as defamatory. Additionally, Howard pointed out that distributing the letter was inconsistent with what General Counsel Blade wrote in his November 1, 2023, email, which (as detailed above) essentially stated that the administration cannot do anything with anonymous complaints. Howard's email also included, as an attachment, a modified Word document version of the anonymous complaint that did not identify Howard or Mitchell by name. Howard did not receive the requested apology or a response to her December 10, 2023, email.

236. In the end, the October 2023, anonymous complaint did not become an agenda item for a Board of Education meeting. Moreover, neither the Board of Education nor the College took any formal action in response to the anonymous complaint.[21]

237. In January 2024, Association President Mitchell met with Brown (the College's Title IX investigator) a second time. During the meeting, Brown said that he would be writing a report and submitting it to Associate Vice President of Human Resources and Labor Relations Turner and General Counsel Blade, who would then be able to revise Brown's report. However, as of the May 2024 hearing for this case, the College has not provided Mitchell with any updates regarding her formal complaint or the related investigation.

238. During a January 2024 Board of Education meeting, Simmons (who, as noted, was not selected for possible retrenchment) provided a public statement to the Board of Education. In her statement, Simmons shared some of the concerns of her colleagues, and accused the College of fabricating a budget crisis, closing the Health Clinic without warning, and not discussing alternatives to layoffs.

239. On January 4, 2024, Alvarado also made public comments during a Board of Education meeting. Among other things, Alvarado alleged that she was wrongly identified for retrenchment in the fall term of 2023.

---

[21]In its post-hearing brief (at 33), the College asserts, "No employee came forward after the anonymous letter was sent to more specifically identify Ms. Howard's or Ms. Mitchell's negative behaviors or interactions. Therefore, there was nothing concrete to investigate, and the College did nothing further with the anonymous complaint."

240. As indicated above, the parties' existing CBA was set to expire on June 20, 2024. Accordingly, the parties would have entered negotiations for a successor CBA in February 2024.

The Association's Listserv

241. The College permits certain groups to create "listservs" (*i.e.*, "distribution lists") that permit a group to send emails to an entire list of lanecc.edu email addresses at the same time using the College's email system. The Association uses one of its multiple listservs to send emails to all of its bargaining unit members' lanecc.edu email addresses at once. (That listserv has been described as the "faculty listserv.") To use that particular listserv and send an email to everyone in the bargaining unit, the Association simply sends an email to faculty@lanecc.edu. The Association's faculty@lanecc.edu listserv is managed, in different ways, by the College's IT and Human Resources departments and the Association (frequently, by Association President Mitchell in particular).

242. In general, the Association uses the faculty@lanecc.edu listserv to share information regarding Association activities and events, bargaining updates, information about grievances, and the College's budget. Some but not all of the emails that go out to the faculty@lanecc.edu listserv are also posted on the Association's website.

243. The Association's faculty@lanecc.edu listserv is only supposed to include bargaining unit employees' College email addresses. It is not supposed to include any managers, classified employees, or students. Bargaining unit employees' email addresses are supposed to be added to the listserv shortly after an employee joins the unit. Likewise, when a bargaining unit employee leaves the unit, his or her College email address is supposed to be removed from the listserv.

244. The end of all emails sent to the Association's faculty@lanecc.edu listserv state, "Confidentiality Notice: LCCEA messages are intended for faculty. If you have received this message in error, please notify LCCEA."

245. The College does not routinely monitor emails that are sent or received via its network. However, when the College does check email activity, it attempts to notify users of that.

246. The College's information technology policy provides, among other things, "[A]ll electronic mail is public record (ORS192) and is subject to inspection and disclosure and scheduled retention and disposition. Users should have no expectation of privacy in their use of electronic mail. In addition, College Technology can be subject to authorized and unauthorized access by both internal and external users."

247. The College is subject to public records requests.

248. Article 11.12 of the parties' CBA provides,

> "**Faculty E-mail Distribution List.** The College's e-mail distribution list for faculty shall be reviewed each term by the Association. The Association shall

submit a timely request and the College shall purge all non-faculty members from the official college faculty email distribution list. All new faculty members shall be added to the list by the College within 30 days of hire."

249. In accordance with Article 11 of the CBA, every term, a Payroll Manager named Aneita Grogan (who is not represented by the Association) provides the Association with an updated roster of employees in the Association's bargaining unit. Separately, if the Association finds out that someone is not included in that roster (and/or listserv) and should be, Association President Mitchell contacts Grogan to make sure that the individual is appropriately included.

250. Article 16.2 of the CBA provides, in relevant part, "The privacy of an employee's mailbox, office, e-mail, phones, and personal material shall be respected. No information from these sources shall be gathered, stored or exchanged."

251. Article 1.1 of the CBA defines the composition of the Association's bargaining unit. Article 1.1.1 provides, "Faculty Unit Exclusions. Specifically excluded from this bargaining unit are all supervisors, confidential employees and instructors who teach only community or adult education classes."

Director Jennifer Kepka's Listserv Activity

252. Since August 1, 2022, Jennifer Kepka has been the College's Director of Academic and Tutoring Services, which is a FT management position that is not included in the Association's bargaining unit. Immediately before she started her current role, Kepka was a contracted/FT faculty member and included in the Association's unit. When Kepka promoted to her current management position, she stopped performing all of the duties affiliated with her earlier represented/faculty member position, and only performed managerial duties. In Kepka's current management role, she does not "officially" interact with the Association on behalf of the College. In total, Kepka has worked for the College for about 14 years.

253. On August 3, 2022, Payroll Manager Grogan informed Association President Mitchell of Kepka's promotion to her current management role, via email. Around the same time, Grogan gave Mitchell a monthly list of terminations, retirements, and layoffs that noted that Kepka's assignment was changing effective July 31, 2022. Grogan also gave Mitchell another document indicating that Kepka started as a manager and as the Director of Academic and Tutoring Services on August 1, 2022. However, Mitchell did not make a request that Kepka be removed from the faculty@lanecc.edu listserv and Kepka was not removed from the faculty@lanecc.edu listserv during that period of time.

254. While Kepka was a bargaining unit employee, she regularly received email via the faculty@lanecc.edu listserv. However, when Kepka promoted into her management position, Kepka did not ask to be removed from the faculty@lanecc.edu listserv, and she continued to receive listserv emails for a time. In Kepka's view, around the time when she accepted her current management position, she merely went on leave from her Association-represented faculty member position for a year but had not "resigned" from it. Kepka also believes that, during that year of

leave, she was simultaneously considered part of the Association's bargaining unit (albeit on leave without pay) and also part of management.

255. As highlighted below, after Kepka promoted to a management position, during the 2022 through 2023 school year, Kepka continued to receive and read emails sent to the faculty@lanecc.edu listserv. In addition, Kepka forwarded a number of those emails to her supervisor, Edward Ian Coronado, the Dean of Academic Support and Innovation (a role he has had for over ten years). In some of those instances, Kepka also shared comments about the emails with Coronado. Normally, Coronado is not directly involved with Association-related matters. However, Coronado has been involved with grievances involving the parties' CBA, and was involved with at least one grievance as of the May 2024 hearing for this case.

256. Whenever Coronado received a forwarded listserv email from Kepka, he generally never shared those emails with anyone else or spoke to anyone else about them. However, he may have discussed the forwarded emails with Kepka. Coronado also believed that whatever emails he received from Kepka would subsequently be shared on the Association's website.

257. Ordinarily, leave of absence forms are only used when a represented faculty member is taking on a management role on an interim basis. However, when Kepka promoted into her current management role, it was not an interim or temporary role. Her management position was also a paid position. Nevertheless, in early August 2022, Kepka, Associate Vice President of Human Resources and Labor Relations Turner, and College President Bulger signed a leave of absence form for Kepka. The form was never signed by an Association representative, and Association President Mitchell was not involved with it. In the form, Kepka specifically requested to go on unpaid leave from September 14, 2022, through September 1, 2023. Again, Kepka actually started her management position on August 1, 2022.

258. Article 20 of the CBA addresses leaves without pay. Article 20.1.1 specifically provides,

> "Upon request a contracted employee may be granted full-time or part-time leave of absence without pay for up to one (1) year when the operation of the College will not be handicapped by his/her absence. Requests for such leave must be submitted to the department/division chair in writing and must include a detailed explanation of the reasons for such absence. Requests must be submitted to the department/division chair in time to allow the employee adequate notice of its disposition prior to the period for which the leave is being used. Notification by the department/division chair shall be timely and in writing. The employee may appeal the decision to the appropriate vice president, who shall make a timely decision in writing."

Article 20.1.1 does not overtly address whether an employee needs to notify the Association when they go on a leave of absence without pay.

259. On September 7, 2022, the Association sent an email to the faculty@lanecc.edu listserv with a variety of Association updates, including a memorandum of agreement. At 8:16 a.m. the same day, Kepka forwarded the email to a faculty member named Sara Pittman.

260. On October 26, 2022, at 5:06 p.m., the Association sent an email to its faculty@lanecc.edu listserv. On October 27, 2022, at 8:00 a.m., Kepka forwarded that email to Coronado. Kepka's email to Coronado also stated, "Did this come through for D&D or am I just getting these because I'm still on the faculty list?" In that email, "D&D" referred to "Deans and Directors."

261. On January 24, 2023, at 8:01 a.m., the Association sent an email to the faculty@lanecc.edu listserv with the subject of "LCCEA President's Update." At 9:32 a.m. the same day, Kepka forwarded the email to Coronado, along with a message of "fyi."

262. On March 1, 2023, the Association sent an email to the faculty@lanecc.edu listserv regarding a new memorandum of agreement "regarding the transition to Moodle 4." At 11:17 a.m. the same day, Kepka forwarded the email to Coronado.

263. On April 6, 2023, the Association sent an email to the faculty@lanecc.edu listserv. The email concerned a bargaining update. Later the same day, at 7:20 p.m., Kepka forwarded the Association's email to Coronado, along with a message stating, "Check out that third bullet." The bullet point that Kepka referred to concerned a proposal that had been made by the Association. It stated, "Instructional testing services (ITS) will provide sufficient in-person proctoring services." That proposal, if accepted, would have impacted Kepka, as she was the manager for ITS at the time.

264. On May 16, 2023, the Association emailed the faculty@lanecc.edu listserv a bargaining update. At 12:57 p.m. the same day, Kepka forwarded the email to Coronado.

265. As noted above, Kepka's leave of absence form covered a period of time that ended on September 1, 2023. Around that time, Kepka filled out some paperwork in order to resign from her former faculty position.

266. On September 11, 2023, at 11:12 a.m., the Association emailed the faculty@lanecc.edu listserv. In that email, which Kepka received, the Association invited the recipients to attend a September 21, 2023, Association event.

267. On September 11, 2023, at 11:30 a.m., Kepka forwarded the Association's September 11, 2023, email to Coronado. In the same email, Kepka wrote to Coronado, "I thought 9/21 was all college-led?"

268. On September 11, 2023, at 3:08 p.m., Kepka sent an email back to the Association (responding to its listserv email). Kepka's email stated, "I believe I am on this message by mistake. I resigned from my faculty position effective at start of September." Kepka sent that email because she understood that employees who were not faculty members are not supposed to receive emails from the faculty listserv. It was the first time that Kepka informed the Association that she was

still on the listserv. (That said, as noted, on August 3, 2022, Grogan informed Mitchell of Kepka's promotion).

269. When Association President Mitchell saw Kepka's September 11, 2023, email to the Association, Mitchell was "really surprised" because Mitchell had received "official notice" of Kepka's promotion in August 2022 via Grogan. Around the same time, Mitchell contacted Grogan about the issue, and sought to determine, via an information request, whether Kepka had been receiving listserv emails while a manager. Afterward, the College provided the information requested, which included the emails that Kepka had received via the faculty@lacecc.edu listserv. When Mitchell learned that Kepka had been receiving then forwarding listserv emails while she was a manager, Mitchell was "very concerned."

## CONCLUSIONS OF LAW

1. This Board has jurisdiction over the parties and the subject matter of this dispute.

2. The College's proposed retrenchments did not violate ORS 243.672(1)(a) or (c).

ORS 243.672(1)(a) makes it an unfair labor practice for a public employer or its designated representative to "[i]nterfere with, restrain or coerce employees in or because of the exercise of rights guaranteed in ORS 243.662." The language of ORS 243.672(1)(a) provides two distinct prongs, one of which prohibits interference, restraint, and coercion "because of" the exercise of the protected rights. Put another way, the "because of" prong prohibits the employer from basing its actions on an employee's protected activity. The other prong of subsection (1)(a) prohibits actions that interfere with, restrain, or coerce employees "in" the exercise of their protected rights. *Portland Assn. of Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 623, 16 P3d 1189 (2000); *Lebanon Education Association/OEA v. Lebanon Community School District*, Case No. UP-4-06 at 29, 22 PECBR 323, 351 (2008). Under either prong, and for all of the unfair labor practice claims in this complaint, the burden of proof is on the Complainant, while the Respondent has the burden of proving affirmative defenses. *See* ORS 183.450(2); OAR 115-010-0070(5)(b).

To determine if an employer violated the "because of" prong, we ordinarily examine the employer's motives or reasons for the disputed action. However, it is unnecessary for a complainant to prove that the employer was subjectively motivated by an intent to restrain or interfere with protected rights. *Mult. Sch. Dist. No. 1*, 171 Or App at 623; *Lebanon Community School District*, UP-4-06 at 29, 22 PECBR at 351. Stated differently, evidence of employer hostility or anti-union animus is unnecessary to establish a claim under the "because of" prong. *Oregon AFSCME Council 75, Local #3943 v. State of Oregon, Department of Corrections, Santiam Correctional Institution*, Case No. UP-51-05 at 22-23, 22 PECBR 372, 393-94 (2008). When presented with "because of" claims, we typically examine the record as a whole to determine what motivated the employer to act. *Mult. Sch. Dist. No. 1*, 171 Or App at 626.

When we analyze an employer's actions under the "in" the exercise prong, we focus on the likely consequences or efforts of the employer's actions on employees. An employer commits an "in" the exercise violation if the employer's conduct, when viewed objectively under the totality of the circumstances, has the natural and probable effect of deterring employees from engaging in

activity protected by the Public Employee Collective Bargaining Act (PECBA). Because the "in" the exercise prong's standard is objective, neither the employer's motive nor the extent to which employees actually were coerced is controlling. *Mult. Sch. Dist. No. 1*, 171 Or App at 623-24; *Service Employees International Union Local 503, Oregon Public Employees Union v. City of Tigard*, Case No. UP-040-13 at 8-9, 26 PECBR 131, 137-38 (2014). Put simply, our test for the prong is: Would a reasonable person be chilled from exercising PECBA rights by the employer's conduct? *Oregon Public Employees Union v. Jefferson County*, Case No. UP-55-98 at 14, 18 PECBR 109, 122, *recons*, 18 PECBR 199 (1999). Additionally, an employer that commits a "because of" violation also generally commits a derivative "in" the exercise violation because the natural and probable effect of the employer's unlawful action is to chill the exercise of protected rights. *Amalgamated Transit Union, Division 757 v. Tri-County Metropolitan Transportation District of Oregon*, Case Nos. UP-42/50-12 at 28, 25 PECBR 640, 667 (2013) (citing *Clackamas County Employees' Assn. v. Clackamas County*, 243 Or App 34, 259 P3d 932 (2011)).

The Association asserts that the College violated both prongs of ORS 243.672(1)(a) by targeting Association President Mitchell, Simmons, Oberstaller, Alvarado, Hampton, and Soriano-Cervantes for retrenchment. The Association argues that the College selected these individuals for retrenchment out of seniority order in contravention of the contract, and without a legitimate basis, because of their union activities. For the reasons discussed below, we find that the Association has not established that the College violated PECBA as alleged.

At the outset, the Association asserts that the College "used a non-existent budget crisis" to discriminate against Association activists. Specifically, the Association avers that "[t]here was no financial need to retrench anyone, because the College learned it would have an unexpected budget surplus as early as late June 2023, obviating the need to create the reserve for revenue shortfall." However, contrary to the Association's position, the record establishes that the College was dealing with significant financial issues around the time that the budget was adopted by the College's Board of Education. To briefly summarize the relevant facts, in late 2022 or early 2023, two external consultants completed an audit of the College and concluded that the College was "barely surviving" financially. Shortly thereafter, the College's Budget Committee convened and similarly concluded that the College was struggling financially and that a reserve was needed in order to cover a potential budget deficit if certain of the College's budget assumptions (including enrollment increases and a certain level of state funding) were not realized. Accordingly, in early June 2023, the Board of Education directed President Bulger and the College's administration to prepare a multi-million-dollar reserve for a potential revenue shortfall. This directive was consistent with a Board of Education policy that requires the College to have a 10 percent ending fund reserve or, where there is insufficient reserve, to form a three-year plan to "build back" the reserve. Then, in late June 2023, the Board of Education unanimously and formally approved the College's proposed budget that included the reserve fund. Around the time that the Board of Education adopted the budget in June (a deadline mandated by statute), the legislature had increased the allocation for community colleges in the state. However, the College did not know the portion of the allocation that it would receive. The College also did not know what enrollment would be for the next academic year. Put another way, it was still unknown to what extent the assumptions in the budget had come to fruition and to what extent those factors would impact the potential budget deficit. The Association's argument also overlooks the fact that before the general state budget information was known to the College in late June, the Board of Education had already

directed the College administration to establish a muti-million-dollar reserve for a potential revenue shortfall. Accordingly, we find the Association's argument unavailing.

We next address the Association's argument regarding the College's September 22, 2023, email response to the Association's information request for a list of the positions being proposed for retrenchment and the incumbents currently in those positions. The Association essentially argues that the College's response failed to properly comply with Article 10 of the parties' CBA, which indicates that College was targeting Association activists for retrenchment. However, the record establishes that the list was provided *before* the parties had engaged in the process under Article 10.2 of the CBA. Furthermore, the College explicitly stated in its response to the request that it would honor the process under the CBA noting that "all named individuals in the spreadsheet possess contractual rights regarding notice, seniority, bumping, etc. that will be upheld as this process unfolds." We also note that Simmons and Oberstaller (two of the employees that the Association alleges were targeted) were not included on the list in the College's response to the Association's information request. Instead, the College listed another employee in the Health Department with higher seniority. The Association apparently argues that the College selected a more-senior employee for retrenchment with the intent of ultimately retrenching Simmons or Oberstaller because they would be subject to bumping by the senior employee under Article 10 of the CBA. It is challenging to square this argument with the Association's position that the College intended to circumvent the process under Article 10 of the CBA. Regardless, under these circumstances, we do not find the College's response to be evidence that it targeted employees for retrenchment based on their protected activity.

The Association likewise asserts that "the College did not follow the contractual process for retrenchments in Article 10, initially skipping the 10.2 process that requires notice to the Association and discussion of alternatives to retrenchments, instead going straight to the Board [of Education at the September 27, 2023, special meeting] for approval of the personnel cuts—something that had never been done in previous retrenchments." The Association argues that this conduct is evidence that the College had intended to proceed with layoffs of the union activists listed for retrenchment until there was "public outcry" at the special meeting. Ultimately, we do not find that the evidence supports the Association's position. The materials for the September 27 special meeting state that the "implementation of budget reductions * * * includes initiating union contractual processes." The presentation also states that "at the June 21st work session, the Board [of Education] supported * * * guiding principles for the * * * budget" including that the College "[a]dhere to collective bargaining contract obligations." Furthermore, during the special meeting the Board of Education passed a motion to "authorize the [College] Administration to initiate the contractual processes, as set forth in the collective bargaining agreements with both LCCEA and LCCEF, for notification and meetings regarding the proposed retrenchments" and to "direct the [College] Administration to work with both collective bargaining units to discuss the general subject of retrenchments as well as possible alternatives to the proposed retrenchments pursuant to the requirements of the respective collective bargaining agreements."[22] Further

---

[22]The Association asserts that the motion that was adopted at the September 27, 2023, Board of Education meeting (set forth above) was materially different from the original motion put forth to the Board of Education. The Association argues that the original motion supports the Association's position that the College intended to proceed with layoffs. The College responds that the original motion was materially

Continued . . . . .

evidence that the College intended to follow the contractual process include public statements made by the College's General Counsel during the special meeting that, after the Association and the College convened pursuant to the CBA, the retrenchments were "likely to change a hundred percent" and would "look nothing like the list" provided to the Association in response to its September 22, 2023, information request. These statements are also consistent with the earlier communication from the College in response to the Association's information request (discussed above), where the College clearly stated that it intended to comply with the process under the parties' CBA. Consequently, we do not find that the College "skipped" the 10.2 process and intended to proceed with layoffs as asserted by the Association. Rather, the evidence establishes that the College created a budget package that included budget reductions in accordance with the directive from the Board of Education to create a reserve for a potential revenue shortfall, and in doing so, the College consistently acknowledged its intent to follow relevant contractual obligations if the Board of Education chose to implement budget reductions that impacted personnel.

We also do not find that the timing of the special meeting and the 10.2 notice, which was sent out by the College to the Association on September 28, 2023 (the day after the special meeting), indicates unlawful motive as alleged by the Association. The Association argues that the College planned to circumvent the required process under the parties' CBA because other past retrenchments under different circumstances were handled by the parties first, before Board of Education involvement. However, it is undisputed that this was the first time that a budget for revenue shortfall was created – and, as explained above, the Board of Education directed the College administration to create a muti-million-dollar reserve for a potential shortfall in June. In turn, College administrators brought the plan that they created to the Board of Education so that the Board of Education could review that plan and ultimately decide next steps, which included engaging with the Association under the process in the CBA if the personnel portion of the budget package was approved. Under these circumstances, we are not persuaded by the Association's argument, particularly given the many assurances the College made to the Association and to the Board of Education that the College would go through the CBA process if retrenchments ended up being necessary.

The Association also argues that various alleged conduct by College administrators warrants this Board making an inference that the College was unlawfully motivated when selecting the positions for retrenchment. Specifically, the Association points to (1) alleged statements made by President Bulger to President Mitchell during meetings; (2) a statement made in 2022 by the retention counselors' former manager that they were the "spawn of Satan"; and (3) alleged animus that Matthews harbored towards Mitchell for her actions concerning the faculty search committee. In considering this argument, we acknowledge that in cases where a complainant must establish unlawful motive, there is rarely direct evidence that a respondent acted "because of" union activity

---

Continued . . . . .
similar to the motion adopted by the Board of Education and that it did not support the conclusion that the College intended to circumvent the CBA process. The exact wording of the original motion is not in evidence and, as explained above, the evidence that is in the record (including statements made at that meeting and the materials from that meeting) ultimately supports the College's position that it intended to engage with the Association over the proposed retrenchments as required under Article 10.2 of the parties' CBA.

and that we must often rely on circumstantial evidence to make such a determination. *See Mult. Sch. Dist. No. 1*, 171 Or App at 624. That being said, after careful consideration of the relevant facts in the record, we conclude that there is insufficient evidence linking the alleged actions listed above to the College's decision-making regarding selection of positions for possible retrenchment. Specifically, there is no evidence connecting President Bulger to the decision to select Mitchell's position for possible retrenchment; there is no evidence that the retention counselor's former manager was involved in, or influenced in any way, the decision to select the at-issue retention counselor positions for possible retrenchment; and there is no evidence that Vice President of Academic Affairs Tinkham was unlawfully motivated when selecting positions for possible retrenchment.[23]

Furthermore, and significantly, there is evidence of legitimate and lawful reasons that the College sought to list positions to potentially retrench, and there was credible testimony detailing the reasoning behind the retrenchments from the administrators that made those decisions.[24] Specifically, in addition to the positions at issue in this case, classified staff positions, administrator positions, and non-represented positions were considered for retrenchment, remained vacant, or were eliminated as a result of the proposed budget reductions. We also (again) find it significant that the College indicated to the Association multiple times during the relevant period that it would honor the process for retrenchment set forth in the parties' CBA and expressly predicted that engagement in that process would impact the proposed retrenchments considerably. Indeed, the record includes evidence, including testimony from both Association and College witnesses, that

---

[23]We also do not find sufficient evidence of unlawful motive that could be imputed to Tinkham's selection of Mitchell's position. There is no evidence that President Bulger was involved in the selection of the retrenchments at all, let alone influenced Tinkham's selections. Although there was evidence that Tinkham consulted the two Associate Vice Presidents of Academic Affairs, Frei and Matthews, when determining what positions to retrench, we do not find sufficient evidence that Matthews was improperly motivated (Matthews was not called to testify) and there is otherwise no evidence that Matthews' experience with Mitchell on the faculty search committee impacted Tinkham's decision to list Mitchell's position for retrenchment.

[24]The Association asserts that, with respect to Mitchell's position (the only FT position in ALS), the College could not justify the proposed retrenchment of that position. The Association points to the College's internal document in support of its position that states in part that "the current and projected future ALS course enrollments could continue to sustain the workload of the one-full time instructor in the department[.]" The Association also asserts that this document "indicates that any potential reductions to the department should be to the staffing of the 'front desk,'" as opposed to the FT faculty position. However, that same document also indicates a drastic decline in enrollment in ALS classes and details a proposed reorganization that would move certain ALS classes to other departments. Furthermore, before the College sent the 10.2 notice and met with the Association pursuant to the CBA regarding the proposed retrenchments, the College believed that there was a three course preparations or "preps" in ALS. That mattered here, from the College's perspective, because declining enrollment in ALS impacted whether there would be multiple sections of a particular course in a term, in turn impacting whether a full course load could be offered within a three-prep limit. However, during the relevant meeting with the Association, the College ultimately adopted the Association's interpretation of the CBA that four preps (not three) was the maximum number of preps in ALS, apparently alleviating the concern regarding whether a full course load could be supported. Consequently, the College did not pursue a retrenchment in ALS. In any event, and as discussed in this order, the record indicates that Mitchell's employment status with the College would not have been impacted even if the proposed partial retrenchment in ALS had occurred.

at least some of the incumbent employees in the positions listed for retrenchment had seniority over other employees in their department and had the right to bump current less-senior employees. Thus, certain employee incumbents in the listed positions proposed for retrenchment (including Association President Mitchell) would not lose their employment at the College as the result of any retrenchments that might occur after the relevant contractual process was completed. Furthermore, the College sent the Association the required 10.2 notice, and in early October 2023, the parties engaged in the process under the CBA, including discussing alternatives to retrenchments. After going through the CBA process, no retrenchments occurred.

Turning to the alleged violation of the "in" the exercise prong of ORS 243.672(1)(a), the Association argues that "[a]gainst the backdrop of the College's non-compliance with the retrenchment process and failure to select the least senior employees [for retrenchment], a reasonable employee in the bargaining unit would see a relationship between the union activities of the employees named on an unsupportable list for retrenchment." However, as discussed in detail above, we do not find that the College failed to comply with the retrenchment process – to the contrary, the College followed the process under the CBA (as it had informed the Association it would). Indeed, the Association's reference to the "list for retrenchment" is not the actual 10.2 notice – rather, it is the College's response to the Association's September 22, 2023, information request. To reiterate, that information request sought the "positions and incumbents" that were being considered for retrenchment *before* the parties had engaged in the process under Article 10 of the CBA; Simmons or Oberstaller were not included on the list; and the listed employees (Mitchell, Alvarado, Hampton, and Soriano-Cervantes) retained contractual rights (*e.g.,* seniority and bumping rights) that the College assured would be "upheld as the process unfold[ed]." Furthermore, the actual 10.2 notice that the College sent the Association stated that the College was "contemplating contracted faculty retrenchment in * * * Academic Learning Skills, French and Counseling" and did not list any specific positions or employees for potential retrenchment. Additionally, after the parties engaged in the contractual process, no employees were ultimately retrenched. Under these circumstances, we do not find that a reasonable employee would be chilled from exercising protected rights because of the College's conduct.

We also do not find that the College's conduct described above violated ORS 243.672(1)(c). ORS 243.672(1)(c) states, in relevant part, that it is an unfair labor practice for a public employer or its designated representative to "[d]iscriminate in regard to hiring, tenure or any terms or condition of employment for the purpose of discouraging membership in an employee organization." In this context, we have defined the word "membership" very broadly to protect a wide variety of union activities. Additionally, our test for determining whether a violation of subsection (1)(c) has occurred is similar to the one we use in determining a violation of the "because of" prong of subsection (1)(a). Here, as described above, we do not find a causal connection between the employees' protected activity and the College's proposed retrenchments. Therefore, the Association has not established a violation of ORS 243.672(1)(c).

3. The College's conduct related to an anonymous complaint did not violate ORS 243.672(1)(a) or (c).

The Association alleges that the College violated ORS 243.672(1)(a) and (c) when: (1) President Bulger sent the Board of Education a copy of an anonymous complaint on

October 31, 2023,[25] and (2) Vice President of Human Resources and Labor Relations Turner sent out an email allegedly "soliciting formal complaints" against Association President Mitchell and Vice President Howard on November 1, 2023. As set forth below, we conclude that the College did not violate ORS 243.672(1)(a) or (c) as alleged.

We first address the charge regarding President Bulger sending the Board of Education a copy of the anonymous complaint. In determining whether that action violated ORS 243.672(1)(a), we find the relationship between the Board of Education and President Bulger of particular significance. Under state law, the Board of Education is the governing body of Lane Community College. In its role, the Board of Education has delegated certain authority to the College administration. For example, with regard to collective bargaining with the Association, the parties' CBA acknowledges that "* * * management is accountable to the Board of Education and for accomplishing the mission and goals of the college and for day-to-day operations of the college" and that, "* * * the Board of Education has delegated to management representatives the responsibility for representing the Board in collective bargaining * * *."[26] Additionally, the Board of Education has likewise delegated authority to the President of the College to oversee the operations of the College. Accordingly, President Bulger reports directly to the Board of Education and is the Board's sole employee. College policy also provides that the President is expected to ensure that the Board of Education "is informed and supported in its work" and to keep the Board "aware of relevant trends and anticipated adverse media coverage." In this context, Bulger's act of sharing the complaint with the Board of Education is closely analogous to a manager sharing an employee complaint that they received with their supervisor. PECBA does not generally prohibit the sharing of employee complaints among management, even when those complaints are critical of union representatives. Accordingly, Bulger's act of simply sharing the anonymous complaint with the Board of Education that was critical of Association President Mitchell and Vice President Howard, does not, alone, establish unlawful motive as argued by the Association. Furthermore, given the relationship between the College President and the Board of Education, as well as the relevant policy as detailed above, we disagree with the Association's assertion that there was "no legitimate reason" for Bulger to share the anonymous complaint with the Board of Education.

The Association also argues that it is evidence of unlawful motivation that Bulger forwarded the anonymous complaint to the Board of Education despite not sharing other complaints (including, for example, Mitchell's whistleblower complaint) with them. However, we ultimately find persuasive evidence that Bulger was motivated to share *this* complaint because of her concern that the Board of Education might be contacted regarding the complaint, and she did not want them to be surprised if that happened. Indeed, Bulger credibly testified to her specific concerns regarding the anonymous complaint, and her testimony aligns with her email

[25]We note that the Association does not allege that the anonymous complaint was created by the College and does not otherwise allege that the creation of or the initial delivery of the complaint was a violation of PECBA. Rather, the Association alleges that President Bulger's action of forwarding that complaint to the Board constituted a violation.

[26]Additionally, the signature page of the relevant CBA provides that it is "by and between" the Association and "the Board of Education of Lane Community College" and the College President and the Chairperson of the Board of Education are among the signatories to the CBA.

communication to the Board of Education that included the complaint as an attachment. That email states:

> "I am attaching a letter that I received today. I do not want you to be surprised in case you hear or have heard from members of the college community regarding the claims raised in the letter. I am going to discuss the appropriate course of action with Mike Blade and Shane Turner (who also received the letter). I will keep you informed."

Additionally, the anonymous complaint letter states that it is from "a concerned group of faculty and staff members" and was signed purportedly on behalf of "Concerned College Community Members,"[27] which lends support to Bulger's stated reason for sharing the complaint insofar as there were an indeterminate number of people who may have written, reviewed, or signed the letter and who were therefore capable of bringing the same concerns directly to the Board of Education. In contrast, there is no evidence in the record that Bulger held similar concerns about any other complaints that she chose not to share with the Board of Education. Under these circumstances, we conclude that President Bulger was ultimately motivated by a desire to keep the Board of Education (her supervisors) informed about an issue that they might hear about from College employees. In reaching this conclusion, we again find it significant that Bulger reports directly to the Board of Education and is expected to keep them informed under Board policy.

In arguing for a different result, the Association asserts that in her email to the Board of Education, Bulger "does not merely indicate that she's providing the Board with the anonymous complaint to keep them informed; she tells them specifically that she will 'discuss the appropriate course of action' with Human Resources Director Shane Turner and in-house legal counsel, Michael Blade. From this point forward, the actions of the College are not at all geared toward keeping the Board 'informed,' but rather investigating the anonymous complaint against the two union officials." However, the record simply does not support the Association's position, as there is no evidence of any investigation into the complaint. Additionally, the Board of Education apparently does not make decisions on employee investigations or discipline, which supports the conclusion that Bulger's actual motivation was to inform the Board of Education of a situation that they might hear about from other members of the College community.[28]

The Association also points to certain alleged comments Bulger made to Mitchell and the timing of Bulger forwarding of the complaint, as evidence supporting an inference that Bulger was unlawfully motivated. We do find Bulger's statements to Mitchell concerning, particularly the

---

[27]We note that the Association strongly contests the contents and legitimacy of the letter, and we make no assessment on the merits of the accusations.

[28]The Association asserts that Bulger's concern that the Board of Education might be approached about the complaint lacks credibility because "the complaint was in the hands of only a few individuals until College President Bulger disseminated it to the Board of Education." We do not find a basis in the record to assess Bulger's understanding of the number of individuals that were provided the complaint at the time that she forwarded it to the Board. Moreover, as noted above, the anonymous complaint states that it is from "a concerned group of faculty and staff members" and is signed "Concerned College Community Members."

allegations that Bulger said that she wanted to "tussle"[29] with Mitchell and that Bulger did not "know how long [Mitchell was] going to be around here." This Board will infer an unlawful motive where an employer threatens to act based on protected activity and then acts to fulfill that threat. *Oregon AFSCME Council 75, Local 3742 v. Umatilla County*, Case No. UP-2-08, at 19, 23 PECBR 108, 126 (2009). We also note that the timing of Bulger forwarding the complaint to the Board was approximately one month after the special Board meeting where Association leaders, including Mitchell and Howard, made public comments to the Board that could be viewed as critical of the College administration. When addressing allegations that an employer acted "because of" an employee's protected activity, the Board "may infer a causal connection when an employer's [alleged unlawful] action closely follows in time after the employee's protected activity." *Id*. However, we are ultimately unpersuaded that Bulger's act of simply forwarding an anonymous third-party complaint (purportedly from "a concerned group of faculty and staff members") to the Board that supervises her and that she is to keep "informed" pursuant to policy, constituted an action taken in furtherance of her alleged threats, or that it was otherwise taken "because of" the Association leaders' protected activity. In reaching this conclusion we again find it significant that there was no investigation into the anonymous complaint and that no adverse employment action was ever taken against Association President Mitchell or Howard as a result of Bulger forwarding the complaint.[30]

We likewise conclude that Bulger forwarding the complaint to the Board did not violate the "in" the exercise of ORS 243.672(1)(a). We recognize that Association President Mitchell and Vice President Howard believe that President Bulger shared a copy of the anonymous complaint with the Board of Education based on their protected union activity. However, employees' subjective impressions are not sufficient to establish a violation, nor are they controlling. *Teamsters Local 670 v City of Vale*, Case No. UP-14-02 at 12, 20 PECBR 337, 348, *recons*, 20 PECBR 388 (2003). Instead, we use an objective standard of whether the alleged violative conduct has the natural and probable effect of deterring employees from engaging in activity protected under PECBA. As discussed above, Bulger forwarded an anonymous complaint to the Board of Education because she was concerned that the Board might hear about the complaint from other people at the College. No investigation into the anonymous complaint occurred and no adverse action was taken against Association President Mitchell or Vice President Howard as a result of Bulger forwarding the complaint. We conclude that a reasonable employee would not be chilled from engaging in protected activity under these circumstances.

---

[29]We note that this comment allegedly occurred on October 4, 2022, over 180 days before the complaint was filed in this matter, on November 7, 2023. Accordingly, we only consider the alleged comment for its potential to "shed light on the state of mind of those responsible" for alleged unlawful conduct that occurred within 180 days of the filing of the complaint. *Amalgamated Transit Union, Division 757 v. Tri-County Metropolitan Transportation District of Oregon*, Case No. UP-62-05 at 10, 22 PECBR 911, 921 (2009), quoting *Smith v. Employment Division*, 38 Or App 241, 245, 589 P2d 1184 (1979).

[30]We acknowledge that adverse action is not required to establish a "because of" claim, however, the lack of any adverse action against Mitchell or Howard and the fact that the Board is not involved in employee investigations or discipline, indicate that Bulger's motivation for sending the complaint was not to target Association leaders, as alleged by the Association.

We next turn to whether College Vice President Turner's November 1, 2023, email to all College employees violated ORS 243.672(1)(a). At the outset, we do not agree with the Association's characterization of that communication as "soliciting formal complaints" against Association President Mitchell or Vice President Howard. To the contrary, the relevant email, on its face, gives no indication that it was related in any way to the anonymous complaint regarding Mitchell and Howard. Indeed, the email makes no reference to Mitchell, Howard, the Association, or its leadership, and does not mention the anonymous complaint. Additionally, the November 1, 2023, email appears substantively similar to other emails that Turner sent to College employees once a term to remind them of the complaint process.

Furthermore, the evidence indicates that the College sent the email pursuant to its responsibilities under Title VII and related College policies and procedures regarding complaints. The College's Harassment and Discrimination Complaint procedure provides, in relevant part, that: "The College will respond to the extent possible to anonymous reports of discrimination or harassment or reports made by third parties not directly involved in the discrimination or harassment. However, the response to such reports may be limited if the information contained in the reports cannot be verified by independent facts." Turner testified that because the complaint did not contain specific facts, the College could not pursue any investigation into the allegations; however, the complaint alleged a "toxic" and "hostile [work] environment" and therefore raised concerns that some follow up was required. After speaking with Bulger, Turner then sent the email to College employees regarding the complaint procedures, with no reference to the anonymous complaint or the Association leaders referenced in that complaint. Thus, we find that the College's limited response of sending the email reminding College employees of the complaint process to be consistent with the College's procedure addressing anonymous complaints. Put another way, the record evidence does not support the Association's contention that the College was motivated to send the email "because of" Mitchell and Howard's protected activity.

We also find that Turner's email would not, when viewed objectively, chill employees from engaging in protected activity. As explained above, the communication makes no reference to the anonymous complaint, the Association, or its leadership. Rather, the communication promoted the college's efforts to "provide an environment free from harassment, discrimination, or bias" and resembled similar emails reminding employees about the College's complaint procedures. Accordingly, we conclude that a reasonable employee would not connect the email with the anonymous complaint at all (assuming they were even aware of the complaint to begin with), let alone determine that it was connected to protected activity. Furthermore, the College's email is consistent with the College's procedure addressing anonymous complaints, and employees should generally expect that the College would follow up on hostile work environment or related claims in the manner described in its policies. Accordingly, we do not find that the College committed an "in" the exercise violation.

For the reasons discussed in detail above, we do not find a causal connection between the employees' protected activity and the College's conduct related to the anonymous complaint. Therefore, we conclude that the College did not violate ORS 243.672(1)(c).

4. The College violated (1)(a) when it emailed Association members that they were prohibited from discussing minimum qualifications at Faculty Council Meetings.

The Association alleges that the College violated ORS 243.672(1)(a) when General Counsel Blade emailed the Faculty Council Co-Chairs on November 6, 2023, stating that the College would take "legal action" if they continued to discuss minimum qualifications at Faculty Meetings. We agree that Blade's email violated the "because of" and "in" the exercise prongs of ORS 243.672(1)(a).

We begin by summarizing the relevant facts: The Faculty Council is a deliberative body that considers and votes on changes to academic policies. The Faculty Council's voting members are all Association-represented faculty members from various College departments. The Faculty Council also includes four non-voting members, one of whom is College Vice President of Academic Affairs Tinkham. During a mid-October 2023 Faculty Council meeting, a faculty member asked about the status of potential changes to minimum qualifications for faculty. In response, the Faculty Council's two Co-Chairs (both Association members) decided that they would include a review of the history of minimum qualifications at the following meeting and included the topic on the agenda for the November 3, 2023, meeting. After Tinkham expressed discomfort with the topic being included on the agenda due to fear that it would be "direct dealing," she was assured by a Co-Chair that the topic was being discussed for informational purposes only. The Co-Chair also removed the copy of the most recent bargaining proposal on the subject from past negotiations, that had been initially included with the agenda.

At the November 3, 2023, meeting, one Co-Chair spoke generally about the history of the minimum qualifications subject for around two minutes. Another Faculty Council member who is also an Association representative, also mentioned that the College and the Association would be bargaining with the College about "MQ and Certification procedures" during a routine update about Association matters.

A few days after the Faculty Council meeting (on November 6), the College's General Counsel sent an email to the Co-Chairs of the Faculty Council, stating, in part, that, "discussion of the collective bargaining subject regarding minimum qualifications and certifications for faculty members [at Faculty Council meetings] * * * is wholly inappropriate and potentially an Unfair Labor Practice ('ULP') for direct dealing with the administration" and to "* * *stop this discussion at Faculty Council immediately." The email further states that "[s]hared governance councils are not the appropriate place to discuss any subject that is being bargained * * *and [minimum qualifications] should not be discussed outside the bargaining sessions" and that "[d]iscussing a new article when the contract is not open is also potentially a ULP." The email also noted that "if the faculty would like to discuss bargaining issues or contractual provisions, they may, but a shared governance council is not the appropriate vehicle for such a discussion as there are managers and classified professionals present" and that, the College would be "forced" to "address these ULPs" before this Board "should this continue." The email also stated that the subject of minimum qualifications could instead be discussed at "faculty only" meetings.

It is apparent that minimum qualifications for faculty, the subject discussed by faculty at the Faculty Council meeting, is directly tied to basic working conditions and contractual rights.

Indeed, whether a faculty member is minimally qualified can affect whether that employee can be certified to teach a particular course, which in turn can affect hiring, seniority, job security, and what classes that employee is assigned. We do not understand the College to argue that it could have generally prohibited discussion of this topic among bargaining unit members outside of the Faculty Council, and such an argument would be contrary to our precedents. *See*, *e.g.*, *Sandy Education Association and Davey v. Sandy Union High School District No. 2 and Heaton*, Case No. UP-42-87 at 9, 10 PECBR 389, 397, *amended*, 10 PECBR 437 (1988) (holding that by directing a bargaining unit member not to discuss workplace concerns with coworkers or union representatives, a public employer violates ORS 243.672(1)(a)). There is also no dispute that the email from the College's General Counsel instructed the bargaining unit members to "stop" discussing the topic of minimum qualifications at Faculty Council meetings and described such discussions as unlawful. Under our precedents, the email presumptively violates the "because of" prong of (1)(a).

Nevertheless, the College argues that the circumstances presented by the Faculty Council meeting should lead to a different result. From the College's perspective, it sent the email to the Faculty Council Co-Chairs because it was "simply trying to prevent a subsequent Faculty Council discussion from devolving into accusations of direct dealing" and that "[the College] was not prohibiting LCCEA, much less the Faculty Council members, from informational presentations." The College asserts that the Faculty Council meeting could have "looked an awful lot like a bargaining session" if the Co-Chair had included the most recent bargaining proposal regarding minimum qualifications on the agenda and if there had been a more robust discussion on the topic at the meeting, particularly because Vice President Tinkham was on the Faculty Council and the College's bargaining team. Thus, the College characterizes the General Counsel's email as an attempt to educate the Co-Chairs about "the potential severity of direct dealing" as opposed to a threat to the Co-Chairs based on their protected activity at the November 3, 2023, meeting.

That argument does not withstand scrutiny. To the extent that the College sought to guard against future accusations of direct dealing, any dispute of that nature would be between the College and the Association. This is so regardless of whether the dispute arose from conduct at a Faculty Council meeting or otherwise. However, here, the College did not raise its purported concern with Association leadership; instead, the General Counsel sent an email directly to the Faculty Council Co-Chairs threatening legal action. Additionally, the parties' CBA and the College's governing documents clearly reflect that the Faculty Council is intended to consider some topics that may also relate to bargaining relationship between the College and the Association. Specifically, Article 39.2.2 of the CBA provides, in part, that the Association "shall make regular reports to the Council on the activity of the Association." Section 1.1 of the Faculty Council Charter broadly provides that the Faculty Council "may also consider other matters brought before it." There is no evidence that the Faculty Council strayed from these purposes and functions, or that the relevant meeting otherwise resembled a bargaining session. Under these circumstances, we conclude that the College's actions violated the "because of" prong of (1)(a).

Moreover, the General Counsel's email, both on its face and read in context, was sent in direct response to the discussion that had occurred at the Faculty Council meeting. We therefore do not agree with the College's characterization that the email was a merely a warning about the severity of potential direct dealing at future Faculty Council meetings. In any event, even if we

agreed with the College's argument that it was solely regarding potential future bargaining unit member conduct, that would not change our conclusion in this case: As discussed above, the College's attempt to restrict faculty discussion on the topic of minimum qualifications at future Faculty Council meetings is plainly unlawful.

In addition to finding a "because of" violation, we also conclude that the College committed a derivative violation of the "in" the exercise prong of subsection (1)(a). A "because of" violation "almost always restrains, coerces, or interferes with the exercise of protected rights." *Oregon AFSCME Council 75, Local 3742 v. Umatilla County*, Case No. UP-2-08, at 20, 23 PECBR 108, 127 (2009) (citing *Lebanon Education Association/OEA v. Lebanon Community School District*, Case No. UP-4-06 at 42, 22 PECBR 323, 351 (2008)). This case is no different. We do not address the question of whether the College also committed an independent violation of the "in" the exercise portion of subsection (1)(a) as doing so would not impact the remedy. See *United Food and Commercial Workers, Local 555 v. Bay Area Hospital*, Case Nos. UP-045-20/004-21 at 21 (2023) (internal citations omitted).

5. The College violated ORS 243.672(1)(a) by engaging in surveillance of the faculty listserv.

The Association contends that the College managers' handling of the Association's faculty@lanecc.edu listserv emails constituted unlawful surveillance of the Association's confidential communications to its members, in violation of ORS 243.672(1)(a). As set forth below, we agree that the College's conduct as alleged violated PECBA.

There is no dispute that the Association had access to the College's email system via the faculty listserv to communicate with bargaining unit employees, nor is there any legitimate question that the Association's usage of the listserv is protected activity. The record also establishes that the Association uses that listserv to share information regarding Association activities and events, bargaining updates, and information about grievances. Employees engage in PECBA-protected activity when they talk with other bargaining unit members about their workplace concerns. Maintaining the confidentiality of such discussions furthers the policies underlying PECBA. *See, e.g.*, *AFSCME Local 189 v. City of Portland*, Case No. UP-7-07 at 46, 22 PECBR 752, 797 (2008) (citing *Wy'East Educational Association/East County Bargaining Council/Oregon Education Association, et al. v. Oregon Trail School District No. 46*, Case No. UP-16-06, 22 PECBR 668 (2008); *Sandy Union High School District No. 2 and Heaton*, UP-42-87 at 9, 10 PECBR at 397). It is also clear that emails that the Association sends to its faculty@lanecc.edu listserv are intended for employees in the Association's bargaining unit only (not managers, classified employees, or students). Indeed, every email that the Association sends to its faculty@lanecc.edu listserv states: "Confidentiality Notice: LCCEA messages are intended for faculty. If you have received this message in error, please notify LCCEA."

Here, Jennifer Kepka, the College's Director of Academic and Tutoring Services, which is a management position, received, read, analyzed, and forwarded emails sent to the faculty@lanecc.edu listserv to her supervisor. Kepka also discussed the contents of some of the emails with her supervisor. It is apparent that Kepka knew that she was not supposed to receive the listserv emails after she was promoted out of the bargaining unit and the emails were also

marked with a "Confidentiality Notice." This Board has previously held that surveillance of confidential union communications violates the "in" the exercise prong in ORS 243.672(1)(a) because such conduct "tends to chill union activity." *City of Portland*, UP-7-07 at 46, 22 PECBR at 797. Accordingly, we find that this surveillance of the Association's emails violated of the "in" the exercise of (1)(a) because that conduct has the natural and probable effect of deterring represented employees from engaging in protected activity (*i.e.*, utilization of the faculty listserv).[31]

In its defense, the College argues that under Section 11.2 of the parties' CBA, the Association is responsible for ensuring removal of non-faculty from the faculty listserv. That provision states, in relevant part, that: "The College's e-mail distribution list for faculty shall be reviewed each term by the Association. The Association shall submit a timely request and the College shall purge all non-faculty members from the official college faculty email distribution list." We ultimately find that this provision of the CBA does not provide an excuse for Kepka's actions. Indeed, Kepka was not merely *receiving* faculty emails; rather, and as noted, she read, analyzed, and forwarded them to another manager; thereafter, she discussed those e-mails with that manager.

The College also asserts various arguments that the Association's communications sent on the faculty listserv were not confidential, and therefore the College did not violate (1)(a) when managers reviewed and discussed them. We first address the College's position that employees have no expectation of privacy when they used the College's email system to communicate about Association-related matters. We ultimately disagree with the College's contention. First, we do not agree that by simply using the employer's email system, employees generally waive any and all confidentiality otherwise applicable to communication between represented employees and the exclusive representative. Furthermore, the evidence in the record establishes that the Association and the bargaining unit members did indeed have an expectation of privacy when they communicated via the faculty listserv. This expectation is both clearly implied by the contractual provision that addresses the purging of non-faculty members from the faculty listserv and affirmed by the fact that the emails sent on the faculty listserv explicitly stated that they were confidential and for faculty only, and to notify the Association if the recipient received the email in error. In reaching this conclusion, we do acknowledge the College policy that applies to the use of the College email system contains cautions regarding the confidentiality of emails sent over the College email system. However, there is no evidence that the college regularly monitors emails in general or that it informed the Association that it would do so relative to the faculty listserv.

Finally, we turn to the College's argument that because information shared on the listserv was also on the Association's publicly available website, the communications were not confidential. However, the record evidence does not support the conclusion that all of the information that is shared on the listserv is also posted on the Association's website or is otherwise publicly available. Consequently, for the reasons discussed above, the College's monitoring and reviewing faculty listserv emails violated (1)(a).

---

[31]We do not address whether the surveillance of the faculty listserv also violates the "because of" prong of (1)(a) as an additional finding on that portion of the claim would not affect the remedy in this case.

6. The Association has not established the alleged aggregate violation of ORS 243.672(1)(a).

The Association argues that the allegations discussed above, considered in the aggregate and in light of all the facts in the record, establish that the College violated ORS 243.672(1)(a). In support of its position, the Association points to (1) President Bulger's alleged "anti-union" remarks; (2) the College allegedly claiming that Association representatives were misusing release time; and (3) the College's refusal to investigate Mitchell's whistleblower complaint. Upon review, and for essentially the same reasons that are detailed above, we conclude that the Association has not met its burden for that claim. As discussed, there is insufficient evidence connecting Bulger's alleged comments to Mitchell, to any of the claims outlined in the complaint. Regarding the release time allegation, the record indicates that the College has not denied any release time requests, and that it was merely "seeking to discuss" release time in a Joint Labor/Management Committee meeting "to gather input in developing a procedure of notification [for release time] that is as timely as possible and one that isn't burdensome." We also conclude that the Association has not proven that the College "refused to investigate Mitchell's whistleblower complaint" as alleged. Accordingly, we dismiss the aggregate violation claim.

7. The College violated ORS 243.672(1)(e) and (b) through its communications with employees about the Division Faculty Coordinator position.

ORS 243.672(1)(e) states that it is an unfair labor practice for a public employer or its designated representative to "[r]efuse to bargain collectively in good faith with the exclusive representative [of its employees]." An employer may violate its ORS 243.672(1)(e) bargaining duty when it attempts to negotiate directly with its represented employees. *Service Employees International Union Local 503, Oregon Public Employees Union v. State of Oregon, Oregon Department of Justice*, Case No. UP-057-13 at 11, 26 PECBR 276, 286 (2014) (quoting *Roseburg Professional Firefighters Association v. City of Roseburg*, Case No. UP-021-13 at 12, 26 PECBR 111, 122 (2014)); *911 Professional Communications Employees Association v. City of Salem*, Case No. UP-62-00 at 20, 19 PECBR 871, 890 (2002). Furthermore, such "direct dealing" is a *per se* violation, which means it violates subsection (1)(e) regardless of the employer's subjective intent because it is "inherently divisive." Direct dealing also need not take the form of "actual bargaining." *Tri-County Metropolitan Transportation District of Oregon v. Amalgamated Transit Union, Division 757*, Case Nos. UP-035/036-20 at 60-61, (2021) (citing *Lane Unified Bargaining Council v. McKenzie School District #68*, Case No. UP-14-85 at 36, 8 PECBR 8160, 8195 (1985); *Allied Signal Inc.*, 307 NLRB 752, 754 (1992)). We have previously held that a public employer violates PECBA when it "solicits employee sentiment with regard to a subject of collective bargaining instead of leaving such effort to the employees' representative" as such conduct "tends to undermine the union's status as the employees' exclusive representative * * *." *Amalgamated Transit Union, Division 757*, UP-035/36-20 at 65 (quoting *Obie Pacific*, 196 NLRB at 458-59 (1972)).

ORS 243.672(1)(b) makes it an unfair labor practice for a public employer or its designated representative to "[d]ominate, interfere with or assist in the formation, existence, or administration of any employee organization." Fundamentally, subsection (1)(b) is concerned with the rights of the union itself, rather than the rights of the bargaining unit employees. *AFSCME Local 189 v.*

*City of Portland*, Case No. UP-7-07 at 43, 22 PECBR 752, 794 (2008). A public employer can violate ORS 243.672(1)(b) if it bypasses the labor organization and deals directly with a bargaining unit member. *Dallas Police Employees Association v. City of Dallas*, Case No. UP-33-08 at 18, 23 PECBR 365, 382 (2009). When a labor organization is chosen by the employees as their exclusive representative, it has the statutory right to represent those employees in dealing with the employer. By bypassing the exclusive representative and dealing directly with the employees on contractual matters, a public employer undermines the exclusive representative's ability to discharge its statutory obligations. Bargaining unit members who see the employer dealing directly with other unit members about contractual issues will inevitably lose confidence in the exclusive representative's capability to represent their interests in dealing with the employer. *Blue Mountain Faculty Association/Oregon Education Association/NEA and Lamiman v. Blue Mountain Community College*, Case No. UP-22-05, 21 PECBR 673, 773 (2007) (quoting *AFSCME, Local 2909 v. City of Albany*, Case No. UP-26-98 at 14, 18 PECBR 26, 39 (1999)).

Here, the Association alleges that the College violated ORS 243.672(1)(b) and (e) by meeting directly with bargaining unit employees to discuss proposed changes to the Division Faculty Coordinator position and sending out a survey to bargaining unit employees gauging their support for those changes. For the reasons discussed below, we agree that the College's conduct constituted unlawful direct dealing.

Turning to the relevant facts in this case, in the fall of 2023, the College sought to evaluate the Division Faculty Coordinator role, including whether to change to a "Faculty Chair model" instead. The Division Faculty Coordinator assignment is addressed in Article 38 of the CBA, and Article 38.2.1 provides that the assignment will "specifically exclude supervisory duties." A Faculty Chair assignment is more extensive than a Division Faculty Coordinator assignment, and a Faculty Chair might be expected to evaluate and otherwise supervise other faculty members.

As part of the College's evaluation of the position, the College conducted meetings with bargaining unit employees who were or had worked as Division Faculty Coordinators and did not discuss the matter with the Association. During the first of two meeting with bargaining unit members, the College posed general questions to the employees, such as "what was working" and "not working" and "recommendations for improving" the position. The College then proceeded to distribute a survey to represented employees that included similar questions to the ones that the College had posed in its initial meeting with employees, but also the following additional question: "What ideas do you have for a Faculty Chair model, how would it be different from the current Division Faculty Coordinator model, and what improvements would it provide?" After the survey was sent to employees, a second meeting was held with bargaining unit employees. During that meeting, employees discussed ideas about changing the Division Faculty Coordinator job to more of a supervisory role, which might affect whether the position was included in the bargaining unit. Another idea that was shared was to have Division Faculty Coordinators conduct performance evaluations of employees in the Association's bargaining unit, under the Faculty Chair model.

Although a public employer is not prohibited from engaging with represented employees as part of what the College describes as "information gathering and continuous improvement," the College's conduct here ultimately went beyond such efforts and instead impermissibly "solicit[ed] employee sentiment with regard to a subject of collective bargaining instead of leaving such effort

to the employees' representative * * *" *Amalgamated Transit Union, Division 757*, UP-035/36-20 at 65. Specifically, the meetings about the Division Faculty Coordinator position were conducted directly with bargaining unit employees, with an eye toward potentially changing to a "Faculty Chair" model and resulted in bargaining unit employee engagement over potentially significant changes to the position, including the potential addition of supervisory duties. In reaching this conclusion, we acknowledge that the College recognized that it could not implement certain changes to the positions without collectively bargaining with the Association, did not make a direct proposal to the bargaining unit employees, or otherwise take any action as a result of the direct dealing. However, as noted above, soliciting employee sentiment on a mandatory subject of bargaining, alone, constitutes direct dealing, as that conduct "tends to undermine the union's status as the employees' exclusive representative * * *." *Id.* (quoting *Obie Pacific*, 196 NLRB at 458-59 (1972)). That the College engaged with Association members on this issue directly, without utilizing formal shared governance structures that include Association representatives, supports our conclusion that the College's conduct after the first meeting had the tendency to undermine the Association's status as the employees' exclusive representative.

In arguing for a different result, the College argues that the Association "bargained away its right to control communication regarding the Division Faculty Coordinator job duties" and thus waived its right to bring a claim for direct dealing. Specifically, the College points to Article 38.3.3 of the CBA that provides, "Specific assignment descriptions of FASAs [Faculty Administrative Support Assignments] will be developed by responsible department/division chair/manager in consultation with stakeholders." The College asserts that the Faculty Coordinators are "stakeholders" and therefore the managers were free, pursuant to the CBA, to consult with them without the involvement of the Association. It is well established that any contractual waiver of a statutory right under PECBA must be in "clear and unmistakable" language. *Service Employees International Union Local 503, Oregon Public Employees Union v. State of Oregon, Department of Justice*, Case No. UP-057-13 at 14, 26 PECBR 276, 289 (2014) (internal citations omitted). Here, the CBA does not specifically define "stakeholders" and the relevant discussion regarding the Division Faculty Coordinator position resulting from the College's outreach to bargaining unit employees, went beyond merely modifying the "assignment descriptions of FASAs" and included the possibility of adding supervisory duties. Regardless, we do not find any "clear and unmistakable" language in Article 38.3.3 of the CBA (or otherwise) that the Association waived its right under PECBA to act as its bargaining unit's exclusive representative, or that permitted the College to directly deal with bargaining unit members, as argued by the College.

8. The Association is not entitled to a civil penalty.

As stated in ORS 243.676(4)(a) and subparagraph (A) of the same, "The [B]oard may award a civil penalty to any person as a result of an unfair labor practice complaint hearing, in the aggregate amount of up to $1,000 per case, without regard to attorney fees, if * * * [t]he complaint has been affirmed * * * and the [B]oard finds that the person who has committed, or is engaging, in an unfair labor practice has done so repetitively, knowing that the action taken was an unfair practice and took the action disregarding this knowledge, or that the action constituting the unfair labor practice was egregious * * *." In this context, the statutory term "person" can apply to a public employer. ORS 243.676(5). Previously, we have defined the term "egregious" as "conspicuously bad" and "flagrant." *East County Bargaining Council (David Douglas Education*

*Association) v. David Douglas High School District*, Case No. UP-84-86 at 11, 9 PECBR 9184, 9194 (1986). We have also stated that actions are "egregious" only if they were taken in knowing disregard of the law. *Association of Professors of Southern Oregon State College v. Oregon System of Higher Education and Southern Oregon State College*, Case No. UP-13/118-93 at 16, 15 PECBR 347, 362 (1994) (citing *David Douglas High School District*, UP-84-86 at 13, 9 PECBR at 9196). Further, the thrust of this Board's decisions involving civil penalties is that "egregious" offenses are those that tend to undermine the very nature of the collective bargaining process. *Lincoln County Education Association v. Lincoln County School District*, Case No. UP-27-02 at 24, 20 PECBR 571, 594 (2004). Upon review, we ultimately conclude that the factors noted above have not been met and decline to award a civil penalty.

9. The Association is entitled to a notice posting.

We generally order the posting of a notice if were determine that a party's violations of PECBA: (1) were calculated or flagrant; (2) were part of a continuing course of illegal conduct; (3) were perpetrated by a significant number of a Respondent's personnel; (4) affected a significant portion of bargaining unit employees; (5) had a significant potential or actual impact on the functioning of the designated bargaining representative as the representative; or (6) involved a strike, lockout, or discharge. Not all of those criteria need to be satisfied for us to order a posting. *Wy'East Education Association/East County Bargaining Council v. Oregon Trail School District No. 46*, Case No. UP-32-05 at 53, 22 PECBR 108, 157 (2007). Here, we find that both the College's conduct of surveilling the Association's listserv emails and its communications with employees about the Division Faculty Coordinator position potentially impacted the functioning of the exclusive representative. We order the College to post the attached notice at the work location. Additionally, because one founded claim related to unlawful surveillance of the faculty email listserv and because it is apparent from the record in this case that email is a common method of communication with College employees, we also order the College to email the attached notice to all Association-represented College employees. See *Oregon Tech American Association of University Professors v. Oregon Institute of Technology,* Case No. UP-023-20 at 37 (2020).

ORDER

The College shall:

1. Cease and desist from violating ORS 243.672(1)(a) by telling the Faculty Council Co-Chairs that they cannot discuss minimum qualifications and certifications for faculty members at Faculty Council meetings and threatening legal actions should they continue to discuss such topics in that setting, and by engaging in surveillance of the Association's faculty listserv.

2. Cease and desist from violating ORS 243.672(1)(b) and (e) through its communications with bargaining unit employees about the Division Faculty Coordinator position.

3. Distribute the attached notice by email and post at the work location within 10 days of the date of this order to all employees represented by the Association.

The complaint's other legal claims are dismissed.

DATED: July 22, 2025.

Adam L. Rhynard, Chair

Shirin Khosravi, Member

Benjamin O'Glasser, Member

This Order may be appealed pursuant to ORS 183.482.

**NOTICE TO EMPLOYEES**

**POSTED BY ORDER OF THE
STATE OF OREGON
EMPLOYMENT RELATIONS BOARD**

PURSUANT TO AN ORDER of the Employment Relations Board (Board) in Case No. UP-060-23, *Lane Community College Education Association (LCCEA) v. Lane Community College*, and in order to effectuate the policies of the Public Employee Collective Bargaining Act (PECBA), we hereby notify our employees that to remedy these violations, the Board ordered that the College:

1. Cease and desist from violating ORS 243.672(1)(a) by telling the Faculty Council Co-Chairs that they cannot discuss minimum qualifications and certifications for faculty members at Faculty Council meetings and threatening legal actions should they continue to discuss such topics in that setting, and by engaging in surveillance of the Association's faculty listserv.

2. Cease and desist from violating ORS 243.672(1)(b) and (e) through its communications with bargaining unit employees about the Division Faculty Coordinator position.

3. Distribute this notice by email and post at the work location within 10 days of the Board's July 22, 2025, order to all employees represented by the Association.

EMPLOYER

Dated________________________, 2025 By: ______________________________

Title: ______________________________

**********

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED**

*This notice must remain posted for 30 consecutive days from the date of posting in each employer facility in which bargaining unit personnel are likely to see it. This notice must not be altered, defaced, or covered by any other materials. Any questions concerning this notice or compliance with its provisions may be directed to the Employment Relations Board, 1225 Ferry Street S.E., Salem, Oregon, 97301-3807, phone 503-378-3807,* ERB.Filings@ERB.oregon.gov.