IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

RICHARD RIORDAN,

Plaintiff,

v.

LANE COMMUNITY COLLEGE, by and through the Lane Community College Board of Education; JESSE MALDANADO, individually and in his official capacity as a Board Member; KEVIN ALLTUCKER, individually and in his official Capacity as a Board Member; JULIE WEISMANN, individually and in her official capacity as a Board Member; STEVE MITAL, individually and in his official capacity as a Board Member; DR. STEPHANIE BULGER, individually and in her official capacity as President of Lane Community College; DR. SHELLEY TINKHAM, individually and in her official capacity as Vice President of Academic Affairs at Lane Community College; DR. COLMAN JOYCE, individually and in his official capacity as Vice President of Student Services at Lane Community College; CARL YEH, individually and in his official capacity as Dean of Student Engagement at Lane Community College; LISA RUPP, individually and in her official capacity as Director of Public Safety & Emergency Preparedness at Lane Community College,

Defendants.

Case No. 6:26-cv-01807-MC

OPINION AND ORDER

MCSHANE, Judge:

When it comes to public discourse, there is effective communication and there is loud communication. By all accounts, Plaintiff is loud. His criticism of school policy directed at the Lane County Community College Board is at times annoying, long-winded, aggressive, hyperbolic, and grandiose. Yet, while we live in a world where public officials face very real security risks, the attempt by the defense to profile the Plaintiff as a serious threat to the community is equally hyperbolic and grandiose. There is nothing in the record before the court to suggest that Plaintiff has posed a threat to anyone. Loud speech might be burdensome to public officials during meetings and in public settings, but it is protected by the First Amendment.

## POSTURE

Plaintiff Richard Riordan moves for a preliminary injunction[1] permitting him to enroll in classes at Lane Community College and attend classes in person. Doing so requires that the Court order Defendants to (1) remove the 73-year enrollment hold on Plaintiff's account and (2) suspend Plaintiff's Trespass Notice for academic purposes only. Because Plaintiff demonstrates likelihood of success on the merits, that he will suffer irreparable harm without injunctive relief, and that in balancing the equities and considering public interest he is entitled to injunctive relief, request for preliminary injunctive relief is **GRANTED** in part and **MODIFIED** in part.

## BACKGROUND

Plaintiff Richard Riordan Jr. has been enrolled as a student at Lane Community College ("LCC") since the Winter term of 2023. Riordan Decl. ¶ 3, ECF No. 3. On June 25, 2026, the LCC

[1] As of September 17, 2026, the parties agreed that Plaintiff's motion would be treated as a preliminary injunction rather than a temporary restraining order (TRO) as originally filed. Defs.' Resp. to Mot. for TRO 5–6, ECF No. 32; Pl.'s Reply to Defs.' Resp. to Mot. for TRO & Mem. in Supp. 1, ECF No. 34. The Court likewise confirmed in Oral Argument on September 23, 2026, that the relief sought would be considered as a preliminary injunction.

Board of Education ("Board") trespassed Plaintiff from all LCC property and barred him from registering for classes until December 31, 2099, constructively expelling him. *Id.* ¶¶ 30–31. Plaintiff has long been an active and frequent attendee of Board meetings. *Id.* ¶ 5. At a Board meeting in March of 2026, Plaintiff criticized LCC's suspension of the Health Information Management program, which happened to be led by Plaintiff's father. *Id.* ¶ 9. Following that meeting, Plaintiff emailed all Board members, decrying the Board's lack of involvement in operations and alleging that political agendas took precedence over student interests. *Id.* ¶ 13.

Without notifying Plaintiff, Defendant Mital, an LCC Trustee, emailed Board members, stating that Plaintiff appeared to be "very angry" and that his emails were angry and threatening. Rupp Decl. ¶ 4, ECF No. 33. Mital proposed that "for everyone's safety," Plaintiff should not be allowed into the boardroom the next day. Rupp Decl. Ex. 1, at 1, ECF No. 33-1. Shortly after this email, and still without Plaintiff's knowledge, LCC's Threat Assessment Team began monitoring Plaintiff. Rupp Decl. ¶ 6.

On May 4, 2026, Plaintiff approached Defendants Vice President Tinkham and Brent Munoz at a coffee shop on campus. *Id.* ¶ 7. During the encounter, Plaintiff asked Tinkham whether she "was ready" for the Board meeting that week. In response, Tinkham stated "yes, absolutely," with Plaintiff replying "I'll be there. I'm ready for the spin." Rupp Decl. Ex. 2, at 1, ECF No. 33-2. After that seemingly innocuous exchange, Defendant Rupp filed a formal report on Tinkham's behalf, alleging that Plaintiff had "accosted" Tinkham and requesting a student conduct hearing be held regarding the matter.[2]Rupp Decl. ¶ 7.

The next day, Defendants Dean Yeh and Rupp met with Plaintiff via Zoom. *Id.* ¶ 9. At the meeting, Defendants instructed Plaintiff to refrain from sending mass emails and to "be careful."

---

[2] Lisa Rupp is the Director of Public Safety at LCC.

Riordan Decl. ¶ 18. Plaintiff was also asked to schedule appointments for any future communication with administrators rather than approaching them directly. Rupp Decl. ¶ 10. At no point during the meeting did Defendants inform Plaintiff that he had violated any LCC policy. Riordan Supp. Decl. ¶ 5, ECF No. 35.

On May 12, LCC employee, Rebeccah ("Beccah") Maley filed an incident report that chronicled Plaintiff's four visits to the Student Life office over the preceding two weeks. Rupp Decl. Ex. 4, at 1, ECF No. 33-4. Ms. Maley wrote that in speaking with the two student Executive Officers, they raised "concerns regarding [Plaintiff's] level of fixation" on the LCC administration. *Id*. The students also reported that they "did not feel Richard posed an immediate threat to himself or others." *Id*. The report lists that it was "being documented for awareness and recordkeeping purposes." *Id*.

Following a Budget Committee meeting on May 27, 2026, Plaintiff approached Defendant Alltucker (an LCC Trustee) in a parking lot. Rupp Decl. Ex. 3, at 9, ECF No. 33-3. Plaintiff confronted Alltucker about a perceived lack of integrity regarding the program cuts, and a security officer recorded the encounter on a body camera. *Id.* The body camera footage was not entered into the record.[3]

On May 28, 2026, Plaintiff sent an 11-page letter to the Board, administration, faculty union, and Student Government Association (SGA). Rupp Decl. Ex. 5, ECF No. 33-5. The letter criticized a proposed limit on public comment during Board meetings. *Id.* It also referenced "'the good ol' days' of Peterloo"[4] and was accompanied by a meme from the movie Shrek featuring the

[3] The Court presumes that if this footage showed Plaintiff acting in a threatening manner, Defendants would have admitted the footage into evidence.

[4] Peterloo is a reference to a historical event in 1819, when a local English government officials sent troops to quell a peaceful protest. Soldiers killed 18 people and injured hundreds.

antagonist, Lord Farquaad.[5] *Id.* at 11. The meme first appeared in an earlier missive in which Plaintiff expressed skepticism about non-uniform budget cuts the Board justified on austerity grounds: "I guess what I'm trying to say here is that the whole 'Cuts for Thee but Not For Me' mentality that has taken [the] administration by storm really does read like this image: 'Some of you may die. But it's a sacrifice I am willing to make.'" Riordan Decl. Ex. 17, at 4, ECF No. 3-17.

On June 2, 2026, Plaintiff emailed the Board and local officials, criticizing Alltucker. Rupp Decl. Ex. 8, ECF No. 33-8. In that email, Plaintiff compared the organization of his writing to "a drive-by shooting," referencing its incoherence. *Id.* Plaintiff's email was forwarded to Beccah Maley with concern. *Id.*

The next day, Plaintiff spoke at another budget meeting. *Id*. Afterward, Ms. Maley filed a report expressing concern about the strength of Plaintiff's language and the time and energy Plaintiff spent writing his emails and letters.[6] *Id.* In her report, Maley advised SGA officers "not to engage [with Plaintiff] and focus on finals." *Id.* Following Maley's report, Rupp opened a crime report charging Plaintiff with harassment and interviewed witnesses over several weeks in preparing it. Rupp Decl. Ex. 3, at 1–2, 3–24. Defendant Rupp created this report on June 18, 2026, and retroactively populated it to cover the period from April 15, 2026, to June 17, 2026. *Id.* at 1–2.

---

[5] The meme seems to represent an authoritarian figure, the comical Lord Farquaad, speaking to the abuse of power when he says, "[s]ome of you may die. But it is a sacrifice I'm willing to make." The context of the meme suggests that Lord Farquaad is representative of the Board, not the Plaintiff.

[6] This was the second report Maley filed regarding Plaintiff. In her first report, Maley explicitly noted that the two people who reported Plaintiff's actions to Maley did not think that Plaintiff was an imminent threat to himself or anyone else. Rupp. Decl. Ex. 4, at 1. Based on the record, it is unclear if Maley ever had a personal interaction with Plaintiff. Maley filed her first report based on what she heard from two "Executive Officers." *Id*. Maley based her second complaint on an email forwarded to her from "executive officers of Lane SGA." Rupp Decl. Ex. 8. Maley states that she was "concerned about the language [Plaintiff] uses and length of time and energy he is putting into these documents." *Id.*

Before the Court is Plaintiff's Motion for Temporary Restraining Order. Pl.'s Mot. for TRO, ECF No. 2. Plaintiff requests that the Court lift the trespass, allow Plaintiff to enroll in classes, and restore Plaintiff's ability to engage in First Amendment activities. *Id.* at 2.

## LEGAL STANDARD

### I. Standards for a Preliminary Injunction

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65(a), plaintiffs must clearly establish: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction serves the public interest. *E.g., Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

In the Ninth Circuit, if a plaintiff raises "serious questions going to the merits" and shows "a hardship balance that tips sharply" in his favor, a preliminary injunction may be appropriate. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (holding "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."). "Serious questions" are "'substantial, difficult and doubtful,'" requiring "more deliberative investigation." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952)).

## DISCUSSION

### I. Plaintiff demonstrates the requirements for injunctive relief

#### a. Plaintiff shows requisite likelihood of success on the merits.

##### i. Plaintiff engaged in protected speech.

The first question is whether Plaintiff has shown a likelihood of success on the merits of his claim that Defendants sanctioned his protected speech.

Defendants state that, as of April 21, 2026, LCC "expressed safety concerns to the Board [about Plaintiff] . . . based on Plaintiff's angry and threatening conduct at [an earlier meeting and over email]." Rupp Decl. ¶ 4; Rupp Decl. Ex.1, ECF No. 33-1. Defendants claim that, because of Plaintiff's "continued threatening actions and failure to de-escalate," LCC chose to trespass Plaintiff. Rupp Decl. ¶ 20. Defendants argue that trespassing Plaintiff from all LCC properties was a "reasonable" restriction of his speech "under the circumstances" because of his "threatening behavior" and "expressed concerns about Plaintiff, ranging from . . . his mental state to . . . their personal safety." Defs.' Resp. to Pl.'s Mot. for TRO 8, ECF No. 32. Defendants do not address Plaintiff's enrollment hold. The Court finds that, because Plaintiff's speech was likely protected by the First Amendment, he demonstrates a likelihood of success on the merits.

LCC, like any state entity, cannot censor, interfere with, or abridge permissible expression. *Healy v. James*, 408 U.S. 169, 180 (1972). The special protections of the First Amendment bar public college officials from unduly restricting or retaliating against students' protected speech, even if such action would be allowable on other grounds. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016). A college student's speech remains protected unless it falls within one of the "well-defined and narrowly limited" categories of unshielded expression. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (citation omitted).

As relevant here, unprotected speech includes true threats, incitement, or fighting words. *E.g., Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (true threats require at least recklessness as to the threatening nature of the statement). However, even speech that college officials or other students find odious, upsetting, or disagreeable maintains protection. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Additionally, neither the First Amendment nor its analogues contain any categorical harassment exception, even if many community members find such speech offensive. *Rodriguez v. Maricopa Cnty. Cmty Coll. Dist.*, 605 F.3d 703, 708–10 (9th Cir. 2010) (citation omitted).[7] During Oral Argument, the Court emphasized this fact, drawing parties' attention to *State v. Johnson*, 345 Or. 190 (Or. 2008) (holding statute criminalizing verbal abuse and harassment as facially overbroad under the Oregon constitution).[8] While *Johnson* construes the state constitution and does not control the Court's federal analysis, it undercuts suggestions that Plaintiff's speech falls within *any* recognized category of impermissible "harassment."

Angry speech is still protected speech, as long as it does not contain a true threat. A true threat is a "serious expression" conveying that the speaker means to "commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Whether a statement qualifies turns on whether a reasonable recipient would receive the statement as a threat in context. *Id.* Here, the Court finds that a reasonable recipient *would not* interpret Plaintiff's speech as a serious expression of intent to commit violence. The Court agrees that though persistent and sometimes impugning, Plaintiff's speech is hyperbole, jest, and political rhetoric. *Watts v. United States*, 394 U.S. 705, 708 (1969). Plaintiff was an engaged student, concerned about how LCC allocated its resources. Additionally, Defendants' alleged concerns of

[7] For harassing speech to be permissibly restricted, it must be "so severe, pervasive, and objectively offensive," such that "victim-students are effectively denied equal access to an institutions' resources and opportunities." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). There is no evidence that Plaintiff's speech approaches this threshold, despite Maley's opinion that she was "concerned about the language" other individuals told Maley Plaintiff said. Rupp Decl. Ex. 8.

[8] In *Johnson*, William Charles Johnson challenged his harassment conviction under ORS § 166.065, the same statute Defendant Rupp listed on Plaintiff's crime report. *Johnson*, 345 Or. at 193; Rupp Decl. Ex. 3, at 1. Johnson was convicted for making racist, obscene, and homophobic insults over a loudspeaker during stop-and-go traffic, targeting an interracial couple he thought were lesbian. *Johnson*, 345 Or. at 192–193. The court struck down the section of §166.065—(1) (a) (B)—that criminalized insulting or abusive speech, ruling it facially overbroad. *Id*. at 194–97. Writing for the court, Justice Gillette stated that although "[Johnson's] expression may have been offensive . . . the state may not suppress all speech that offends with the club of the criminal law." *Id.* at 197.

a serious threat rings hollow given that on this record, no one who *actually* interacted with Plaintiff chose to file a report. Because permissible political language can be "vituperative, abusive, and inexact," even Plaintiff's sharpest comments are protected. *Id*.

*Counterman*'s second prong assesses the speaker's subjective intent and asks whether the speaker "consciously disregarded" the substantial risk that their speech would be viewed as threatening violence. 600 U.S. at 69, 79–80. The Court similarly finds that Plaintiff did not speak recklessly, even if sometimes unwisely. Again, Plaintiff comes across as merely a concerned student and enthusiastic participant in his school's political processes. A listener feeling uncomfortable, offended, or "unsafe" does not satisfy either *Counterman* requirement.

Additionally, the Court struggles to see how Plaintiff could be expected to know how his speech was being received when Defendants' own record shows they opted to keep their concerns from Plaintiff. Rupp Decl. Ex. 3, at 5. In this respect, Rupp's report of her June 8, 2026 meeting with Board Chair Folnagy is instructive. The purpose of the meeting was for Rupp to answer questions Folnagy had about Rupp's request that Board members not engage with Plaintiff after Board meetings. *Id*. Folnagy explained to Rupp that he felt it was his duty "as an elected official" to communicate with Plaintiff. *Id*. When Folnagy asked Rupp if he could relay the substance of their meeting to Plaintiff, Rupp responded, "absolutely not." *Id*. Troublingly, this reads more like LCC covertly building a case *against* Plaintiff than it does an earnest attempt to problem solve *with* Mr. Riordan at the lowest level.

On this record, Plaintiff's speech was protected by the First Amendment, and Defendants' restrictions on Plaintiff's speech, in the form of trespassing him and barring him from enrollment, were manifestly unreasonable. In other words, Plaintiff has established a likelihood of success on the merits of his First Amendment claim.

**ii. Defendants engaged in First Amendment retaliation.**

Having found that Plaintiff establishes a likelihood of success on the merits that his speech was protected, the Court applies the same analysis in weighing whether Defendants retaliated against Plaintiff because of his constitutional expression. Plaintiff argues that because he engaged in First Amendment speech critical of "the LCC Board and its administration," Defendants effectively expelled him in retaliation. Pl.'s Mot. for TRO 16.

To prove First Amendment retaliation, a plaintiff must show that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien*, 818 F.3d at 932 (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). Retaliation need not take any particular form to qualify. *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867–68 (9th Cir. 2016). Denying a valuable government benefit or imposing informal sanctions constitutes retaliation when they would stifle protected expression. *Id*.

As noted above, Plaintiff engaged in protected First Amendment speech, establishing the first element of retaliation. Under the second prong, Defendants' decision to trespass Plaintiff from all LCC properties and to bar him from enrolling at LCC for life (constructively expelling him) easily counts as a chilling action.[9] Permanently removing a student from school does not merely stifle their speech on campus—it silences it altogether.

---

[9] Although "constructive" or "de facto" expulsion is not a Ninth Circuit doctrine in First Amendment retaliation cases, it is similar to constructive discharge in employment contexts. *See, e.g., Poland v. Chertoff*, 494 F. 3d 1174, 1184 (9th Cir. 2007) (actions short of formal termination treated as a discharge if employee induced to resign or conditions prevented continued employment). When a college makes a student's continued enrollment impossible because of his speech, it expels him in every sense the First Amendment cares about. The absence of a formal expulsion no more undermines Plaintiff's claim than the lack of a termination letter defeats a constructive firing. *Cf. Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004); *Green v. Brennan*, 578 U.S. 547, 555 (2016). Additionally, this Court need not propose a new doctrine to decide the injunction. Using the analogy simply recognizes that Defendants' actions far exceed the ordinary-firmness threshold required for a First Amendment retaliation showing.

Defendants' argument that allowing Plaintiff to participate in LCC Board meetings via video link means he can still express his opinions does little to mitigate the chilling effect of indefinitely interrupting his education. Defs.' Resp. to Pl.'s Mot. for TRO 8; Rupp Decl. ¶ 22; Rupp Decl. Ex. 7, ECF No. 33-7. Remarkably, Defendants address only the Board meeting restrictions in their brief, ignoring the fact that the trespass order essentially expelled a student who had attended LCC for several years. Applying *Coszalter*, the Court finds Plaintiff shows the third element—a defendant's retaliatory motive—required for a First Amendment retaliation claim. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). Again, Defendants do not dispute that the restrictions stemmed from Plaintiff's speech; instead, they rely solely on the argument that they reacted reasonably to legitimate security concerns. On this record, Defendants' argument is anemic and unconvincing.

Circumstantial evidence can establish retaliatory motive by identifying (1) temporal proximity between plaintiff's speech and the defendant's adverse action, (2) defendant's expressed opposition to the speech, and (3) evidence that the defendant's proffered explanation is false or pretextual. *Coszalter*, 320 F.3d at 977. Once a plaintiff makes this showing, the burden shifts to the defendant to prove, by a preponderance of the evidence, that they would have taken the same action in the absence of the protected conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Nieves v. Bartlett*, 587 U.S. 391, 406–09 (2019) (even when probable cause exists, plaintiffs can show First Amendment retaliatory arrest if police enforce law based on content of plaintiff's protected speech).

The Court finds ample evidence that little time passed between Plaintiff's speech and Defendants' adverse action. Defendant Alltucker emailed Defendants Bulger and Rupp about

---

*O'Brien*, 818 F.3d at 932.

Plaintiff's then-most recent email and letter the day before LCC issued the trespass notice and enrollment hold. Rupp Decl. ¶ 18; Riordan Decl. Ex. 18, ECF No. 3-18. Defendant Rupp likewise opened and retroactively populated a crime report concerning Plaintiff's alleged misconduct only a week before LCC sanctioned Plaintiff. Rupp Decl. ¶ 20.

On *Coszalter*'s second point, Defendants also frequently opposed Plaintiff's speech. *E.g.,* Rupp Decl. Ex. 1 (LCC's disciplinary complaint casts Plaintiff's correspondence as "angry and threatening"; however, the attached email is a data dispute that criticizes an official's public statements and contains no threat).

For the third element, the Court finds evidence that Defendants' proffered explanation is pretextual. Defendants distort Plaintiff's communications, strip them of context, and reformulate them as threats. For example, Defendants' crime report narrative about Plaintiff grounds the concern in "memes contained within the emails," the "drive by shooting phrase," and historical comparisons. Rupp Decl. Ex. 3, at 2, ECF No. 33-3. While a jarring reference, Plaintiff clearly disparages his own writing by comparing it to a chaotic, messy crime. Rupp Decl. Ex. 8. By writing the words "drive by shooting," Plaintiff is not threatening to commit one. Similarly, the Shrek meme is a widely circulated joke image and framing it as a promise of future violence inexplicably decontextualizes the image itself and how Plaintiff used it. Riordan Decl. Ex. 17, at 4. The degree of Defendants' misrepresentation here approaches dishonesty.

Finally, Defendants, through their interviews, explicitly link Plaintiff with perpetrators of domestic violence, mass shootings, and domestic terrorism. Rupp Decl. Ex. 3, at 3–24. Nothing in the record remotely supports these characterizations. Tarring Plaintiff with these labels could have an enduring, pernicious effect, easily and prematurely foreclosing Mr. Riordan's future education and employment opportunities. Defendants' conclusions about Plaintiff, including

unsubstantiated speculation about future dangerousness, register as imprudent, if not verging on defamatory. It seems clear that Plaintiff, his speech, or both annoy Defendants. Whatever truly animates Defendants' grievances matters only to the extent it shows their asserted reasons for punishing Plaintiff are an excuse.

The Court finds that Plaintiff engaged in a protected First Amendment activity, that Defendants' actions would chill the protected speech of a person of ordinary firmness, and that Plaintiff's speech was a substantial or motivating factor behind Defendants' conduct. The Court holds that Plaintiff is likely to succeed on the merits of his First Amendment retaliation claim.

**b. Plaintiff will suffer irreparable harm without injunctive relief.**

Plaintiff will suffer both irreparable constitutional and educational harm without injunctive relief.

Irreparable harm is harm for which no adequate legal remedy exists. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Although Plaintiff can currently participate in LCC Board meetings via Zoom, the restrictions severely curtail his ability to participate and engage in First Amendment expression on campus. Impairing First Amendment rights constitutes a qualitative, not a quantitative, harm. "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *accord Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009).

While being trespassed from campus, Plaintiff cannot engage in any in-person protected First Amendment activity without risking criminal sanctions and arrest. Pl.'s Mot. for TRO 12–13; Rupp Decl. ¶¶ 20–21; Riordan Decl. Ex. 21, at 1, ECF No. 3-21. Plaintiff cannot distribute literature, converse or debate face-to-face with his peers, professors, or other LCC officials. The

Court finds that without injunctive relief, Plaintiff will continue to suffer irreparable harm stemming from a constitutional violation.

Independently, interrupting a student's education and the resulting delay or loss of educational and professional opportunities cannot be remedied by money damages after the fact. *See N.D. v. Reykdal*, 102 F.4th 982, 994–95 (9th Cir. 2024) (being denied access to education can constitute irreparable harm); *see generally Ariz. Dream Act Coal.*, 757 F.3d at 1068 (loss of opportunity to pursue chosen profession); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153. 1165–66 (9th Cir. 2011) (delay in or loss of professional advancement).

Plaintiff is currently unsure if he will be able to continue his education at LCC. Riordan Supp. Decl. ¶ 16, ECF No. 35.[10] Without injunctive relief, he cannot resume his studies at the institution where he has been a student nearly every term since enrolling in Winter 2023. Riordan Decl. ¶3, ECF No. 3. Additionally, if the current sanctions stand, he may have difficulty matriculating elsewhere to continue his education because of the taint associated with being effectively expelled and labeled "threatening" or unsafe. The downstream consequences for future employment, and subsequent limitations on life-time earnings, are also very real. Some accusations are nearly as damning as formal findings, and Defendants' conduct looks much like blacklisting. The Court finds that without granting injunctive relief, Plaintiff will suffer irreparable educational harm, too.

**c. Balancing the equities and considering public interest, Plaintiff is entitled to injunctive relief.**

[10] At Oral Argument on September 23, 2026, Defendants' counsel indicated that under the restrictions imposed, Plaintiff could still register for online classes. The Court considers this an entirely unacceptable proposed resolution.

When the government is a party, courts analyze the public interest and the balance of equities together. *E.g., Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020). The balance of harms often favors facilitating a student's uninterrupted education when the state would bear an increased administrative burden. *See N.D.*, 102 F.4th at 995–96. District courts in the circuit also weigh equities similarly in campus speech cases. *E.g., Coll. Republicans of the Univ. of Wash. v. Cauce*, Case No. C18-189-MJP, 2018 WL 804497 (W.D. Wash. Feb. 09, 2018). As for the public interest, courts scrutinize the public interests served by both granting and denying an injunction. *E.g., Cottrell*, 632 F.3d at 1138.

Plaintiff argues that the equities favor him because he would suffer far greater hardship if barred from continuing his education and from exercising his First Amendment rights as a public college student. Pl.'s Mot. for TRO 17. Regarding the public interest, Plaintiff asserts that denying the injunction would allow "LCC to forever bar students critical of it…[and] infringes [on not only Plaintiff's free expression], but of all other students who may wish to engage in a critical inquiry of their college." *Id.* at 18. Granting the injunction, however, would vindicate Plaintiff's rights. *Id.* Defendants, by contrast, argue that they imposed only a "minor restriction" on Plaintiff's speech and that this sanction is outweighed by public safety concerns. Defs.' Resp. to Pl.'s Mot. for TRO 10.

Both characterizations are incomplete or lack nuance. The restriction on Plaintiff is not minor; it is total with respect to his physical access to campus and enrollment in classes. The safety concerns are unadjudicated and not supported by Plaintiff's speech or conduct on the record.

The Court does not suggest that in today's world of political rhetoric, government officials should not be hypervigilant when it comes to their security. The Board members here are clearly worried that Plaintiff's rhetoric could escalate and those fears should not be discounted as

frivolous. *E.g.*, Rupp Decl. Ex. 3. One Defendant stopped attending Board meetings in person, and staff reported being escorted to their vehicles.[11] *Id*. But on this record alone, the Court cannot interrogate the sincerity or bases of Defendants' fears. However, the Court finds the connection between Plaintiff's communications and Defendants' expressed public and personal safety concerns insufficiently established. A listener's subjective fear or perception that a statement is threatening does not convert protected speech into an actionable offense. At this juncture, the balance of the equities and the public interest tip in Plaintiff's favor.

## CONCLUSION

Plaintiff not only "raises serious questions going to the merits," but also demonstrates a likelihood of success on the merits in showing that he was retaliated against because of his protected First Amendment speech. *Cottrell*, 632 F.3d at 1132; *Winter*, 555 U.S. at 20. He further establishes that he is experiencing irreparable harm, that the equities favor him, and that granting the injunction serves the public interest. *Winter*, 555 U.S. at 20. Because Plaintiff demonstrates the requirements for injunctive relief, the Court grants in part and modifies in part Plaintiff's motion as a preliminary injunction.

However, some Defendants fear Plaintiff. To be clear, the sanctions LCC imposed are unreasonable and legally unsupported. Still, because the Court takes seriously Defendants' subjective safety concerns, the Court will limit the suspension of Plaintiff's trespass to permit access to LCC's campus for academic purposes only. For now, and until further proceedings, orders, or mutual agreements state otherwise, Plaintiff may not attend Board meetings in-person or approach Defendants. Leaving this limitation in place intends only to foster de-escalation; it

[11] Plaintiff challenges whether Defendant Weissmann stopped attending LCC Board meetings in person due to his commentary and communications, suggesting remote participation was always her preference. Plaintiff states that he never "[saw] Julie Weissmann attend a Board meeting in person." Riordan Supp. Decl. ¶ 13. Plaintiff's attendance of these meetings pre-dates any concern Defendants expressed about him. Riordan Decl. ¶¶ 7–10.

does not imply the Court thinks there is an objective basis for Defendants' concerns. The Court strongly urges parties' respective counsels to communicate with one another and resolve outstanding issues.

Defendants shall, effective immediately: (1) remove the enrollment hold from Plaintiff's account, allowing him to register for classes at Lane Community College for the semester beginning September 28, 2026; (2) lift Plaintiff's Trespass Notice to permit his access to LCC's campus for academic purposes only.

Plaintiff's Motion for Temporary Restraining Order, ECF No. 2, treated now as a preliminary injunction, is **GRANTED** in part and **MODIFIED** in part.

IT IS SO ORDERED.

DATED this 28th day of September 2026.

s/Michael J. McShane
Michael J. McShane
United States District Judge